# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
Long Term Capital Holdings, et. al.:
     petitioners                    :
                                    :        Civil Nos.
v.                                  :        3:01cv1290, 3:01cv1291,
                                    :        3:01cv1292, 3:01cv1711,
                                    :        3:01cv1713, 3:01cv1714
                                    :        (JBA)
United States of America,           :
     respondent.                    :
```

## FINDINGS AND OPINION

## Table of Contents

I.   Summary. . . . . . . . . . . . . . . . . . . . . . .1
II.  Factual Background . . . . . . . . . . . . . . . . .4
     A.   Long Term Entities. . . . . . . . . . . . . . .4
     B.   Babcock and Brown ("B&B") and Onslow Trading and
          Commercial LLC ("OTC"). . . . . . . . . . . . .11
     C.   CHIPS and TRIPS Transactions. . . . . . . . . .12
          1.   CHIPS IVA and IVB. . . . . . . . . . . . .13
          2.   TRIPS I. . . . . . . . . . . . . . . . . .19
          3.   Purported Tax Consequences of CHIPS IVA
               and IVB and TRIPS I. . . . . . . . . . . .20
     D.   OTC and Long Term . . . . . . . . . . . . . . .22
          1.   OTC/Long Term Transaction. . . . . . . . .23
          2.   Long Term/B&B/UBS Transaction. . . . . . .27
          3.   Long Term's Tax Returns. . . . . . . . . .29
          4.   B&B and OTC After CHIPS and TRIPS. . . . .30
          5.   The Origin of a Transaction for Long Term. . .35
          6.   Long Term and B&B. . . . . . . . . . . . .38
          7.   Long Term and Shearman & Sterling. . . . .42
          8.   Long Term and King & Spalding. . . . . . .46
               a.   Kuller's Claimed Pre-Tax Expectation
                    of Profit Analysis. . . . . . . . . .51
               b.   Kuller's Credibility. . . . . . . . .55
          9.   Long Term and OTC. . . . . . . . . . . . .59
               a.   Communication Among Long Term's
                    Principals. . . . . . . . . . . . . .59
               b.   Unusual Nature of OTC's
                    Contributions . . . . . . . . . . . .64
               c.   Long Term's and OTC's Intent Regarding
                    the OTC Transaction . . . . . . . . .66
               d.   Scholes' November 12, 1996 Memorandum . .68
          10.  The Turlington Problem . . . . . . . . . .71
          11.  Petitioner's Expert: Frank J. Fabozzi. . . . .75

12.  Scholes' Economic Analysis . . . . . . . . . .78
13.  Government's Expert: Joseph Stiglitz . . . . .82
14.  IRS Audit and Long Term's Response . . . . . .87
III. Discussion . . . . . . . . . . . . . . . . . . .89
A.  Burden of Proof . . . . . . . . . . . . . . . . .89
1.  Cooperation with Reasonable Requests . . . .91
2.  Net Worth. . . . . . . . . . . . . . . . . .99
3.  Conclusion on Burden of Proof. . . . . . . .100
B.  Lack of Economic Substance. . . . . . . . . . . .100
1.  Objective Economic Substance . . . . . . . .104
2.  The Scope of the Transaction for Purposes of
Measuring Costs and Reasonable Expectation
of Return. . . . . . . . . . . . . . . . . .108
3.  Reasonably Expected Return . . . . . . . . .110
4.  Costs of the OTC Transaction . . . . . . . .112
a.  Legal Fees. . . . . . . . . . . . . . .112
b.  "Consulting Arrangement" with B&B . . .115
c.  The Turlington Payment. . . . . . . . .119
d.  Scholes' Allocation and Noe's Bonus . .123
e.  Economic Structure of OTC Contributions .124
f.  B&B's Investment Through UBS. . . . . .129
5.  "Things Economic Happened" - Tr. [Doc. #207]
at 3228:25-3229:1. . . . . . . . . . . . . .134
6.  Subjective Business Purpose. . . . . . . . .136
C.  Step Transaction Doctrine . . . . . . . . . . . .147
D.  Penalties . . . . . . . . . . . . . . . . . . . .157
1.  Burden of Proof. . . . . . . . . . . . . . .158
2.  Gross Valuation Misstatement . . . . . . . .164
3.  Substantial Understatement of Income Tax . .165
a.  Substantial Authority . . . . . . . . .168
b.  Reasonable Belief . . . . . . . . . . .177
4.  Reasonable Cause Exception . . . . . . . . .178
a.  Receipt and Content of King & Spalding
Advice. . . . . . . . . . . . . . . . .181
b.  King & Spalding's Written Opinion . . .186
c.  Long Term's Lack of Good Faith. . . . .192
IV.  Conclusion . . . . . . . . . . . . . . . . . . .195
Appendix - Timeline of OTC Transactional Events . . . . . .196

## I.    Summary

Petitioners Long-Term Capital Holdings ("Holdings"), Long-Term Capital Management L.P. ("LTCM"), Long-Term Capital Portfolio L.P. ("Portfolio"), Long-Term Capital Fund,[1] Eric Rosenfeld, and Richard Leahy filed petitions under 26 U.S.C. § 6226(a)(2) seeking (a) readjustment of the IRS denial of $106,058,228 in capital losses for petitioners' 1997 tax year in connection with the sale by Portfolio on December 30, 1997 of preferred stock for $1,078,400 with a claimed basis of $107,136,628, and (b) a determination that the IRS imposition of penalties pursuant to 26 U.S.C. § 6662(a),(b)(1-3), (h) was erroneous.  Jurisdiction is conferred by 28 U.S.C. § 1346(e). The Court's findings of fact and conclusions of law set out in this opinion are based on the bench trial held June 23, 2003 - July 30, 2003.

Petitioners' claim that Portfolio sold stock on December 30, 1997 with a tax basis one hundred times in excess of its fair

---

[1] Holdings, organized in 1995 under the Delaware Revised Uniform Limited Partnership Act ("DRULPA"), was LTCM's general partner in 1997 and is currently and was during 1996 and 1997 LTCM's tax matters partner.  LTCM, organized in 1994 under DRULPA, is currently and was during 1996 and 1997 the tax matters partner of Long-Term Capital Partners L.P. ("LTCP" or "Partners"). LTCM was owned by the twelve managing partners of Long Term and their families.  LTCP was organized in 1994 under the DRULPA.  Portfolio was organized in 1994 under the laws of the Cayman Islands, and, in 1996 and 1997, was a privately organized pooled investment vehicle, also referred to as a hedge fund.  LTCM, LTCP, and Portfolio were all treated as partnerships for federal tax purposes during 1996 and 1997 with their principal place of business located in Greenwich, Connecticut.  Unless specification is necessary, Holdings, LTCM, Portfolio, and LTCP will be referred to collectively as "Long Term".

1

market value arises from two separate sets of transactions.  The
first set is comprised of nine cross border lease-stripping
transactions, five of which utilized a master lease or wrap lease
structure and were termed "Computer Hardware Investment
Portfolio" ("CHIPS") and four of which utilized a sale/lease back
structure and were termed "Trucking Investment Portfolios"
("TRIPS").

In the CHIPS transactions, Onslow Trading and Commercial LLC
("OTC"), an entity incorporated under the laws of the Turks and
Caicos Islands, purportedly leased from General Electric Capital
Computer Leasing ("GECCL") computer equipment already subject to
existing leases to end-users and then immediately subleased its
rights in the equipment to U.S. based partnerships.  The new
sublessees then pre-paid 92.5% of the rent due under the
subleases.  The prepayments, totaling tens of millions of
dollars, were made with loans to the U.S.-based partnerships from
Barclays Finance & Leasing B.V. ("Barclays") and were guaranteed
by GECCL.  OTC, formed under foreign laws and resident in the
United Kingdom, paid no U.S. taxes upon receipt of the rent
prepayments and deposited them into a Barclays branch bank
account.  OTC then exchanged the master leases, the subleases and
the bank accounts with the prepayment deposits for preferred
stock in certain U.S. corporations; OTC received approximately
$1,000,000 in preferred stock for every $100,000,000 of

2

prepayments and lease positions it gave up.  OTC's transfer was timed to be prior to accrual of rent under the subleases such that under UK law OTC paid no taxes on the prepayments.  Pursuant to 26 U.S.C. §§ 351, 358, these exchanges were claimed to be tax free exchanges and OTC claimed an adjusted basis in the preferred stock tranches it received of approximately $100,000,000.

In the TRIPS transactions, Wal-Mart sold fleets of trucks to NationsBanc and First American National Bank, the banks leased the trucks to OTC, and OTC subleased the trucks back to Wal-Mart. Wal-Mart guaranteed OTC's obligations to the banks and prepaid a percentage of the rent due under the sublease.  In TRIPS I, the prepayment was 92.5% of the rent due, approximately $27 million, which OTC deposited in a bank account.  Again, before the sublease rent accrued, OTC exchanged its lease positions and bank deposits for preferred stock of American corporations.  The ratio of exchange again approximated $1 of preferred stock received for every $100 of lease positions and prepayment deposits given up.

OTC, in a purported transaction under 26 U.S.C. § 721, contributed to Long Term the tranches of preferred stock it received from the TRIPS and CHIPS transactions, which had a fair market value of approximately $4 million and a claimed basis of $400 million, in exchange for a Long Term partnership interest. OTC subsequently sold its partnership interest to Long Term and withdrew from the partnership.  Long Term then had Portfolio sell

3

a portion of the contributed TRIPS and CHIPS stock to purportedly generate the claimed losses in dispute in this case and those losses were allocated to Long Term under the loss allocation rules of U.S. partnership tax law.[2]

For the reasons set forth below, the Court finds that the transaction in which OTC and Long Term engaged lacked economic substance and therefore must be disregarded for tax purposes, and, in the alternative, must be recast under the step transaction doctrine as a sale of preferred stock by OTC to Long Term resulting in an adjustment in Long Term's basis in the preferred stock to Long Term's purchase price. With respect to penalties, the Court rejects Long Term's contention that it satisfied the requirements of the reasonable cause defense to such penalties by obtaining legal opinions, and upholds the IRS application of 40% gross valuation misstatement and 20% substantial understatement penalties related to Long Term's claim of basis in OTC's contributed stock. Accordingly, the petitions are DENIED in all respects.

## II.  Factual Background

### A.  Long Term Entities

Long Term's origins can be traced to late 1992 and January

---

[2] A brief time line highlighting OTC's transactional role in CHIPS IVA, CHIPS IVB, TRIPS I, and with Long Term is set forth as an Appendix.

4

1993, when founding principals John Meriwether, Eric Rosenfeld,[3] James McEntee, and Robert Merton[4] began discussing the prospect of creating a hedge fund[5] to execute strategies using leveraged investments keyed to arbitrage opportunities in large bond markets.  They used 1993 and early 1994 to raise money, find principals, locate office space, and hire employees.  Ultimately, Long Term had twelve founding principals, including Meriwether, Rosenfeld, Merton, and Myron Scholes.[6]  In March 1994,  Long Term began to manage the investments it had raised.  The principals themselves invested more than $100,000,000 in Long Term when the fund began its operations in 1994, and they sought to increase their individual investments throughout Long Term's active operation, including through loans to LTCM, investment of LTCM's

---

[3] Dr. Rosenfeld holds a Ph.D. in finance from M.I.T. and taught for five years at Harvard Business School.  Rosenfeld was Long Term's trial representative.

[4] Dr. Merton, a professor of finance at Harvard Business School since 1988 and previously on the faculty of MIT's Sloan School of Management (1970-1988) teaching finance, investment banking, and corporate finance, was jointly awarded the Nobel Prize in 1997 for his work on derivatives and option pricing.

[5] A hedge fund is an investment vehicle in which sophisticated institutions and individuals of high net worth pool investments.  Because of the level of sophistication required to invest in a hedge fund and other requirements, such funds are not subject to extensive regulation and are permitted to pursue a wide range of investment strategies.  The core business of the hedge fund is to earn high returns for investors.

[6] Dr. Scholes was a professor at M.I.T., University of Chicago, and Stanford University from 1967 to 1995, and was awarded the Nobel Prize in economics in 1997 for development of a methodology for valuing options, commonly referred to as the "Black Scholes Option Pricing Model," and for the application and use of the model for risk management.  Dr. Scholes co-authored "Tax and Business Strategy: A Planning Approach", which covers various tax concepts, such as economic substance, business purpose, and the step transaction doctrine.

working capital into Portfolio, and reinvestment of their individual investment profits into Portfolio. During 1994 and 1995, Scholes was giving explanatory presentations about the fund to prospective investors. He also worked closely with Long Term's counsel in structuring Long Term's private placement memoranda, which described the legal rights of investors, the objectives of an investment in the fund, and the risks involved with an investment. By 1996, Long Term had grown to 150 employees with twelve managing partners and offices in Greenwich, Connecticut, London, and Tokyo, and was managing five to six billion dollars of equity. Long-Term had a diverse group of investors, most of which were institutional investors, including a number of investment banking firms, but some of which were high net worth individuals. Two-thirds of its investors were located overseas.

Meriwether was the managing partner from March 1994 until at least 1996. As established and advanced by him, the twelve Long Term principals operated on a consensus management model, in which all twelve participated in managerial decisions, no votes were taken, and all had to agree or Long Term did not move forward with a proposed course of action. The principals participated in risk management meetings at least weekly. Meriwether would delegate particular issues or responsibilities to committees or principals who then bore the burden of

6

explaining substantive issues and recommending courses of action.
Scholes was the principal primarily in charge of the "OTC"
transaction that figures centrally in this case.  Larry Noe,
hired in early 1996 as Long Term's in-house tax counsel, worked
closely with Scholes on the tax issues related to the OTC
transaction.[7]

Long Term operated with a three-tiered structure: LTCM was
the top tier and managed all of the affairs of Long Term
generally; Portfolio, the hedge fund, was the bottom tier into
which all investments flowed; and in the middle tier were various
investment vehicles, including LTCP, a U.S. domestic limited
partnership, which served as conduits to pool all investments in
Portfolio.  Multiple mid-tier investment vehicles were used in
large part to avoid complexities arising from laws of different
countries by pooling assets from investors from particular
countries.  Thus, generally, foreign investors did not invest in
Portfolio via LTCP but through overseas investment vehicles only.
LTCP was the only investment vehicle that was treated as a

---

[7] Noe worked as Director of Taxes and Tax Counsel at Long Term from 1996
to 1999.  His academic and professional history demonstrate sophistication in
the area of federal taxation: he was a tax associate at Coopers & Lybrand from
1982 to 1989 and a partner in the firm's tax accounting services group or
financial services group from 1989 to 1996; he also received an LLM in tax
from New York University in 1986.  While at Long Term, Noe was responsible for
overall tax planning and compliance, including tax return preparation.  Both
through a partnership tax course at NYU and through work with clients, Noe had
developed a detailed familiarity with federal partnership tax law.  Long Term
viewed Noe as its in-house tax expert and Noe served primarily to report to
the management committee on tax matters.  Long Term had a tax committee
consisting of principals Myron Scholes, Larry Hilibrand, and Victor Haghani.
Noe worked most closely with Scholes.

partnership under U.S. federal income tax laws.

Simpson Thacher Bartlett LLP was regular outside counsel for Portfolio during the 1994 to 1998 time frame, although LTCM utilized a number of different law firms depending on which one it considered best suited for particular problems as they arose. Prior to the OTC-related transactions at issue in this case, Long Term had not used the law firm of Shearman & Sterling.

Long Term established general investing requirements, including minimum capital investment amounts and time periods, although the principals retained discretion to vary these terms for particular investors. The minimum investment required when Long Term began was $10 million but under certain circumstances Long Term accepted investments smaller than that amount. See e.g. infra note 9. Initially, Long Term required new investments to be committed for a three year period but allowed investors to remove their profits generated from the initial investment on a yearly basis. Early on, however, Long Term realized that the three year lock-in would result in a lumpy capital structure if investors elected to remove their capital at the expiration of the three year period, and it adjusted its investing requirements to permit investors to remove a third of invested capital annually. In addition, investors were required to obtain Long Term's permission to pledge or assign their partnership interest. Taking on new investors was a fairly routine matter that did not

8

typically require substantial outlay of expenses for legal advice
or opinions.

LTCM charged fees on all equity capital invested in
Portfolio: a two percent annual management fee calculated on a
quarterly basis from the equity capital invested in Portfolio;
and an incentive or performance fee of twenty-five percent of the
gross return of Portfolio in excess of the two percent management
fee.[8]

In late 1995, Long Term was running out of investment
strategies and "closed" Portfolio to new investors, prompted by
concern that continued expansion of its equity capital base would
compromise its ability to continue to earn the high returns
obtained for investors in 1994 and 1995.  "Closed," however, did
not mean that LTCM would not accept new investors under any
circumstances.  Rather, Portfolio remained open, in the
discretion of the principals, to investors who provided strategic
benefits or advantages to Long Term.[9]  A strategic investor was

---

[8] There appears also to have been a provision termed a "high water
mark," Tr. [Doc. #186] at 2224:24, pursuant to which Long Term would earn no
fees in any year following one in which Portfolio had lost money.

[9] Private trading of shares in Long Term after the fund had closed
caused LTCM to realize there were a number of entities who desired to invest
in Portfolio and some who were paying a premium to existing investors to do
so.  LTCM recognized that the market had placed a value on simply being able
to invest in Portfolio and therefore believed it could use such value in
exchange for strategic alliances.

One example of a strategic investor was Michael Ovitz, then president of
Disney, who was permitted to invest $5 million in Long Term in late 1996.
Long Term considered Ovitz strategic because of his business connections
generally and in China specifically, Disney's name recognition and financial
position, and the fact that Disney was not in the finance business.

one that Long Term believed added value over and above the normal fees earned on any investment; procurement of fees alone did not constitute "strategic value."[10]

Long Term had an unrestricted right to redeem an investor's interests. In late 1997, following investors declining voluntary dividends in early summer, Long Term decided to return approximately $2.7 billion in capital to its investors,[11] having concluded after extensive debate within the management committee that a reduction in capital was more in keeping with achieving a certain return relative to an agreed risk level.[12] After the capital return, Portfolio had a balance sheet of $5 billion, and its investment positions were virtually unchanged although supported by less equity. No capital was returned to LTCM so that its stake in Portfolio increased from 30 to 45 percent.

---

[10] From mid-1996 to the end of 1997, approximately fifteen "strategic" investors were permitted to make new or additional contributions to Portfolio. Several were foreign banks which augmented Long Term's global network, constituting "eyes and ears from around the world," Tr. [Doc. #188] at 2264:17, and thus could provide help in identifying local regional opportunities, including obtaining financing for positions in those opportunities. Similarly, the Tang family foundation from Palo Alto, California was permitted to invest because of its potential to help Long Term with contacts in Southeast Asia. Other investors, such as three senior partners from Bear Stearns and the senior management of Merrill Lynch were considered strategic because Long Term worked closely with those firms in the conduct of its business and wanted to maintain those relationships.

[11] While the formula for determining the amount of the mandatory return to investors was established in September 1997, the $2.7 billion figure was not decided upon until later and the actual return of capital was made on December 31, 1997.

[12] Rosenfeld termed this a "controversial decision," Tr. [Doc. #188] at 2253:20-21, testifying that some principals advocated raising additional capital to reduce Portfolio's risk and others urged reducing capital to maintain high returns for investors.

Long Term's historical gross returns (without deduction of
fees) were 28% for the ten months of its operation in 1994,
58.77% for 1995, 57.46% for 1996, and at least 21.55% in 1997.
During only nine months in this 1994-1997 time period was its
overall return negative although there was a decline in expected
returns.  Long Term examined its portfolio annually to adjust its
expected return figure, making conservative estimates which only
considered existing positions and did not account for new profit
opportunities.  When first marketing the fund, Long Term told
investors it thought it could make a 30% to 40% overall return.
In Summer 1997, concurrent with its request that investors take a
voluntary dividend, Long Term advised investors that investing
opportunities had decreased and percentage expected returns to
them would be mid-teens (with expected gross returns in the low
20s).  Internally, Long Term "thought [it was] going to make 30
to 40 percent gross returns in '94, ... low 20s in '97, and maybe
mid-20s in 1996...."  Tr. [Doc. #188] at 2271: 17-20.


**B.    Babcock and Brown ("B&B") and Onslow Trading and
        Commercial LLC ("OTC")**

B&B is a San Francisco-based investment banking firm in the
business of asset-based financing, including acquisition and sale
or management of assets and advising on the same.  Richard
Koffey, formerly a partner at the law firm of Morgan, Lewis, and
Bockius, where he specialized in leveraged lease transactions,

11

joined B&B in 1987.  OTC was incorporated under the laws of the
Turks and Caicos Islands on June 29, 1994, by three United
Kingdom principals, Sir Geoffrey Leigh, Dominique Lubar, and
Gregory Wills.  Each principal capitalized OTC with a
contribution of $2,500 and a personal loan commitment of $1.5
million.

### C.    CHIPS and TRIPS Transactions

Two types of cross-border leasing transactions, CHIPS and
TRIPS, are claimed by petitioners to have produced the basis in
the preferred stock which Portfolio sold in 1997 to generate
claimed capital losses of over one hundred million dollars
allocated to LTCM but disallowed by the IRS.  Koffey was the
principal designer and mastermind of both CHIPS and TRIPS, and
Shearman & Sterling advised B&B on their structure, issuing legal
opinions that the leases involved therein were true leases.  OTC
was formed specifically for the purpose of participating in the
CHIPS and TRIPS leasing transactions because a U.K. entity was
needed to create the purported tax benefits created by the
transactions.[13]  Five CHIPS transactions were completed and a
sixth was unwound after it had begun.  While the details of each
CHIPS and TRIPS transaction differ slightly, each type shared a

---

[13] OTC principal Wills testified that he understood the entirety of the
CHIPS structure to have been created for "tax planning in some way or other."
Pets.' Ex. 438 34:16-18; see also id. at 24:22-25:1.

common structure.  The Court focuses only on the transactions the parties have denominated CHIPS IVA and IVB and TRIPS I as those are the transactions that produced the lots of preferred stock sold by Portfolio in 1997 purportedly to generate the tax losses claimed by petitioners.  Because the Court finds it unnecessary to address the economic substance of the CHIPS IVA and IVB and TRIPS I transactions, applicability of the step-transaction doctrine to them, or whether the purported 26 U.S.C. § 351 tax free exchange embedded in them in fact generated stock in the hands of OTC with the tax basis Long Term claims (three legal theories proposed by the Government), the Court will only set out background details on these transactions between OTC and Long Term necessary for understanding the Court's conclusions.[14]

### 1.   CHIPS IVA and IVB

The CHIPS IVA transaction employed the following steps, all of which except the last took place on July 5, 1995:

1.   OTC entered into a Master Lease Agreement ("CHIPS IVA Master Lease") with General Electric Capital Computer Leasing, Inc. ("GECCL").  The CHIPS IVA Master Lease was for a term of approximately 60 months and set out the terms for leasing

---

[14] The summary of the CHIPS IVA and IVB and TRIPS I transactions is for the sole purpose of describing the form of those transactions and no terminology used in the descriptions is intended to convey any conclusion regarding the actual substance of the transactions or their characterization for federal tax purposes.

computer hardware equipment ("CHIPS IVA Equipment") to OTC, subject to existing leases to end users previously entered into by GECCL ("User Leases"). The User Leases had an average duration of 36 months, denominated the "Base Term" in the CHIPS IVA Master Lease. The period from the end of the Base Term to the end of the CHIPS IVA Master Lease was denominated the "Supplemental Term."

2.    OTC also entered into an Agreement of Sublease ("CHIPS IVA Sublease") with Britamer Computer Co., L.P. ("Britamer"). Britamer was a partnership of B&B and a company called Cebern.[15] The CHIPS IVA Sublease provided for the sublease of the CHIPS IVA Equipment from OTC as sublessor to Britamer as sublessee, and was for a term of approximately 46 months. During the period of overlap between the CHIPS IVA Master Lease and the CHIPS IVA Sublease, Britamer was entitled to receive rents generated by the User Leases, OTC was entitled to receive rents from Britamer, and GECCL was entitled to receive rents from OTC.

3.    Britamer entered into a Loan Agreement with Barclays Financial & Leasing B.V. ("Barclays B.V.") pursuant to which Britamer borrowed $46,133,860.27, or 91.5% of the present value

---

[15] The name of the sublessee entity was changed as the CHIPS transactions progressed. The purpose for the name changes is suggested in an e-mail dated March 10, 1995, from Koffey to Jan Blaustein Scholes, B&B's general counsel responsible for setting up Britamer and the other sublessee entities: "For our CHIPS III entity let's use a name unrelated to CBB. It makes it just a bit harder for the IRS to link all the deals together." Govt.'s Ex. 191.

14

of the rents due to Britamer under the User Leases.

4.    Britamer prepaid to OTC $46,638,053, or 92.5% of the present value of the rents due to Britamer under the User Leases (the "Britamer Prepayment").

5.    OTC used the Britamer Prepayment to purchase a U.S. Treasury Bill in the amount of $46,633,446 ("CHIPS IVA Treasury Bill").

6.    GECCL and Barclays (PLC) Guaranty entered into a guaranty agreement (the "Barclays/GECCL Guaranty") whereby Barclays (PLC) guaranteed payment of a portion of the rent due to GECCL under the CHIPS IVA Master Lease in an amount equal to the future value of the Britamer Prepayment.

7.    OTC and Barclays (PLC) entered an agreement ("CHIPS IVA Onslow Agreement") whereby OTC agreed (a) to reimburse Barclays (PLC) for any amount paid under the Barclays/GECCL Guaranty, (b) granted a security interest in the CHIPS IVA Treasury Bill to Barclays (PLC) as collateral to secure OTC's obligations under the CHIPS IVA Onslow Agreement, and (c) agreed to provide substitute collateral in the future in the form of U.S. Treasury obligations or a deposit account at Barclays Finance Corporation of the Cayman Islands, Ltd. ("Barfinco").

8.    GECCL and Britamer entered into a Service and Remarketing Agreement providing that GECCL would, for a fee, perform the servicing of the leases and be responsible for

15

remarketing any CHIPS IVA Equipment at the expiration or termination of the User Leases.

9.    On August 4, 1995, OTC and Quest & Associates, Inc. ("Quest") entered into an Exchange Agreement (the "Quest Exchange Agreement").  Quest was an existing subsidiary of the Interpublic Group of Companies, Inc. ("Interpublic").  Under the Quest Exchange Agreement, OTC transferred its purported interests in the CHIPS IVA Master Lease, the CHIPS IVA Sublease, the CHIPS IVA Treasury Bill and the CHIPS IVA Barfinco deposit account (the "Quest Exchange Property") to Quest in return for 505 shares of Quest preferred stock (the "Quest Preferred Stock").  Also on August 4, 1995, Interpublic contributed $2,510,000 to Quest in exchange for 510 shares of Series A preferred stock.

The CHIPS IVB transaction employed the following steps, all of which except the last took place on July 5, 1995:

1.    OTC entered into a Master Lease Agreement ("CHIPS IVB Master Lease") with GECCL.  The CHIPS IVB Master Lease was for a term of approximately 60 months, and set the terms for the leasing of computer hardware equipment ("CHIPS IVB Equipment") to OTC subject to existing User Leases with an average duration of 36 months (the "Base Term" under the CHIPS IVB Master Lease). The period beginning with the end of the Base Term until the end of the CHIPS IVB Master Lease was denominated the "Supplemental Term."

16

2.    OTC entered into an Agreement of Sublease ("CHIPS IVB Sublease") with Briternational Computer Co., L.P. ("Briternational"), providing for the sublease of the CHIPS IVB Equipment from OTC as sublessor to Briternational as sublessee for a term of approximately 46 months.  Similar to CHIPS IVA, during the period of overlap between the CHIPS IVB Master Lease and the CHIPS IVB Sublease, Briternational was entitled to receive rents generated by the User Leases, OTC was entitled to receive rents from Britamer, and GECCL was entitled to receive rents from OTC.

3.    Briternational entered into a Loan Agreement with Barclays B.V. pursuant to which Briternational borrowed 91.5% of the present value of the rents due to it under the User Leases.

4.    Briternational prepaid to OTC $33,824,986.53 (92.5% of the present value of the rents due to Briternational under the User Leases (the "Briternational Prepayment")).

5.    OTC used the Briternational Prepayment to purchase a U.S. Treasury Bill in the amount of $33,816,182 ("CHIPS IVB Treasury Bill").

6.    GECCL and Barclays (PLC) Guaranty entered into a guaranty agreement (the "CHIPS IVB Barclays/GECCL Guaranty") whereby Barclays (PLC) guaranteed payment of a portion of the rent due to GECCL under the CHIPS IVB Master Lease in an amount equal to the future value of the Briternational Prepayment.

17

7.    OTC and Barclays (PLC) entered an agreement ("CHIPS IVB Onslow Agreement") in which OTC agreed (a) to reimburse Barclays (PLC) for any amount paid under the Barclays/Guaranty, (b) granted a security interest in the CHIPS IVB Treasury Bill to Barclays (PLC) as collateral to secure OTC's obligations under the CHIPS IVB Onslow Agreement, and (c) agreed to provide substitute collateral in the future in the form of U.S. Treasury obligations or a deposit account at Barfinco.

8.    GECCL and Briternational entered into a Service and Remarketing Agreement providing that GECCL would, for a fee, perform the servicing of the leases and be responsible for remarketing any CHIPS IVB Equipment at the expiration or termination of the User Leases.

9.    On August 2, 1995, OTC and Rorer International Corporation ("Rorer") entered into an Exchange Agreement (the "Rorer Exchange Agreement").    Rorer was an existing subsidiary of Rhone-Poulenc Rorer, Inc. ("RPR").    Under the Rorer Exchange Agreement, OTC transferred its purported interests in the CHIPS IVB Master Lease, the CHIPS IVB Sublease, the CHIPS IVB OTC/Barclays Guaranty, the CHIPS IVB Treasury Bill and the CHIPS IVB Barfinco deposit account, the TRAC Lease, the TRIPS Sublease and the TRIPS Deposit (the "Rorer Exchange Property")[16] to Rorer in return for 6,600 shares of Series B preferred stock issued by

---

[16] The TRIPS transaction giving rise to the TRAC lease, the TRIPS Sublease and the TRIPS Deposit is described _infra_.

18

Rorer (the "Rorer Preferred Stock").  Also on August 2, 1995,
another RPR subsidiary, Rorer Pharmaceutical Products Inc.
("RPPI"), contributed $10 million to Rorer in exchange for an
amount of Rorer common stock equal to approximately 33.11% of the
total issued and outstanding Rorer common stock.

### 2.   TRIPS I

The TRIPS I transaction employed the following steps:

1.   On June 30, 1995, OTC entered into a TRAC Lease
agreement (the "TRAC Lease") with NationsBanc Corporation of
North Carolina ("NationsBanc"), which provided for the lease of
long-haul truck tractors ("TRIPS Equipment") to OTC.  The TRAC
Lease was for a term of 4.5 years.

2.   On June 30, 1995, OTC entered into a Sublease agreement
(the "TRIPS Sublease") with Wal-Mart Stores, Inc. ("Wal-Mart"),
which provided for the sublease of the TRIPS Equipment from OTC
as sublessor to Wal-Mart as sublessee.  The TRIPS Sublease was
for a term of 4.5 years.

3.   On July 5, 1995, Wal-Mart prepaid to OTC $26,773,985,
or 92.5% of the present value of the rents due to OTC under the
TRIPS Sublease (the "Wal-Mart Prepayment").

4.   OTC deposited with Sanwa Bank Ltd. ("Sanwa") the Wal-
Mart Prepayment of $26,687,000 ("TRIPS Deposit").

5.   OTC granted a security interest in the TRIPS Deposit as

19

collateral security to secure its obligations under the TRAC Lease.

6.    As described above, on August 2, 1995, OTC and Rorer International Corporation ("Rorer") entered into an Exchange Agreement (the "Rorer Exchange Agreement").  Rorer was an existing subsidiary of Rhone-Poulenc Rorer, Inc. ("RPR").  Under the Rorer Exchange Agreement, OTC transferred its purported interests in the CHIPS IVB Master Lease, the CHIPS IVB Sublease, the CHIPS IVB OTC/Barclays Guaranty, the CHIPS IVB Treasury Bill and the CHIPS IVB Barfinco deposit account, the TRAC Lease, the TRIPS Sublease and the TRIPS Deposit (the "Rorer Exchange Property") to Rorer in return for 6,600 shares of Series B preferred stock issued by Rorer (the "Rorer Preferred Stock").  Also on August 2, 1995, another RPR subsidiary, Rorer Pharmaceutical Products Inc. ("RPPI"), contributed $10 million to Rorer in exchange for an amount of Rorer common stock equal to approximately 33.11% of the total issued and outstanding Rorer common stock.

### 3.    Purported Tax Consequences of CHIPS IVA and IVB and TRIPS I

The CHIPS and TRIPS transactions were designed to take advantage of OTC's status as a foreign entity not subject to U.S. taxes, the United Kingdom's tax laws under which prepayments of rent are not taxed until rent actually accrues, and U.S. tax law

regarding non-recognition incorporation transactions.  In theory,
the prepayments OTC received were not taxable to it under U.S.
tax law because of its foreign entity status, and were not
taxable under U.K. law because, as "prepayments," rents had not
yet accrued under the subleases.  Based on this theory, OTC's
business plan called for OTC to transfer its purported lease
interests, treasury bills, and bank deposits associated with any
particular CHIPS and TRIPS transaction as soon as it could
identify an appropriate American corporation (Quest in CHIPS IVA
and Rorer in CHIPS IVB and TRIPS I) to take them over.  It was
OTC's expectation that the transfer could be accomplished in a
couple of months and thus would be effected prior to any accrual
of rent.  Each transfer was cast as a tax free incorporation
under 26 U.S.C. § 351 pursuant to which the American corporation
claimed no recognition of income from the prepayments it received
from OTC (Quest and Rorer combined received approximately $100
million in prepayments in CHIPS IVA, CHIPS IVB, and TRIPS I), and
OTC, although receiving in exchange preferred stock only valued
at a small fraction of the prepayments it exchanged
(approximately $1 million for CHIPS IVA, CHIPS IVB, and TRIPS I),
was not required to adjust its carry over basis in stock under
26 U.S.C. § 358 from the purported tax basis it claimed to have
had in the prepayments prior to the exchange.  B&B required the
American corporations to pay it several million dollars in fees

21

per transaction.  In this way, the income represented by prepayments of rent was never taxed but was claimed to have been stripped away from the corresponding deductions the American corporations claimed after making the rental payments required of them under the master leases with withdrawals from the bank accounts received from OTC.  In sum, for every approximately $1 million in preferred stock and several million dollars in fees to Koffey and B&B with which the American corporations parted, they received in exchange guaranteed tax savings of $40 million (approximately $100 million in deductions multiplied by corporate tax rates).

B&B next endeavored to transfer the capital losses claimed to be inherent in OTC's preferred stock (for CHIPS IVA, CHIPS IVB, and TRIPS I purportedly having a fair market value of $1 million but a carry over tax basis one hundred times that amount) to a U.S. tax paying entity.

### D.   OTC and Long Term

The following outline of the structure of both the transaction in which OTC and Long Term engaged as well as the transactions in which Long Term, B&B, and Union Bank of Switzerland ("UBS") participated provides the background for the Court's holdings that the transaction in which OTC and Long Term engaged lacked economic substance and therefore must be

22

disregarded for tax purposes, and, in the alternative, must be recast under the step transaction doctrine as a sale of preferred stock by OTC to Long Term.

### 1. OTC/Long Term Transaction

On August 1, 1996, OTC acquired a limited partnership interest in LTCP. Pursuant to a subscription agreement dated August 1, 1996, OTC contributed cash in the amount of $2,833,451 and preferred stock with a market value of $2,506,549 to LTCP in exchange for a partnership interest with an initial capital account of $5,340,000. The preferred stock contributed to LTCP by OTC on August 1, 1996 consisted of the Rorer Preferred Stock, as well as other preferred stock that OTC acquired in other CHIPS transactions.[17]

On August 1, 1996, LTCM (UK), a United Kingdom limited partnership,[18] made a secured, recourse loan to OTC in the amount of $5,010,451. This loan bore interest at the market rate of 7% per annum and had a maturity date of November 21, 1997. From the

---

[17] Based upon bid estimates provided by Salomon Brothers, Inc. ("Salomon") on July 31, 1996, for settlement on that date, and including accrued dividends through that date, the Rorer Preferred Stock received by LTCP on August 1, 1996 had a fair market value of $616,058. The other preferred stock received by LTCP on August 1, 1996 included 9,850 shares of Rorer Series A preferred stock with a fair market value of $916,767, and 100,000 shares of Power Investment Corporation (a subsidiary of Electronic Data Systems or "EDS") with a fair market value of $973,724.

[18] LTCM (UK) and LTCM essentially had common ownership. Any difference was not "supposed to be material [or] economically meaningful." Tr. [Doc. #182] at 1738:16-20.

proceeds of this loan, OTC used $2,833,451 to fund its cash contribution to LTCP, $2,116,000 to repay existing indebtedness that encumbered the contributed stock, and $61,000 to purchase two put options from LTCM.  The loan was secured by OTC's limited partnership interest in LTCP and the two put options.

The two put options sold by LTCM to OTC on August 1, 1996 were a "liquidity put" and a "downside put."  The liquidity put provided OTC with the option to sell its partnership interest in LTCP to LTCM during the period October 27, 1997 through October 31, 1997, at a strike price equal to the net asset value of its partnership interest as determined under the LTCP partnership agreement.  OTC paid LTCM $1,000 for the liquidity put.

The downside put provided OTC with the option to sell its partnership interest in LTCP to LTCM during the period October 27, 1997 through October 31, 1997, at a strike price equal to $5,340,000 (the value of OTC's initial capital account with LTCP).  OTC paid LTCM $60,000 for the downside put.

On August 1, 1996, the preferred stock and cash contributed to LTCP by OTC was contributed by LTCP to Portfolio.  As a result, LTCP received an increase in its capital account in Portfolio of $5,340,000.

On November 1, 1996, OTC acquired an additional limited partnership interest in LTCP.  Pursuant to a subscription agreement dated November 1, 1996, OTC contributed cash in the

24

amount of $3,356,467 and preferred stock with a market value of $1,643,533 to LTCP in exchange for a partnership interest with an initial capital account in LTCP of $5,000,000.  The preferred stock contributed to LTCP by OTC on November 1, 1996 consisted of the Quest Preferred Stock as well as other preferred stock that OTC acquired in other CHIPS transactions.[19]

On November 1, 1996, LTCM (UK) made another secured, recourse loan to OTC in the amount of $4,316,842 with market rate interest again of 7% per annum and with a maturity date of November 21, 1997.  From the proceeds of this loan , OTC used $3,356,467 to fund its cash contribution to LTCP, $900,375 to repay existing indebtedness that encumbered the contributed stock, and $60,000 to purchase two put options from LTCM.  This loan, too, was secured by OTC's limited partnership interest in LTCP and the two put options.

As previously, the two put options sold by LTCM to OTC on November 1, 1996 included a liquidity put and a downside put. The liquidity put provided OTC with the option to sell its partnership interest in LTCP to LTCM during the identical period as before, October 27, 1997 through October 31, 1997, at a strike

---

[19] Based upon bid estimates provided by Salomon on October 29, 1996, for settlement on October 31, 1996, and including accrued dividends through that date, the Quest Preferred Stock received by LTCP on November 1, 1996 had a fair market value of $534,504.  The other preferred stock received by LTCP on November 1, 1996 included 900 shares of Mt. Vernon Leasing, Inc. (a subsidiary of Advanta Corporation) Series B preferred stock with a fair market value of $816,522, and 320 shares of Mt. Vernon Series C preferred stock with a fair market value of $292,507.

price equal to the net asset value of the partnership interest as determined under the LTCP partnership agreement.  OTC paid LTCM $1,000 for the liquidity put.

The downside put provided OTC with the option to sell its partnership interest in LTCP to LTCM during the period October 27, 1997 through October 31, 1997, at a strike price equal to $5,000,000.  OTC paid LTCM $59,000 for the downside put.

On November 1, 1996, the preferred stock and cash contributed to LTCP by OTC was contributed by LTCP to Portfolio resulting in an increase in LTCP's capital account in Portfolio of $5,000,000.

On October 28, 1997, OTC exercised its August 1, 1996 and November 1, 1996 liquidity put options and OTC sold its limited partnership interests in LTCP to LTCM as of October 31, 1997, for $12,614,188, an amount representing the aggregate fair market value of OTC's capital account in LTCP on October 31, 1997. Based upon the total investment in LTCP by OTC in 1996 and 1997, LTCM earned management and incentive fees of $1,061,848.

Based upon bid estimates provided by Salomon, on December 30, 1997, Portfolio sold the Rorer Preferred Stock to an affiliate of Merrill Lynch & Co., Inc. ("Merrill") for $613,800, which represented the fair market value of that preferred stock on December 30, 1997.  On December 30, 1997, Portfolio sold the Quest Preferred Stock to an affiliate of Merrill for $464,600,

26

which represented the fair market value of that preferred stock on December 30, 1997.

### 2.    Long Term/B&B/UBS Transaction

Effective September 1, 1996, Carillon LLC ("Carillon"), a partnership whose partners included members of B&B, purchased a call option from UBS for a premium of $2,001,650, which provided that on August 31, 2001, Carillon could acquire from UBS an interest in LTCP representing the growth in a $30,000,000 capital account on September 1, 1996, for a strike price of $44,000,000. The call option had an expiration date of August 31, 2001.

Effective September 1, 1996, UBS invested $30,000,000 in Long-Term Capital, Ltd., a Cayman Islands company ("LTCL") and purchased a put option from LTCM for a premium of $2,349,000, which provided that on August 31, 2001, UBS could sell to LTCM an interest in LTCL representing a $30,000,000 capital account on September 1, 1996, for a strike price of $44,000,000. The put option had an expiration date of August 31, 2001.

As of January 1, 1997, Carillon purchased another call option from UBS for a premium of $1,700,000, which provided that on December 31, 2001, Carillon could acquire from UBS an interest in LTCP representing a $20,000,000 capital account on January 1, 1997 for a strike price of $28,520,000. The call option had an expiration date of December 31, 2001.

27

Also effective January 1, 1997, UBS invested $20,000,000 in LTCL and purchased a put option from LTCM for a premium of $1,700,000, which provided that on December 31, 2001, UBS could sell to LTCM an interest in LTCL representing a $20,000,000 capital account on January 1, 1997, for a strike price of $28,520,000.  The put option had an expiration date of December 31, 2001.

Through the end of 1997, LTCM earned management and incentive fees from the UBS investments made as part of the first UBS/B&B transaction of $3,597,504 and $1,580,387 from the second UBS/B&B transaction.  The total fees earned by LTCM in 1996 and 1997 from both of these investments was $5,177,891.

As the structure and how UBS viewed the transaction makes apparent, these transactions were essentially a loan to Long Term from UBS at the LIBOR[20] rate plus fifty basis points.  Ronald Tennenbaum, head of global fund coverage at UBS during 1996 and UBS' representative working with Scholes on the transaction, described the sale of call options to Carillon and UBS' corresponding purchase of put options from Long Term:

"[E]ssentially it works into a lending type of transaction .... But it looks more like a lending type transaction, or a use of balance sheet type transaction, where you are basically buying

---

[20] "'LIBOR' stands for London Interbank Offered Rate, the rate at which top-rated banks in the European money market provide funding to each other." Thrifty Oil Co. v. Bank of America Nat'l Savings and Trust Assoc., 322 F.3d 1039, 1043 n.2 (9th Cir. 2002).

something today and selling it in 5 years time, so you need to earn interest over that period. Then the question becomes 'okay, what rate of interest is appropriate given the risk,' and that was deemed to have been 50 basis points over LIBOR on the first transaction and then, you know, we made a little bit more on the second transaction." Govt. Ex. 436 at 9:14-23; see also id. at 49:21 ("I thought we were being paid for essentially lending money...."). Accordingly, UBS primarily focused on the strike price and exercise date of the options in negotiations with Scholes and Long Term and did not negotiate with B&B at all over the cost of the call options but left that matter to Long Term and B&B. UBS' lending risk was the possibility that Long Term would not be able to perform if and when UBS put its options to Long Term at their respective strike prices.[21]

### 3.   Long Term's Tax Returns

Rosenfeld was the tax matters partner for Long Term and responsible for ensuring the timely filing of accurate tax returns. He accomplished his task by delegating responsibility

---

[21] The use of options originated with B&B's desire for a leveraged investment in Portfolio to reduce commitment of its working capital and for downside protection from Long Term. B&B thus generated the idea of purchasing the call options from LTCM to facilitate participating in the upside of Portfolio while simultaneously maintaining downside protection on any investment simply by not exercising. Scholes suggested B&B obtain the call options from UBS so that Long Term would not also have to make a corresponding investment in Portfolio to protect against a call option it itself wrote. UBS in turn, for facilitating B&B's investment in Long Term by means of call options, required that it be permitted to invest in Portfolio with downside protection, namely, the put options.

to Noe and outside accountants, including Price Waterhouse,
expecting them to look at and raise important issues for his
consideration.  Long Term claimed losses of $106,058,228
resulting from the sale of Quest and Rorer preferred stock on its
U.S. Return of Partnership Income (Form 1065) for its 1997 tax
year.  This claim was premised on Long Term's claim that, after
acquiring OTC's partnership interest in Partners, it succeeded to
OTC's purported basis (approximately $100 million) in the Rorer
and Quest preferred stock and the sale of the stock on December
31, 1997 for approximately $1,000,000 thus produced these capital
losses.  Long Term reported the losses as "Net Unrealized Gains"
on line 6 of Schedule M-1.  See e.g., Pets.' Exs. 319, 332.  An
internally prepared draft copy of Portfolio's return used the
description "Net Capital Gains/Losses," see Govt.'s Ex. 321,
which was changed after input from Coopers & Lybrand and Price
Waterhouse to its final form, "Net Unrealized Gains."  Pursuant
to 26 U.S.C. § 704(c), Portfolio allocated the losses to LTCP,
and LTCP allocated them to LTCM.  The losses were then allocated
by LTCM to LTCM's partners and indirect partners under 26 U.S.C.
§ 704(b).

### 4.   B&B and OTC After CHIPS and TRIPS

B&B expected to market for significant fees the preferred
stock OTC obtained from the CHIPS and TRIPS transactions,

30

including CHIPS IVA, CHIPS IVB, and TRIPS I.  By fee agreements
dated July 5, 1995 (the date of commencement of the CHIPS IVA and
CHIPS IVB transactions but prior to the August 2 and 4, 1995
exchanges with Rorer and Quest), OTC and B&B agreed that B&B
would be OTC's exclusive agent for the sale of any non-cash
consideration received in connection with the CHIPS IVA, CHIPS
IVB, and TRIPS I transactions, <u>see</u> Pets.' Exs. 159, 160, and 161,
namely, the Rorer and Quest Preferred Stock.  The exclusive
agency was to last at least six months, and B&B was to earn a fee
from the disposition of the stock, which was to be negotiated
among the parties.  Even after a termination of its exclusive
agency, B&B retained the right to purchase the stock before OTC
transferred it to another.  This was a poison pill provision
designed to assure that, if OTC and/or another tax product
promoter attempted to cut B&B out of a deal involving the
purportedly high basis stock, B&B could buy the stock and thereby
destroy the claimed high basis.  The exclusive agency and poison
pill provisions in these fee agreements were, for all relevant
purposes, identical to the ones in the fee agreements B&B and OTC
had for all CHIPS transactions.  <u>See</u> Tr. [Doc. #163] at 314:24-
315:7; Govt.'s Ex. 120.[22]  Regarding CHIPS II, Koffey estimated

---

[22] Govt.'s Ex. 120 was admitted as representative of the fee agreements
entered into by B&B and OTC with respect to the CHIPS transactions.  <u>See</u> Tr.
[Doc. 163] at 316:8-317:7.  While the document on its face appears to relate
only to CHIPS I, Koffey testified more generally that the exclusive agency and
poison pill provisions set forth therein constituted the deal B&B had with OTC
regarding all CHIPS transactions.  <u>See</u> <u>id</u>. at 314:24-315:7, 315:23-316:6,

that the preferred stock OTC obtained from that transaction,

because of its purportedly high tax basis and attendant "$100

million of deductions," Tr. [Doc. #163] at 327:2-3, could be

transferred for a fee ranging from seven to nine million dollars

as long as the structure of the transaction did not hurt those

deductions, i.e., diminish the disparity between fair market

value and purported tax basis, see id. at 324:9-327:6; Tr. [Doc.

#164] at 456:18-23; Govt.'s Ex. 172.[23]

Initial marketing attempts had begun by early 1995. Koffey

developed a structure in which OTC would exchange its high basis

preferred stock for preferred stock of another corporation.

Koffey inquired of Shearman & Sterling on the viability of the

---

317:8-318:20. This level of generality is corroborated by the fact that the specific fee agreements discussed supra for CHIPS IVA, CHIPS IVB, and TRIPS I, contain the same provisions. See Pets.' Exs. 159, 160, and 161.

[23] The Government questioned Koffey on exhibit 172 at trial, see Tr. [Doc. 163] at 327:7-328:20 and offered it as a business record, see Tr. [Doc. 203] at 3155:10-21. Long Term objected on hearsay and relevance grounds. Exhibit 172 is a memorandum Koffey wrote to file on December 8, 1994, in which he calculates the price of purchasing OTC's preferred stock interest from CHIPS II at approximately $9 million ($900,000 for fair market value plus nine percent of the capital loss tax benefits derivable from the stock) reflecting himself as "quot[ing] a price of 9 percent of losses" to a potential buyer. Koffey's testimony independently establishes the relevance of the memorandum: with respect to CHIPS II, that B&B expected the purported tax benefits derivable from OTC's preferred stock to yield a substantial purchase price (seven to nine million dollars) equivalent to nine percent of those benefits and that Koffey quoted that price to a potential buyer and its lawyer. There is no hearsay problem as the Court admits the exhibit for the purpose of demonstrating B&B's marketing intent and not for the truth of the statements contained therein. Koffey and B&B's marketing intent and expectation of earning fees with respect to CHIPS II is relevant to CHIPS IVA, CHIPS IVB, and TRIPS I because it depicts another manifestation of B&B's overall expectation with respect to the CHIPS and TRIPS transactions, a monolithic view already memorialized in writing in B&B's fee agreements with OTC concerning CHIPS transactions generally and CHIPS IVA, CHIPS IVB, and TRIPS I specifically. Therefore, this internal memorandum further tends to make more probable the fact that B&B was not willing to facilitate the OTC/Long Term transaction without being paid a fee in some form.

structure, and Shearman & Sterling responded that the proposed exchange would not satisfy the requirements of 26 U.S.C. § 351. Simultaneously, Koffey asked Shearman & Sterling to render a legal opinion that OTC's tax basis in the CHIPS and TRIPS preferred stock exceeded $90 million.[24]  Koffey's idea was to market the stock to a potential acquirer with a basis opinion from Shearman & Sterling and allow the acquirer to construct a transaction for transferring the high basis stock into its hands without diminishing the basis.  Shearman & Sterling informed Koffey that it could render the requested basis opinion.  The opinion Shearman & Sterling agreed to render was essentially the same opinion it ultimately delivered to Long Term in connection with OTC's contributions of preferred stock to LTCP.

Part of Shearman & Sterling's work on the opinion requested by Koffey was billed to Long Term's account notwithstanding that it was performed on behalf of B&B prior to Long Term's retention of Shearman & Sterling to opine on the OTC transaction.  While the recollections of Woody Flowers and John Sykes, Shearman and Sterling's testifying tax lawyers were faded, their initial discussions with Koffey "could have" begun as early as February

---

[24] Although not made explicit in Koffey's testimony, the entirety of the record reveals that this >$90 million figure refers only to OTC's purported basis in some but not all of the CHIPS and TRIPS stock as the totality was claimed to have a much higher basis.  The import of the testimony is that Koffey sought an opinion from Shearman & Sterling that OTC's blocks of CHIPS and TRIPS stock, by operation of 26 U.S.C. §§ 351, 358, had an adjusted basis equal to OTC's purported basis in the property exchanged with the American corporations for each block.

1995. Tr. [Doc. #179] at 1520:4. Shearman & Sterling's internal billing records reveal that Shearman & Sterling's attorneys were billing time in early March 1996 under matters described as "[r]eview memo regarding preferred stock," "meeting with J. Sykes regarding B&B transaction issues...," "revise memo regarding new structure," "[l]egal research regarding transferee liability; sections 482 and 351 and 269," "[r]eview Koffey memo regarding stock sale by OTC (CHIPS)...," etc. <u>See</u> Pets.' Ex. 290.[25] In Shearman & Sterling's records, these billing entries are assigned to Long Term's account number even though Shearman & Sterling's representation of Long Term did not commence until April 11, 1996.[26]

As for OTC, under its business plan, it had no interest in retaining the CHIPS and TRIPS preferred stock but desired to dispose of it for cash as early as legally possible.

_____

[25] The "Koffey memo" referred to in the time detail was not produced by Shearman & Sterling in response to a Government subpoena. Sykes explained: "I can't tell you what happened to that memo. Ofttimes things - - well, not ofttimes, but it's not terribly unusual for attorneys to throw these things away, to keep them in their personal files, which are ultimately discarded, and for the item not to reach the firm files. When you issued the subpoena, we all went back and looked through what [they] had, including the firm files, and that – if you say you didn't get the memo, I believe you didn't get the memo, but it would have been only because we didn't have it any longer." Tr. [Doc. #179] at 1524:7-18.

[26] At trial, Sykes offered an explanation for why these billings appeared in Long Term's account: because Long Term was charged on a fixed fee basis, these entries were moved from another account strictly as an internal accounting matter to avoid having to write off time from another account. Sykes conceded that, to the extent the entries in fact related to OTC's contributions to Long Term, as the Court concludes they did, a fair reading of them is that, without any explicit agreement with B&B, Shearman was performing legal work at B&B's behest with the hope of being compensated for that work by the party that ultimately acquired OTC's stock.

### 5.     The Origin of a Transaction for Long Term

In early 1996, James Babcock of B&B approached Donald R.
Turlington, a New York tax lawyer who served as regular tax
counsel to Long Term in the mid-1990s.[27]  Over dinner in New York
City, Babcock discussed with Turlington the potential placement
of preferred stock with high basis, and, either at the same
dinner or shortly thereafter, Babcock agreed that, if Turlington
assisted in the placement of the stock, B&B would compensate
Turlington with a percentage of the profits B&B earned from the
placement.

Shortly after his discussions with Babcock, Turlington was
at Long Term's offices in Greenwich, Connecticut, for a meeting
unrelated to Babcock's high basis stock proposal.  After the
meeting ended, Turlington approached Noe about an idea involving
preferred stock he thought might be beneficial to the partners in
Long Term.  When Noe expressed interest, Turlington summarized a
transaction in which an investor that owned a security with a tax
basis higher than the value of the security would contribute the
security to LTCP in exchange for a partnership interest and, if
LTCM subsequently were to purchase the investor's partnership
interest before Portfolio sold the contributed securities, the
tax law would permit "the tax deduction," Tr. [Doc. #174] at

---

[27] Turlington had provided occasional legal services to B&B during the
preceding five to ten years.

1026:12, the capital loss, generated from the sale to be
allocated to LTCM.  The discussion was about the availability of
preferred stock with high basis, the mechanism by which to get
the stock into Long Term, and the technique for allocating the
capital losses generated upon sale to the Long Term principals
through LTCM by means of loss allocation rules of U.S.
partnership tax laws.  Other than a bare description of an
investor having stock with a tax basis higher than its fair
market value, the discussion was unconcerned with the identity or
characteristics of the investor.  In fact, at the time,
Turlington was unaware that OTC was the nominal owner of the
preferred stock, and Noe's purpose at Long Term was to handle tax
matters not matters related to potential new investors.

Although Noe had no experience in high basis stock
transactions, as a sophisticated tax practitioner, he understood
the potential tax benefits that Long Term's partners could obtain
from such stock, and explained Turlington's idea to Scholes by
way of querying Long Term's interest.  Scholes, who among Long
Term's principals would assume primary responsibility for the OTC
transaction, informed Noe that Long Term was interested and
directed him to pursue it further, specifically with the goal of
determining what the high basis asset was and why it had high
basis.  Noe and Scholes were well aware of the tax law
requirements of economic substance and business purpose and

36

discussed the need therefore to figure out a reason independent of taxes for Long Term to engage in a transaction with the holders of the high basis preferred stock, understanding that Long Term "would have to have a way ... to expect to profit from that interaction."  Tr. [Doc. #179] at 1611:10-13.

Noe conveyed Long Term's interest to Turlington, and Turlington introduced Noe to B&B and Shearman & Sterling.  Having advised B&B on the structure of and rendered true lease opinions for the CHIPS and TRIPS transactions, Shearman & Sterling had access to the documentation related to both, and Turlington instructed Noe that he needed to speak with both B&B and Shearman & Sterling because of their knowledge of those transactions.[28] Turlington also recommended to Noe and Long Term the law firm of King & Spalding for advice on the potential federal partnership tax consequences of any contribution of preferred stock to LTCP and possible subsequent sale of the contributor's partnership interest to LTCM.  Shortly after attending an initial meeting with Noe and Shearman & Sterling, Turlington's role ended when potential conflicts of interest were recognized.  Long Term's interactions and discussion with B&B, Shearman & Sterling, and King & Spalding began in March or April 1996.

---

[28] Koffey also subsequently recommended Shearman & Sterling because of the knowledge that firm derived from serving as special counsel to B&B in rendering true lease opinions for CHIPS and TRIPS.

### 6.    Long Term and B&B

Having been introduced to B&B by Turlington and having learned that B&B was acting as advisor to the holder of the high basis CHIPS and TRIPS preferred stock, Scholes had Noe arrange dinner with Koffey in March 1996 in San Francisco to discuss Long Term's potential acquisition of the stock by means of a transaction following the structure outlined by Turlington, including the then unknown holder of the stock becoming a partner in LTCP. At this initial meeting, Koffey did not tell Noe and Scholes about OTC, and Noe and Scholes did not ask for the identity of the owner of the preferred stock. Rather the discussion focused on the availability of the stock, the structure of the CHIPS and TRIPS transactions as it related to generating the stock's purported high basis, and the means by which Long Term might acquire the stock.[29]

A precise chronological time line of interaction between or among Noe, Scholes, Koffey, and B&B subsequent to that dinner in San Francisco cannot be reconstructed with any precision from the testimony. What is clear is that following shortly thereafter, Noe and Scholes engaged in a series of meetings or discussions with Koffey and then continued to work closely with him on the acquisition of OTC's CHIPS and TRIPS preferred stock until OTC

---

[29] Scholes also testified that, having learned sometime before the dinner that B&B might want to invest in Portfolio, he described to Koffey the details of such an investment.

made its contributions to LTCP.  During this time frame, Koffey
responded to Noe's and Scholes' inquiries regarding OTC, the
terms of OTC's preferred stock, and "knowing ... that the
structure that [Long Term] had in mind provided [Long Term] with
the tax benefit," Tr. [Doc. #161] 161:2-3, the structure of the
CHIPS and TRIPS transactions and how it was claimed to generate
the stock's purported high basis.  Noe and Scholes were aware of
the potential for hundreds of millions of dollars of tax
deductions in connection with acquisition of the stock and
understood from B&B that such tax benefit stood to be obtained in
exchange for roughly a few million dollars (the approximate value
of OTC's tranches of preferred stock).[30]

Noe and Scholes discussed with Koffey whether B&B would be
entitled to a cash fee for facilitating acquisition of OTC's
preferred stock and indicated that Long Term was only interested
in a transaction in which no cash fees would be paid.  Long Term
was worried that paying a cash fee could be construed as buying
tax benefits which would raise questions about the economic
substance of the transaction or Long Term's business purpose for
it.  According to Noe, who during this time frame had specific
discussions with Long Term's principals about the tax law
doctrines of sham transaction and economic substance, Long Term's

---

[30] Long Term originally contemplated purchasing only the tranche of
stock associated with CHIPS I but eventually agreed to acquire all of OTC's
CHIPS and TRIPS preferred stock.

goal was to "construct a real business transaction so that
doctrines like economic substance, business purpose and sham
would not be issues." Tr. [Doc. #169] at 703:17-20. He stated
that Long Term was

> not interested in a transaction where there would be cash
> compensation to anyone. [Long Term's] idea was that [it]
> wanted a transaction, a fund investment where someone would
> be - - would find the attractiveness in investing in the
> funds and take the total risk and economic benefit of the
> fund, and if that's what they were interested in, then
> that's the transaction [Long Term] wanted to do.

Id. at 573:7-13. Long Term thus proposed that, instead of a cash
fee, B&B settle for an investment in Long Term, and Scholes
marketed the investment idea to Koffey by representing that the
expected investor return into the future of such an investment
would be 21%. After some time, B&B agreed to take an investment
in Porfolio in connection with the OTC transaction in lieu of the
outright payment of a cash fee labeled as such.[31]

On the same day OTC contributed its Quest Preferred Stock to
LTCP, November 1, 1996, Long Term and B&B entered into a
"consulting arrangement" pursuant to which Long Term agreed to
pay B&B $100,000 per month for one year.[32] Long Term had not

---

[31] At trial, Jan Blaustein Scholes, who has been B&B's general counsel
since 1987 and who married Myron Scholes in 1998, testified that she could
recall only one transaction for which B&B did not charge a fee for services
rendered. It is not clear from her testimony whether the one transaction she
referenced was the OTC transaction or another one.

[32] Noe claimed Long Term entered into the agreement to keep B&B
motivated to continue to think about transactions interesting to Long Term,
desiring to take advantage of B&B's leasing and tax expertise. Noe conceded,
however, that Long Term was not engaged in any leasing transactions during
this time frame in which B&B had leasing experience and that B&B had never

before and did not after enter into any kind of comparable
consulting arrangement with any other investment banking firm,
and did not renew the agreement after its expiration.  Koffey had
proposed the agreement to Scholes, and did so only after Scholes
and Noe made it clear that Long Term would not pay formal cash
fees for B&B's facilitation of the OTC transaction.  There were
never any specific discussions between Scholes and B&B regarding
how B&B would earn its $1.2 million "consulting fee" and the
agreement itself imposed no performance requirements on B&B.  The
written terms of the agreement explicitly provided that B&B would
also be entitled to additional fees to be negotiated on a
transaction-specific basis.  Although the agreement had a thirty
day notice provision pursuant to which Long Term could cancel it,
Long Term never exercised that right and paid B&B $1.2 million
over the course of the year the agreement was in place.

　　While the "consulting arrangement" was in place, B&B and
Long Term worked together on a tax oriented transaction termed
"LIPS" that B&B brought to Long Term and that sought to take
advantage of tax opportunities created by tax treaties between
different countries.  B&B indicated that its fee for the "LIPS"
transaction was not to fall below 7.5% of the "benefit of the
deal," which, if not totally comprised of the hoped for tax

---

stated it would only be willing to bring transactions to Long Term if a
"consulting arrangement" was reached.  Scholes claimed Long Term entered the
consulting agreement to build a strategic relationship with B&B due primarily
to B&B's experience in structuring transactions and international contacts.

41

benefit to Long Term, was at least a component thereof.[33]

### 7.    Long Term and Shearman & Sterling

Also at some time in March or April of 1996, Turlington arranged an initial meeting for Long Term with Sykes at Shearman & Sterling.  The meeting focused on providing Long Term with an understanding of the underlying CHIPS and TRIPS transactions, Shearman & Sterling's involvement as special counsel to B&B in those transactions, and what level of opinion Shearman & Sterling could render on the tax bases of the different tranches of OTC's CHIPS and TRIPS preferred stock.  Either at the initial meeting or shortly thereafter, Noe and Long Term made it clear to Sykes that Long Term only wanted a legal opinion if it could be rendered at a "should" level.[34]

After Shearman & Sterling assured Long Term that it had the

---

[33] Also during the time frame of the "consulting arrangement," Scholes and Koffey worked on creating an Overseas Economic Investment Company in the U.K. ("OEIC").

[34] Trial testimony proffered by petitioners revealed the following about customary tax law practice: Tax law practitioners customarily use the wording of a legal opinion to convey their level of comfort that the legal conclusions contained therein are correct as a matter of law assuming the factual representations and assumptions set forth in the opinion are also correct.  Different comfort levels are customarily indicated with the language "more likely than not," "should," and "will."  A "should" level opinion evinces a fairly high level of comfort on the part of the tax practitioner that the legal conclusions follow as a matter of law from the factual representations and assumptions.  Representation and assumption sections are standard for tax opinions and provide the basis for the attorney author's legal analysis.  The attorney author has a duty to ensure that the material representations and assumptions are reasonable and correspondingly to reject an assumption or representation if it varies with the material facts or to seek further information from the client regarding such facts.

relevant knowledge of and access to information about the CHIPS and TRIPS transactions and could render legal opinions on the bases of OTC's CHIPS and TRIPS preferred stock tranches at the "should" level, Long Term retained the firm for that purpose. Sykes was selected as the Shearman & Sterling tax lawyer with primary responsibility for the representation, all legal opinions requested were to be rendered prior to the closing of the contribution transaction to which each related, and by letter dated April 26, 1996, the retention was retroactively made effective April 11, 1996. Long Term insisted on April 11 as the date of commencement of the representation because Long Term "wanted to establish a date when [Shearman & Sterling was] representing [Long Term] and only [Long Term]." Tr. [Doc. #179] at 1511:19-20. Shearman & Sterling began its task right away, performing substantial work on the opinions between March/April of 1996 and June 12, 1996, the date Long Term first had any contact with OTC and its principals. During the course of the representation, Noe and Sykes frequently discussed and reviewed drafts of the opinions.

Ultimately, Long Term received five virtually identical formal opinions from Shearman & Sterling in connection with OTC's contributions to LTCP. For example, with respect to the August 1, 1996 contribution of the Rorer Exchange Property, Shearman & Sterling opined that OTC had received the preferred stock in a

43

tax free exchange pursuant to 26 U.S.C. § 351, that the preferred
stock received in the exchange transaction had an adjusted tax
basis in OTC's hands of at least $60,503,182, a basis which was
equal to OTC's adjusted tax basis in the Rorer Exchange Property,
and that, as of the date of OTC's contribution of the stock to
LTCP, the basis had not changed.  The opinions substantially
overlapped with the true lease opinions Shearman & Sterling had
earlier rendered in the CHIPS and TRIPS transactions.

        The opinions contain no legal reasoning or analysis.
Rather, they set out the factual underpinning for the legal
conclusions, including any representations or assumptions on
which Shearman & Sterling relied.  Noe testified that he
understood from discussion with Sykes that Shearman & Sterling's
legal analysis was in a separate file memorandum, that the
memorandum contained all the legal reasoning and authority for
the legal conclusions, and that the file also included the
supporting documentation and grounds for the representations and
assumptions relied on in the opinion.  Noe did not ask to see
Shearman & Sterling's legal or factual analysis and did not do
any analysis himself regarding the representations and
assumptions relied on in the Shearman & Sterling opinions
letters, but asked Shearman & Sterling to make sure that all the
assumptions and representations were supported by underlying
facts and documents.  At trial, petitioners offered a single

44

separate file memorandum dated July 22, 1996, see Pet.'s Ex. 226,
and while Sykes testified that the analysis contained in the
memorandum was only "a part of the analysis that [Shearman &
Sterling] went through in preparing the opinions," Tr. [Doc.
#177] at 1478:16-17, neither Shearman & Sterling nor petitioners
produced any other memoranda contemporaneously memorializing
Shearman & Sterling's legal or factual analysis.  Notably absent
from the memorandum is any analysis of the step transaction
doctrine, 26 U.S.C. § 269, whether B&B and OTC were alter egos,
and sham transaction theories.  Sykes claimed that, although he
had no memory of having analyzed the CHIPS and TRIPS transactions
in light of those code sections and legal doctrines, he was sure
Shearman & Sterling's legal team would have done so because "it
was not uncustomary for [Shearman & Sterling] to do research and
not necessarily memorialize it...."  Tr. [Doc. #179] at 1508:1-2.

    Other than showing Scholes a copy of Shearman & Sterling's
opinions which Scholes did not read, Noe did not circulate the
opinions to any other partners of Long Term but informed them
that Long Term had "should" level opinions from Shearman &
Sterling and that the tax bases of the contributed stock tranches
should be the number set forth in the opinions.  Scholes
explained that he did not think it necessary to read the opinions
because he had worked closely with Noe throughout the process and
Noe had relayed to him detailed information regarding his work

45

and discussions with Shearman & Sterling.  While Scholes was
aware that the opinions contained assumptions, he says he relied
on Noe's and Shearman & Sterling's experience with respect to
both tax matters as well as Shearman & Sterling's experience with
the CHIPS and TRIPS transactions in presuming that sufficient
analysis would have been done to justify the assumptions.
Rosenfeld and the other principals did not review the opinions
and did not ask Noe any questions about them.  Rosenfeld and the
others thus were not aware of the contents of the opinions,
including what Shearman and Sterling had considered or assumed.

Long Term would not have gone through with the OTC
transaction without "should" level opinions from Shearman &
Sterling on OTC's tax basis in its CHIPS and TRIPS preferred
stock.  Long Term compensated Shearman & Sterling $500,000 for
its opinion letters, $100,000 each, and paid an additional
$13,331.69 in related costs.

### 8.    Long Term and King & Spalding

Based on Turlington's recommendation, Long Term retained
King & Spalding to opine on the potential partnership tax
consequences of the OTC contributions to LTCP.  The retention
formally began on May 22, 1996, prior to which King & Spalding
had never been retained by Long Term.  William McKee and Mark
Kuller, who were the tax attorneys at King & Spalding with

46

primary responsibility for the representation, ultimately

rendered their formal legal opinion to Long Term on OTC's stock

contributions to LTCP and subsequent sale of its partnership

interest in LTCP to LTCM.[35]   According to Noe, Long Term

> wanted someone who was expert in partnership matters to
> really get involved at the very initial stage of what was a
> potential transaction, to advise us as we went through every
> aspect of it, as we went really in formulating what the
> transaction became and also to ultimately render a tax
> opinion if and when it became necessary.
>
> ...
>
> [Long Term] wanted [King & Spalding] to be involved from the
> outset so they were familiar with all facts, all
> circumstances, and not only [...] familiar with it but have
> an input in making decisions as we went along the way.
>
> As the transaction developed, there was a transfer of OTC's
> partnership interest to LTCM.  That led to LTCM succeeding
> to the tax attributes that OTC had when they contributed the
> property.
>
> When property was sold - - if an asset was sold, that loss
> would be allocated back to LTCM.  So we wanted - - at that
> point, if any loss was recognized or there was any tax
> result from the transaction, we wanted King & Spalding to
> render an opinion that that was the proper analysis of the
> law and that was the proper result.

---

[35] Kuller left King & Spalding in 1999 and subsequently helped found
McKee Nelson, the firm representing Long Term in this litigation.  Pursuant to
D. Conn. L. Civ. R. 83.13(c) and with the consent of the Government, the Court
permitted McKee Nelson to remain as trial counsel notwithstanding that Kuller
was called as a witness on behalf of Long Term.  See Doc. #140.  While Kuller
is not counsel of record in the present case, he participated in the conduct
of the litigation after the petitions were filed with the district court,
discussing the case with one of petitioner's rebuttal experts, reviewing and
commenting on filings with the Court, including briefs and motions, discussing
technical points with the lawyers involved in the case, and discussing the
progress of the case with Long Term.  Kuller also represented Long Term during
the initial stages of the IRS audit and has advised on settlement negotiations
and prospects (although the record is not clear whether such advice related
only to the initial stages of IRS involvement or also after the filing of this
case with this Court).  The substance and credibility of Kuller's testimony is
evaluated in this context.

Tr. [Doc. #169] at 651:11 - 652:14.

King & Spalding rendered its written opinion to Long Term on
January 27, 1999 long after OTC's stock contributions to LTCP and
subsequent sale of its partnership interest to LTCM.  Long Term
had hoped to receive the King & Spalding written opinion prior to
filing its 1997 tax return, on which it claimed the capital
losses at issue in this case, but King & Spalding was not
prepared at that time to issue the written opinion because it was
still in draft stage.  On April 14, 1998, the day before Long
Term's tax returns were filed, Noe wrote the following memorandum
to file:

> Long-Term Capital Portfolio, L.P. (Portfolio) generated a
> short-term capital loss of $59,889,382 on the sale of 6,600
> shares of Rorer International Corporation (Pennsylvania)
> Series B preferred stock and a long-term capital loss of
> $46,168,846 on the sale of 505 shares of Quest & Associates,
> Inc. preferred stock (Loss).  The bases of such securities
> were determined based on the opinions provided by Shearman
> and Sterling dated August 1, 1996 and November 1, 1996,
> respectively.  Such Loss was allocated to [LTCP] pursuant to
> Internal Revenue Code section 704(c) since it related to a
> contribution of such property to Portfolio by [LTCP].
> [LTCP] then allocated the Loss to Long-Term Capital
> Management, L.P. (LTCM) pursuant to Internal Revenue Code
> section 704(c) since LTCM had acquired the capital account
> of Onslow Trading and Commercial LLC (OTC), the original
> contributor of such property.  In deciding how to properly
> allocate the loss, I had discussions with Mark Kuller of
> King & Spalding.  Mark, on this date, has orally confirmed
> that King & Spalding will issue an opinion that the
> allocation of such Loss, as described above, should be
> sustained; that is, it is properly allocable to LTCM.  Mark
> further advised that this opinion will be rendered in
> accordance with the requirements of Treasury Regulation
> sections 1.6662-4(d), 1.6662-4(g), and 1.6664-4(c).
>
> King & Spalding have based their opinion on current U.S.

48

Federal income tax law and administrative practice as in
effect on the date hereof.  They have considered all
pertinent facts and circumstances and the current U.S.
Federal income tax law and administrative practice as it
relates to such facts and circumstances.  Any factual
statements and assumptions are based upon their review of
the documents, instruments, opinions, letters and materials
and factual representations by the relevant parties, which
they believe to be reasonable to rely upon and reasonable to
assume and they have no reason to believe that any such
items are incorrect.  We have provided all relevant
information to King & Spalding in order for them to render
their opinion.  I know of no information or facts that may
be relevant to their opinion which were not provided to King
& Spalding.

Based upon the advice of King & Spalding, [LTCP] will
allocate the Loss to LTCM pursuant to Internal Revenue Code
section 704(c) and LTCM will report such Loss on its tax
return.  Portfolio's and [LTCP's] tax returns will be timely
filed on April 15, 1998 while LTCM's return will be properly
extended.

Pet. Ex. 346.  More than nine months after Long Term filed the

disputed tax return, King & Spalding opined in writing that the

tax basis of the preferred stock to LTCP after OTC's contribution

and the tax basis of the preferred stock to Portfolio after

LTCP's contribution "should" be equal to OTC's tax basis in the

preferred stock before its contribution to LTCP, that, upon the

sale of the Rorer B shares and the Quest shares by Portfolio,

Portfolio "should" recognize a loss for federal income tax

purposes equal to the excess of Portfolio's tax basis in the

stock over the selling price of the stock, and that the loss

recognized by Portfolio "should" ultimately be allocated to LTCM

and correspondingly the partners of LTCM to the extent of the

"built in loss" (the extent of the excess of OTC's tax basis in

the stock immediately before contribution over the fair market value of the shares at the same time).

The first page of the opinion states,

[This opinion] is prepared as part of LTCM's litigation strategy to aid LTCM and its partners in anticipation of possible future litigation regarding certain federal income tax consequences that result from the sale of certain preferred stock by Portfolio, as further discussed herein.

Pet.'s Ex. 357 at 1-2.[36]  It contains no citation to any decisions of the Second Circuit Court of Appeals whose caselaw would apply to any appeal related to Long Term's tax return.  The representations and assumptions set forth with respect to Long Term's pretax expectation of profit from the OTC transaction include:

6.    Each of the transactions addressed herein was entered into for a valid and substantial business purpose, independent of federal income tax considerations, for the purpose of deriving a material pre-tax profit, and there was a reasonable expectation of deriving such a profit (taking into account all related fees and transaction costs).

...

12.    LTCM expected to derive a material pre-tax profit from OTC's investment in Partners (taking into account all related fees and transaction costs) and, excluding the litigation settlement payment made to Mr. Turlington, did derive such a profit.

...

28.    The services provided by B&B under the financial advisory agreement between B&B and LTCM were commensurate in value with the fees that were paid thereunder.

---

[36] Opinion co-author Kuller testified that this phraseology about litigation just was "boilerplate" in all his opinions to preserve attorney-client work product privilege.

...

30.  It was LTCM's expectation and belief that no fee,
commission, or other compensation was due or owing to Mr.
Turlington by LTCM, Partners, or Portfolio relating to OTC's
investment in Partners or any other transaction addressed
herein.  During the period preceding December 31, 1997,
there was no expectation on the part of LTCM, Partners, or
Portfolio that it would make any payment to Mr. Turlington
other than normal hourly fees for legal services.

31.  Except for the litigation settlement payment made
to Mr. Turlington by LTCM, there were no fees, commissions,
premiums, or other compensation paid to OTC, B&B, or any
other party in connection with, or related to, OTC's
investments in Partners or any other transaction addressed
herein.

Pet.'s Ex. 357 at 18, 20-21, 26-27.


### a.   Kuller's Claimed Pre-Tax Expectation of Profit Analysis

At trial, Kuller testified that, in rendering opinions to

Long Term, he performed and discussed "at length" with Noe a

calculation of Long Term's pretax expectation of profit,

including an examination of Long Term's costs for the OTC

transaction and expected return.  Kuller insisted he performed

this calculation to become comfortable that Long Term's

representation that it expected a material pre-tax profit from

OTC's investment was a reasonable one but that it was an "easy"

analysis that he could do quickly in his head.  Kuller maintained

that his discussions with Noe occurred over a period of time

contemporaneous to Long Term's consideration of OTC's stock

contributions and encompassed both Kuller's normative view as to

51

what costs and profits should be included in the analysis in
addition to what costs and profits a revenue agent might believe
should be included.  The deficient nature and substance of
petitioners' evidence about any pre-filing analysis and
discussions in the time period claimed compels the Court's
conclusion that if they even took place in that time frame, it
was not in the embellished form offered by Kuller's testimony
detailing the analysis he claims he did and discussed with Noe,
which testimony is summarized as follows:

As Long Term's costs, Kuller included corporate and travel fees
for both the OTC and UBS/B&B investments of $50,000 to
$100,000,[37] and the costs of the legal opinions from Shearman &
Sterling and King & Spalding, which Kuller estimated at $500,000
each.[38]  Kuller excluded the contemporaneous $1.2 million
consulting agreement with B&B based on Noe's assurances that the
value of the consulting services provided for in the agreement
were commensurate with what was being paid.  Kuller also excluded

---

[37] Kuller claimed his normative view was that the costs and profits of
both the OTC and UBS/B&B investments should be combined as those transactions
were a unit and that King & Spalding's written opinion treated them as such.

[38] Kuller testified that, although Noe "was not going to convey [the
cost of the Shearman & Sterling opinions] to [him]," Tr. [Doc. #186] at
2172:8, Kuller assumed and told Noe he assumed a cost of $500,000.  He
calculated the $500,000 for the King & Spalding opinion based on $100,000 for
the writing and $400,000 for the premium.  In addition, Kuller testified he
told Noe that he believed the costs of the legal opinions should not have been
included in the calculation as transaction costs but that he did include them
in an abundance of caution with a view that a revenue agent might disagree.
Kuller's reasoning, purportedly relayed to Noe, was that the costs for the
legal opinions were "optional costs," Tr. at 2168:8, because B&B and OTC did
not require Long Term to obtain the opinions before they would agree to invest
rather Long Term decided to obtain them.

any share paid by Long Term towards the joint $1.8 million
settlement payment with B&B to Turlington's law firm for
Turlington's role in introducing B&B to Long Term and his
partnership tax idea for transference of OTC's basis to Long
Term.  This exclusion was based on Noe's assurance that, although
"initially there was some suggestion from Mr. Noe that he might
give Mr. Turlington something if Babcock did not agree, ...
Babcock ultimately did agree to pay Mr. Turlington something, and
therefore, Long-Term went into the deal believing it had no
financial obligation whatsoever to Mr. Turlington."  Tr. [Doc.
#186] at 2171:3-9.

     As expected profits, Kuller testified he considered that
Long Term's profits from the transaction derived primarily from
the management and incentive fees it could earn from OTC's and
the UBS/B&B investments.  Kuller calculated profits from fees
based on what he characterized as a conservative expected
investor return of 21%, which he selected based on information
from Noe that Scholes and others used this figure in marketing
Portfolio to investors, and on what he characterized as a
historical rate of investor return for Portfolio in 1995 and 1996
of approximately 42%.[39]  Based on these assumed rates of return,

_____

     [39] The projected investor return of 21% assumed an overall return to
Portfolio of 30%: 2% to Long Term as its management fee, 25% of the net
remaining 28% (or 7%) to Long Term as its incentive fee, with the remaining
21% to the investor as return.  Similarly, the projected investor return of
42% assumed an overall return to Portfolio of 58%: 2% to Long Term as its
management fee, 25% of the net remaining 56% (or 14%) to Long Term as its

base investments by OTC of $10,000,000 and UBS/B&B of
$50,000,000, and taking into account "that there was a put that
was going to take place 15 months after [OTC's] August
investment....," Tr. [Doc. #186] at 2176:5-7, Kuller calculated
annual fee returns to Long Term of either $6,750,000 (based on
21% investor return) or $12,000,000 (based on 42% investor
return).  Based on the large calculated returns under these
assumptions, Kuller claims he discussed with Noe his belief that
he did not need to extrapolate to account for the additional
years of expected return from the UBS/B&B investment as the
calculated returns would significantly outweigh transaction
costs, even including the premiums for the legal opinions, the
$1,200,000 B&B consulting fee, and other costs.

    Although Kuller claimed he told Noe he believed the proper
calculation would consider profits from both the OTC and UBS/B&B
investments, he also advised Noe that the IRS might disagree and
thus discussed with Noe the pre-tax profit calculation if only
OTC's $10,000,000 investment were considered.  Using the assumed
investor returns of 21% and 42% and a cut off date for the
investment of late October 1997, Kuller calculated profits to
Long Term from OTC's investments as ranging from $1,125,000 to
$2,000,000.  He believed it reasonable to average the two figures
to approximately $1,500,000/$1,600,000, which return he

---

incentive fee, and the remaining 42% to the investor as return.

54

considered showed a "reasonable expectation of profit" for Long Term.[40]

### b.  Kuller's Credibility

Kuller has an obvious stake in Long Term prevailing in this case.  He represented petitioners during the IRS audit and has assisted in this litigation.  See supra note 35.  He also co-authored King & Spalding's written opinion to Long Term which is under scrutiny in this case.  His advocacy role was confirmed by the character of his testimony which had the distinct quality of advocacy, not an effort to just accurately report recollection, notwithstanding his protestations that he was "up here just to tell the truth as to what happened."  Tr. [Doc. #186] at 2190:12-13.  His belligerence in responding to the Government's cross examination stood in marked contrast to his manner on direct examination by his law partner.

An important aspect of Kuller's testimony on how costs and profits were treated in the King & Spalding written opinion was unsupported and lacked credibility.  Echoing Long Term's trial position, Kuller testified that contemporaneously with the OTC transaction he had viewed the OTC and UBS/B&B investments as a

---

[40] While not explicit in Kuller's testimony, this latter conclusion impliedly excludes the Turlington fee settlement payment and the $1.2 million dollar B&B consulting fee as costs, and includes only legal fees related to the King & Spalding and Shearman & Sterling opinions plus minimal travel expenses and corporate legal fees.

unit and therefore believed the costs and profits of both should

be combined in evaluating Long Term's pre-tax profit potential

from the OTC transaction.  In regard to this testimony, Kuller

was asked on cross-examination about the following

"representation/assumption" contained in the King & Spalding

written opinion:

> 12.  LTCM expected to derive a material pre-tax profit
> from <u>OTC's investment in [LTCP]</u> (taking into account all
> related fees and transaction costs) and, excluding the
> litigation settlement payment made to Mr. Turlington, did
> derive such a profit.

<u>See</u> Pets.' Ex. 357 at 20-21 (emphasis added).  Kuller insisted

that he viewed the phrase "OTC's investment in [LTCP]," <u>id.</u>, to

mean the combined $60,000,000 of both the OTC and B&B

investments, <u>see</u> Tr. [Doc. #186] at 2194:14-2195:6.  However, the

King & Spalding written opinion, which he co-authored, read in

the context of the economics of the OTC transaction discredits

this interpretation.  The fact section of the written opinion

never states that the two investments were viewed as combined,

and describes the OTC transaction and the UBS/B&B investment

under separate headings.  The word "investment" in

representation/assumption number 12 is not capitalized or

otherwise specially defined, and the representation/assumption

makes no reference to the UBS/B&B investment.  The logical

reading of representation/assumption number 6, recited in full

<u>supra</u> Part II.D.8., is that it covers "each of the transactions

56

addressed herein" as it states, <u>see</u> Pets.' Ex. 357 at 18, and the
specifically identified transaction in representation/assumption
number 12 refers by its terms only to the "OTC[] investment in
[LTCP]," <u>id.</u> at 20.[41]  Most telling is the text of
representation/assumption number 12 itself which explicitly
states that Long Term expected to and in fact did derive a
material pre-tax profit from "OTC's investment in [LTCP] (taking
into account all related fees and transaction costs)" only if the
litigation settlement payment to Turlington, which the King &
Spalding written opinion identified as $1,250,000, <u>see</u> Pets.' Ex.
357 at 10, was excluded as a transaction cost, <u>see id.</u> at 20-21.
Thus, it is evident that Kuller and co-author McKee recognized as
late as January 27, 1999 that $1,250,000 represented a figure
which exceeded the amount of any fees Long Term could earn from
"OTC's investment in [LTCP]" minus transaction costs.  Therefore,
in stark contradiction to Kuller's trial testimony, the phrase
"OTC's investment in [LTCP]" could only have been intended to
mean OTC's $10,000,000 of contributions because the actual fees
earned (which would have been known by November 1997) from just
fifteen months of the "combined" investment of OTC and B&B/UBS
(without any inclusion of the four extra fee earning years of the
B&B/UBS transaction) totaled approximately $6.2 million, a number

---

[41] Other language in the King & Spalding written opinion supports an
intended distinction between OTC's investment in LTCP and the UBS/B&B
investment: "...OTC's investment in LTCP or any other transaction addressed
herein."  Pets.' Ex. 357 at 27.

far in excess of the costs of the OTC transaction even if the premiums for the legal opinions (approximately $1 million), the cost of the consulting fee arrangement ($1.2 million), <u>and the $1,250,000 litigation payment to Turlington</u>, and other costs were counted as transaction costs.  Thus, because representation/assumption number 12 clearly envisions that the $1,250,000 Turlington litigation payment would have precluded contemporary expectation of and actual material pre-tax profit on "OTC's investment in [LTCP]," Kuller's trial testimony that he definitely authored the assumption to also include the B&B/UBS transaction seriously undermines his credibility, both specifically and generally.

Also of no small significance is the absence of any contemporaneous memorialization of this material pre-tax profit analysis Kuller claims to have discussed with Noe.[42]  No trace of it appears in Noe's e-mail of April 14, 1998.  The alleged analysis is only implicitly alluded to in the final King & Spalding' written opinion to the extent the conclusory "representation"/"assumption" that Long Term expected to earn a material pre-tax profit from the OTC transaction required some independent reflection by the opinion's authors.

Finally, when Noe was asked on direct examination during

---

[42] Contemporaneous documents show only a calculation, based on zero investor return, of the potential for OTC to suffer an economic loss as a result of its investments in LTCP.  <u>See</u> Pet.'s Ex. 388.  By way of contrast, these documents also analyze OTC's expected investor return at 21%.

58

questioning related to King & Spalding's involvement in the OTC transaction whether, as part of Long Term's due diligence, the potential pretax profit from the OTC contribution was evaluated, he answered in vague terms only that Long Term took into account the fact that it was going to earn fees from the contribution, see Tr. [Doc. #169] at 653:4-654:11, and said nothing about any quantification of those fees against expenses.

Based on the foregoing, the Court concludes that petitioners' have failed to prove that Kuller's purported pre-tax profit analysis was ever made and discussed with Noe contemporaneously with the OTC transaction or prior to Long Term's tax return filing.

### 9.    Long Term and OTC

#### a.    Communication Among Long Term's Principals

Before approving the OTC transaction, Long Term's twelve principals discussed it both formally in management meetings and informally amongst themselves.  At trial, four principals -- Merton, Meriwether, Scholes, and Rosenfeld -- testified as to their recollections of those discussions and their related personal concerns.  Rosenfeld's testimony provided the greatest detail.

Merton was chiefly concerned with accurate determination of the fair market value of the high basis preferred stock to be

contributed to LTCP, the need for tax expertise to assure that
the tax treatment of the stock was as Long Term thought because
Merton did not understand how the stock had high basis, and Long
Term's fees to be earned from the contribution as with any other
investment.  As of the time of the OTC transaction in 1996,
Merton did not know that "OTC" stood for Onslow Trading and
Commercial LLC but believed it to be merely an acronym for a
transaction involving the contribution of preferred stock with
high basis to Portfolio in exchange for a partnership interest.
Merton discussed with other principals in both formal and
informal settings obtaining the tax benefits of the preferred
stock for themselves and that the IRS might challenge their
claimed tax benefits.  Merton never read the opinions of Shearman
& Sterling and King & Spalding, and did not know what
assumptions, if any, were made in those opinions.

Meriwether recalled surprisingly little about almost any
aspect of the OTC transaction and any formal or informal
discussions about it by the Long Term principals.  He had no
recollection of dealing with lawyers on the subject, of a loan to
OTC, of selling put options to OTC, or of anything about OTC
(including what business it carried on, who its principals were,
or even what "OTC" stood for).  Prior to trial, he was not even
aware who B&B was or of the UBS/B&B investment.  Meriwether did
have a recollection of discussing with Scholes a contribution of

60

preferred stock to Long Term with a tax aspect to it, and of one risk management meeting in which the transaction was discussed, regarding which he recalled only that Scholes gave a presentation about the transaction that involved an investment in Portfolio. Meriwether repeatedly emphasized in his testimony that, because of the vigorous debate and consensus management style that characterized Long Term, he is confident that thorough discussion occurred about all aspects of the OTC transaction among the Long Term principals, and that he must therefore have been comfortable with the decision to move forward on it.

Scholes generally claimed that he was involved in a series of discussions with the management committee, the tax committee, and Long Term's other principals in which he kept them informed about and sought advice regarding the OTC transaction. Scholes informed his co-principals that Shearman & Sterling had rendered strong opinions as to the basis of the preferred stock to be contributed, and specifically that the "should" level legal opinions from Shearman & Sterling and King & Spalding provided tax penalty protection.

Rosenfeld recalled two management committee meetings at which the OTC transaction was discussed. The first was a lengthy meeting of several hours, in which Scholes, with the help of a

61

PowerPoint presentation and a written handout,[43] walked the principals through the details of the OTC transaction. The transaction was referred to as the "OTC transaction," but there is no evidence that the investor was identified beyond being "a UK investor" and "a client of [B&B]", Tr. [Doc. #188] at 2298:2,7, or that any specific information about the potential investor (including details about formation, capitalization, and net worth) or its shareholders was provided to or requested by the management committee. Scholes explained the potential for tax benefits from the transaction, specifically the potential for Long Term's principals to obtain substantial tax benefits from the loss built into the investor's high basis preferred stock by the investor's exercise of a put option. The written handout also contained an explanation of these tax benefits. There is no evidence that any other subject matter was included in the handout, and the handout and PowerPoint presentation were the only written materials provided to the LTCM principals. It is not clear whether Scholes discussed the legal opinions of Shearman & Sterling and King & Spalding at this meeting and there is no credible evidence that Scholes discussed the investment of

---

[43] Rosenfeld did not recall whether the handout correlated to the PowerPoint presentation. In addition, neither item was either introduced as evidence at trial or ever turned over to the IRS. Rosenfeld testified that he did not know what had become of the handout and that Long Term was unable to find either item. The significance of this testimony is discussed infra.

B&B through UBS.[44]  Although the meeting ended without Long Term
reaching a decision on the OTC transaction, Rosenfeld was
comfortable with it after having heard Scholes' analysis.  The
second management committee meeting at which the Long Term
principals approved the OTC transaction was short and included
discussion of the legal opinions.

During the time frame of the OTC transaction in 1996,
Rosenfeld understood that the IRS could challenge the OTC
transaction and could impose penalties but believed that
penalties would not be appropriate because Long Term had "should"
level opinions from Shearman & Sterling.[45]  He also understood
that, for a transaction to be valid for tax purposes, it had to
possess economic substance and that economic substance required a
reasonable expectation of profits.  He claims however that, at
the time, he was not thinking about transaction costs, including
legal fees paid for the Shearman & Sterling and King & Spalding
opinions.  He also was not aware of any specific analysis

---

[44]  While Rosenfeld testified at trial on direct examination that, in
addition to an explanation of the potential tax benefits Long Term stood to
obtain from the transaction, he also recalled discussion of legal opinions and
B&B's investment through UBS, his deposition testimony was more equivocal - he
remembered only Scholes' presentation as having covered the potential tax
benefits of the OTC transaction and did not remember but thought that the
legal opinions were also discussed.  On cross examination, he attempted to
clarify his deposition testimony, stating (in the context of affirming that
the legal opinions were definitely discussed at the second management
committee meeting) that it was possible the legal opinions were also discussed
at the first meeting.

[45]  Rosenfeld thought that Long Term's principals had discussed penalties
in deciding whether to approve the OTC transaction, according to his
deposition testimony, although his trial testimony was that he did not recall
discussion of penalties.

63

comparing transaction costs with potential fees generated by the
OTC investment, and admitted that the legal opinions were
obtained in connection with the potential tax benefits and would
have been unnecessary had Long Term simply accepted an investment
of preferred stock in exchange for a partnership interest.[46]

### b.    Unusual Nature of OTC's Contributions

Beyond the initial contributions of the founding principals
to Portfolio in March 1994, no outside investor other than OTC
was ever permitted to contribute non-cash assets in exchange for
a partnership interest (even though Long Term's private placement
memorandum acknowledged its discretion to accept non-cash
contributions).  As a general matter, Long Term was not in this
time frame interested in purchasing preferred stock.  After OTC's
stock contributions, OTC's stock was the only U.S. preferred
stock held by Portfolio.  Before the OTC transaction, Long Term
had never sold downside protection puts to any investor.  After
the transaction, Long Term sold downside put protection only to
UBS in connection with the UBS/B&B transaction.  Similarly,
Meriwether could not recall any other occasions in which Long

---

[46] Rosenfeld also testified that he viewed B&B as the strategic investor
justifying OTC's contributions to LTCP, elaborating that B&B's expertise in
the financing of illiquid assets was crucial to Long Term's business and thus
a relationship with B&B was desirable.  However, he conceded on cross-
examination that B&B's expertise was in the financing of illiquid assets other
than securities (for example, airplanes and trestle bridges) and in his
deposition (again divergent from his trial testimony) that he was not aware of
any steps Long Term took to develop business activities in such assets.

Term loaned money to an investor to facilitate the investor's contributions.

The atypical nature of OTC's preferred stock contributions is underscored by Long Term's disclosure, prior to the close of OTC's August 1, 1996 contribution, to certain investors in what Scholes termed "most favored nation letters," Tr. [Doc. #182] at 1653:1, that Long Term was about to engage in the OTC transaction.  The letters explaining OTC's contribution in Portfolio were required pursuant to an agreement with the investors that Long Term would not enter into any arrangement with another investor granting more favorable investor rights without first offering the other investors the same rights.  The letters, one set dated July 23 and another July 30, 1996, described the OTC transaction as "unique," informed the recipients that the OTC transaction was considered to be in their best interest because it has the economic effect of increasing the investment of the principals of LTCM in the fund, and explained that it would be unlikely the recipients would be able to structure a similar investment.  The July 23, 1996 letters disclose only the OTC transaction, while the letters dated July 30, 1996 disclose both the OTC transaction as well as the B&B/UBS transaction.  The letters are all signed by Scholes.

65

c.    **Long Term's and OTC's Intent Regarding the OTC Transaction**

On June 12, 1996, Scholes and Noe met for the first time (and only time prior to the August 1, 1996 contribution of preferred stock) two of the principals of OTC, Sir Geoffrey Leigh and Nicholas Wills.[47]  Koffey had arranged the meeting in London at the request of Scholes and Noe, and was also present.  At the meeting, OTC communicated its desire to liquidate any interest it might acquire in LTCP in the near future, stating that they wanted the option to liquidate the investment in a particular period of time and not have to hold the investment for three years as Long Term's private placement memorandum's three year lockup provision required.  The two put options ultimately purchased by OTC were the solution to this lock up problem.  There was also discussion at the meeting about the possibility that the put options to be purchased by OTC be extended into 1998 in the event that Long Term did not need tax losses for the year 1997, but no extension provision was written into the final embodiment of the options.[48]  At some point, presumably during this meeting, Scholes informed OTC that he expected an investment in Portfolio to yield an approximately 21% investor return.  By

---

[47] There is lack of clarity in the record as to whether or not Wills was present at this meeting.  Wills' presence, however, is of little significance.

[48] Long Term wanted the put options to extend for a term of at least twelve months in part to provide the appearance of a real investment over a sufficient period of time and thereby avoid questions of economic substance.

the close of the meeting, there was a mutual intent to attempt to close the contribution of OTC's preferred stock to LTCP by either July 1 or August 1 of 1996.

A draft letter written by Scholes to OTC dated June 18, 1996 and referring to the previous week's meeting states, "[i]n order to accommodate OTC's desire to potentially liquidate their investment sometime in the near future, LTCM will grant a Put Option...." Govt.'s Ex. 290. Kuller struck the language from the draft before the letter was sent to OTC.

Prior to OTC's contributions, Noe's review of OTC's balance sheet revealed that OTC did not possess sufficient funds to repay the loan from LTCM U.K. without liquidating its interest in LTCP. Under its partnership subscription agreement, OTC was prohibited from pledging its interest to any other lender without the approval of LTCM.

In connection with OTC's contributions, Long Term also agreed to permit the shareholders of OTC to make individual cash investments in Portfolio up to a combined total of $10,000,000 with a required combined $2,000,000 minimum. The agreement permitted the individual investments as of January 1, 1998 or January 1, 1999. OTC's principals never exercised their rights under this agreement.

The closing documents accompanying the promissory note for Long Term (U.K.)'s loan of $5,010,451 to OTC in connection with

67

the August 1, 1996 transaction and loan of $4,316,842 to OTC in

connection with OTC's November 1, 1996 transaction included the

minutes from the meetings of OTC's board of directors at which

OTC approved both the August 1 and November 1 contributions to

LTCP in exchange for a partnership interest and the facilitating

loan from Long Term U.K.  The August 1 minutes, among other

items, note the date of the meeting as August 1, 1996, and

provide, "[OTC] is acquiring the partnership interest with a view

to selling the interest at a profit under the put option

arrangements set out in 3.3 below."  Pets.' Ex. 231 at A002403;

see also Pets.' Ex. 238.[49]  The November 1 minutes similarly note

the date of the meeting, October 30, 1996, and provide identical

language regarding OTC's intent to exercise one of its put

options.  See Pets.' Ex. 257 at A002466.


### d.    Scholes' November 12, 1996 Memorandum

In a memorandum to Long Term's management committee dated

November 12, 1996, eleven days after the second of OTC's

---

[49] Section 3.3 in turn provides,

[OTC] will purchase from Long-Term Capital Managment, L.P. (LTCM,L.P.),
two put options (the Put Options) pursuant to which it will have the
right to put its partnership interest in LTCP to the general partner of
Long-Term Capital Managment, L.P., for a price equivalent to either:

    (a) the net asset value of the limited partnership interest on
    October 31, 1997; or

    (b) US $5,340,000.

The price of the put option will be US $61,000.

68

contributions of preferred stock to LTCP, Scholes wrote,

> After OTC transfers its investment in LTC partnership to
> LTCM entities (which ones?), LTCP's sale of the preferred
> stock that it holds (when it sells it) will generate $245
> million of short-term capital losses and $140 million of
> long-term capital losses.  Not all of the losses need be
> taken in the same year.

> We must decide in the near future (1) how to allocate these
> capital losses; (2) how to "trade" them so that they are
> held in high-valued hands; and (3) how to plan to be able to
> enjoy the benefits of the use of these losses for the
> longest period of time.

> ...

> **If we are careful, most likely we will never have to pay
> long-term capital gains on the "loan" from the Government.**

> ...

> **Value of Losses:**

> The value of losses depends on how quickly we can use them
> up.  If we establish a mechanism to "reallocate" the losses
> to the principals who can use them most quickly ..., we
> maximize their present value to all of us collectively.

> With the reallocation, Bruce estimates that we can use about
> $75 million of capital losses next year.  At this rate (and
> with growth in the Fund) it will take 4 years to use up the
> tax losses.  ($75 million in year 1; $90 million in year 2;
> $108 million in year 3 and remainder in year 4).  Assuming
> no recapture of losses at a future date, the undiscounted
> after-tax value of the losses are $170.62 million.  This is
> the anticipated cash flow from the Government (its loan to
> us) over the next 4 years.

> ...

> **How should LTCM pay those who brought the Tax Losses to
> Fruition and allocate the expenses of undertaking the trade?**

Govt.'s Ex. 320B (emphasis in original).

At trial, although Scholes characterized the language

"[a]fter OTC transfers its investment ... to LTCM..." as "inappropriately written," Tr. [Doc. #182] at 1731:5-6, he admitted that the language does not anticipate any contingency and conceded that he fully expected OTC to exercise either the liquidity put or downside put.

Scholes' testimony that his "expectation was that [the $170 million in tax savings] would be paid sometime in the future," id. at 1714: 10-11,[50] and that, while he understood there was "some probability" the taxes would not have to be paid, he "didn't have any assessment what that probability was," id. at 1714:14-15, does not square with his contemporaneous statement to his partners, "[i]f we are careful, most likely we will never have to pay long-term capital gains on the 'loan' from the Government."[51]

With respect to the language, "[h]ow should LTCM pay those who brought the Tax Losses to Fruition...," Scholes proffered the dubious explanation that it meant how much to compensate Long Term's principals and Noe for their involvement in bringing about

---

[50] Scholes meant by such testimony that individual partners would at some point pay capital gains taxes on withdrawals in excess of their bases in their partnership interests or upon sale of their partnership interests, presumably asserting that their bases had been reduced by the amount of capital loss passed through to them as a result of the sale of the Rorer and Quest stock by Portfolio.

[51] Because this portion of Government Exhibit 320B had been redacted from original Government Exhibit 320 to protect claimed attorney-client privilege and was turned over only by order of the Court at the end of trial, Scholes had no opportunity to explain the statement during his testimony. Petitioners did not seek to recall Scholes.

the OTC and B&B/UBS transactions.  There were no tax losses
associated with the B&B/UBS transaction, only the OTC
transaction.  Scholes and other partners ultimately received
extra partnership allocations for their work on the OTC
transaction, and Scholes' allocation amounted to several million
dollars.  The extra allocation exemplified the standard manner in
which Long Term generally allocated profits to principals based
on the benefits or value they were perceived to have brought to
Long Term.  Similarly, Noe received $50,000 to $100,000 as an
incentive bonus for his work on the OTC transaction.  The bonus
was paid over a period of years but derived from an arrangement
in place at the time of his hiring pursuant to which Long Term
had agreed to pay Noe incentive bonuses for work and involvement
in structured transactions like the OTC one.

### 10.  The Turlington Problem

Prior to OTC's contributions, in his initial discussion with
Noe or sometime shortly thereafter, Turlington raised the issue
of how much Long Term might compensate him for his role in
bringing the preferred stock transaction idea and B&B to Long
Term.  Noe, aware that Turlington had a complex fee agreement
with B&B, responded that, after the transaction had been
completed, Long Term would compensate Turlington with a fair
amount in relation to "what the transaction ultimately turned out

71

to be and how much [Turlington] was compensated by B&B."  Tr. [Doc. 174] at 1037:25-1038:1.  Noe was aware that Turlington believed a fair amount to be $1.8 million and told Turlington that Long Term would consider that amount because of his long standing commitment to Long Term and his knowledge that the partners of Long Term wanted to treat Turlington fairly.  Noe also understood that Turlington calculated the $1.8 million based on a percentage of the tax losses that Long Term would obtain from the sale of the preferred stock.

At some point not later than December 1996 (but apparently after OTC's November 1, 1996 contribution), Turlington made a claim for fees against B&B.  While unclear from the trial record, Long Term appears to have been also included in the fee dispute by no later than May 1997 as evidenced by a draft letter dated May 9, 1997 written by Jim Rickards, Long Term's general counsel, to Turlington:

> It was a pleasure seeing you in New York for dinner recently. ...
>
> Since we met, I have conducted further interviews and inquiries regarding the basis on which your fee should be computed for demonstrating a valuable idea to Babcock and ourselves as to which the investment funds we manage may be the ultimate beneficiaries.  It is surprising that this issue could be in dispute when the bare facts are largely agreed.  It may be helpful to recite some of those facts before explaining our position on the fee issue.
>
> ... Shortly after presenting your idea to us, you introduced Babcock as a party which might be able to facilitate the implementation of this idea. ...  All of the parties ... recognized ... actual and potential conflicts

.... It was at this point that all parties agreed that your prospective relationship in this transaction would be solely with Babcock and that we would independently obtain whatever advisers we needed, at our sole expense, in addition to dedicating internal resources in order to consummate the suggested transaction. *An obvious and explicitly agreed corollary of that decision was that Babcock would be the sole source of all fees to be paid to you for any resulting transactions*. This decision was without prejudice to what those fees might be. You were free to negotiate ... any appropriate fee structure you wished with Babcock presumably on an "all in" basis with reference to benefits derived by our funds. We were not unaffected by this as, to the extent we independently agreed to pay fees to Babcock, they would obviously be looking for some net between what they might receive from us and what they paid to you for their value added; therefore, the higher the fee they paid to you, the more we might logically expect to be paying to them. However, this state of affairs is a far cry from any notion of "two fees" payable separately by us and Babcock with respect to a single course of dealing. ...

At our dinner, we spent some time discussing your conversations with [Noe] on the subject of fees. These discussions were entirely consistent with the understandings described above in that (a) we highly value our prior and prospective relationship with you and therefore wanted to be assured you were being compensated fairly by Babcock, (b) we had critical information which would be needed by Babcock to compute their fee payable to you and were quite happy to share this information with you in the interests of facilitating your discussions with them and (c) to the extent that Babcock looked to our fee to pay you, we were in a position to 'top up' our fee to them to enable them to pay you more than would otherwise be the case. We are greatly distressed that our good faith efforts to use our good offices to facilitate your dealings with Babcock have been misconstrued as a separate "fee" negotiation directly with you.

... We are firm in our consistently held view that your fees for the transactions discussed herein will be paid exclusively by Babcock and that such fees will compensate you for the benefit derived by our funds. For our part, we have fully and fairly compensated Babcock for these investor benefits and respectfully urge you to continue your discussions with Babcock as your source of compensation.

73

Govt.'s Ex. 331.  While the letter is unsigned and marked "draft
JGR letterhead," the letter was delivered to B&B from Long Term,
presumably as a part of their joint negotiation with Turlington
over the amount of his fee.

It is not clear from Turlington's testimony whether his
"claim for fees" was formal or informal but at a minimum the
threat of litigation can be inferred from the fact that shortly
after the claim was raised and into 1997, Turlington's lawyers
were involved in negotiating with Long Term and B&B over what
Turlington's fee would be.  Long Term and B&B ultimately jointly
contributed to a settlement payment of $1.8 million to
Turlington's law firm for his role in introducing B&B to Long
Term and his partnership tax idea regarding the preferred stock.
B&B contributed $550,000 and Long-Term contributed $1.25 million
to the settlement.  B&B only made its share of the payment
because Long Term asked it to, which B&B viewed as a cost of its
ongoing relationship with Long Term.

During the period of the fee dispute, B&B and Long Term
discussed with Turlington the possibility of his law firm
obtaining a piece of the call option B&B had acquired from UBS,
indicating, oddly, to Turlington that they did not want to
provide Turlington information on the call option possibility in
writing.  Furthermore, in negotiating the fee with Turlington,
B&B informed Turlington that it knew other individuals or

entities with high basis preferred stock and that it would undertake to explain Turlington's idea to them for the purpose of earning additional fees for B&B and additional compensation for Turlington.  At trial, Turlington plausibly conjectured that such offer was an attempt by B&B to negotiate down the fee owed in connection with the Long Term deal.

### 11.  Petitioner's Expert: Frank J. Fabozzi

Petitioners offered Dr. Frank J. Fabozzi, an expert in economics, finance, structured finance, and leveraged transactions with an extensive academic and publishing background, to opine on OTC's risk return profile in the CHIPS and TRIPS transactions, OTC's risk return profile with respect to its contributions to LTCP and subsequent sale of its partnership interest to LTCM, and Long Term's potential benefit from both the OTC contributions and B&B's investment via UBS.  The Court is here unconcerned with Fabozzi's first opinion.

With respect to OTC's contributions, Fabozzi opined that OTC risked losing the equity it had in its preferred stock, OTC stood to benefit from appreciation in value of its partnership interest, and Long Term's potential quantitative benefit could be found in the fees it could earn on OTC's contributions.  Fabozzi calculated OTC's equity in the contributed preferred stock at $1.012 million, which was the approximate difference between the

75

amount of the loans from Long Term UK secured by OTC's
partnership interest ($9,327,293) and the amount of OTC's total
investment ($10,340,000).  Fabozzi specified that,
notwithstanding a hypothetical exercise by OTC of its downside
put, OTC risked losing the majority of the equity in its
investment because the $10,340,000 received from Long Term upon
exercise would be used to pay off the approximately $9.3 million
loan from Long Term U.K. plus seven percent interest, leaving
approximately $284,000 for OTC.[52]  Subtracting the cost of the
downside put options, $121,000, Fabozzi calculated the amount of
equity remaining in OTC's investment at $163,000 in the event OTC
had to exercise its downside put.  In addition, Fabozzi opined
that OTC was at risk of losing all its equity as a result of
"counter party risk," the chance that Long Term would be unable
to perform on the exercise of the downside put.

Fabozzi testified that the quantitative allure for Long Term
of OTC's contributions and B&B's investment via UBS would have
been the potential to earn management and incentive fees on the
investments.  Fabozzi had no opinion on whether the OTC
transaction and the UBS/B&B transaction should be considered one
package, but had performed calculations both ways.  Regarding the
OTC transaction, Fabozzi opined that Long Term would receive a

---

[52] Fabozzi's calculation included added interest to OTC on the basis of
a contractual provision requiring OTC to wait one month after exercise of the
downside put option before receiving payment from Long Term in exchange for
the payment of interest on the held investment.

two percent management fee from the $10,340,000 plus an incentive
fee calculated as twenty-five percent of the appreciation on the
investment after subtracting the management fee.[53]  Fabozzi
provided mathematical computations on how the fee earnings might
work in pracice.  For example, he calculated that, if one assumed
a 21.55% rate of return and that OTC would exercise either its
liquidity or downside put, Long Term stood to earn combined fees
of $835,654 on OTC's investment.[54]  Similarly, at a 21.55% rate
of return over the five years of B&B's investment via UBS,
Fabozzi calculated that Long Term stood to earn fees of
$17,622,812.[55]

While Fabozzi's hypothetical rates of return were derived
from historical rates of return for Portfolio, Fabozzi repeatedly
emphasized throughout his testimony that he was not opining on
the reasonableness of any particular rate of return or on whether
it would have been reasonable to believe that historical
performance would continue, acknowledging that no one can
accurately predict a rate of return into the future.  On cross
examination, he stated that he was aware that, at the time of

---

[53] Fabozzi also indicated that Long Term might further benefit by being
able to use OTC's equity to leverage itself further.

[54] It was apparently Long Term's practice to calculate fees on a monthly
basis.  Fabozzi's figures, however, were not based on monthly calculation but
simplified and thus omit any appreciation that would have increased subsequent
months' management fees.

[55] Fabozzi also simplified this calculation by omitting Long Term's
typical yearly compounding of any intervening price appreciation.

OTC's contributions, Long Term was generally restricted to new investors and opined that this situation was likely due to Long Term having run out of investment strategies.  If that were the case, he continued, the addition of investor capital would only serve to dilute the rate of return with respect to any particular investment, thus driving down the expected incentive fee return to Long Term from any one investor.

Also on cross-examination, Fabozzi acknowledged that, assuming Long Term and Long Term U.K. were under common ownership, Portfolio would earn a 21% rate of return for investors, and Long Term U.K. already possessed the approximately $9.3 million it loaned to OTC at 7% per annum to facilitate OTC's contributions, there would be an opportunity cost to Long Term for participating in the OTC transaction of 14% of that investor return because, instead of subjecting the $9.3 million loan to the risk of Portfolio by securing it with OTC's partnership interests, Long Term could have invested the $9.3 million into its own capital account in Portfolio thereby entitling itself to all 21% of expected investor return.

### 12.  Scholes' Economic Analysis

Scholes claims that, while he did not perform an independent economic analysis of the TRIPS and CHIPS transactions, he did analyze the economics of the OTC transaction prior to OTC's

contributions and concluded that Long Term could make a good return and profit by virtue of the management and incentive fees that would inure to Long Term from OTC's contributions to LTCP and B&B's investment in Long Term via UBS.  Scholes testified to the specifics of his analysis as follows: in 1996, he expected Long Term to obtain a 21% return after fees on both OTC's and UBS's contributions, generating approximately 9% of the overall contributions as management and incentive fees for Long Term, and, with modifications for projected investment growth, calculated anticipated fees of $34 million from the UBS/B&B investment alone over the course of its expected five year period.  Assuming an "overwhelming probability," Tr. [Doc. #184] at 1836:24, that B&B would exercise the call options it purchased from UBS, Scholes added the $4 million Long Term received in option premiums.  He also testified that he thought the fee income from OTC's and B&B's investments could be invested back into Portfolio to generate more fee income for Long Term's principals and that profits would result from the consulting agreement with B&B.  Scholes claims he excluded the bonus allocation he received for his work in bringing the OTC transaction to Long Term because the fees being generated from the B&B investment coupled with the partners' extra income from both OTC's and B&B's investments diminished the significance of the bonus, particularly because the bonus allocation included not

79

only cash but also an increased stake in Portfolio.

Scholes admitted that, viewing the OTC transaction on its own and apart from the B&B investment "then obviously the profits look very marginal, if any, if you allocate all of the cost to the OTC transaction." Tr. [Doc. #184] at 1854:10-14.[56]  He repeatedly claimed that his economic analysis never considered such an allocation but instead only allocated expenses against the combined expected fees generated by both the OTC and B&B investments because, in light of Portfolio having been "closed" and many investment banks having been turned away as potential investors, the other Long Term principals would not have permitted B&B to invest without OTC's contributions of preferred stock.  Scholes' allocation rational appears more likely a contrivance to show expected profitability and objective economic substance than a serious economic analysis.  He acknowledged that the B&B/UBS transaction was "a very standard investment," Tr. [Doc. #184] at 1853:13, that the King & Spalding and Shearman & Sterling legal opinions do not opine at all on the B&B investment, and that, without OTC's stock contributions, an independent relationship with B&B was "potentially possible." Tr. [Doc. #182] at 1772:10.  There is thus no practical reason for any of the costs for the legal opinions to be allocated to

---

[56] By "cost" here, Scholes refers primarily to the legal costs associated with the King & Spalding and Shearman & Sterling opinions.  See Tr. [Doc. #184] at 1840:22-25.

the B&B investment.  Moreover, Scholes' illogical insistence that the two transactions be combined for objective economic profit loss analysis had the secondary effect of illuminating Long Term's business purpose for the OTC transaction.  Scholes knew B&B would not have been permitted to invest in Long Term without OTC's stock contributions and that Portfolio was open only to strategic investors (i.e. investors bringing value in excess of fees) during this time frame, and admitted that he saw no value to any continued relationship with OTC.  The inescapable conclusion is that Long Term's goal in permitting both investments was to obtain the tax benefits inherent in OTC's preferred stock.  Scholes in part explicitly acknowledged this goal when he testified that some of the Long Term principals viewed the sole value brought by OTC and B&B as anticipated tax benefits.[57]  At bottom, Scholes' claimed belief that the IRS would evaluate the economic substance of the OTC transaction in combination with the B&B investment was because Long Term declared it so: "it was LTCM's decision to take in the investment from both OTC and B&B."  Tr. [Doc. #184] at 1853:18-21.

---

[57] Koffey's testimony also contains a qualified admission: "B&B was given the opportunity to invest in part because of [B&B's] help in introducing Long-Term to OTC and in part because ... Long-Term saw this as an opportunity to expand a relationship in which B&B could provide very useful services to Long-Term."  Tr. [Doc. #164] at 476:11-16.

81

### 13.  Government's Expert: Joseph Stiglitz

The Government offered Dr. Joseph Stiglitz, a professor of economics and finance in the Graduate School of Business at Columbia University and a Nobel Prize winner in 2001 for his work on the economics of information,[58] to opine on whether real economic value was created in the process of the CHIPS, TRIPS, or OTC/Long Term/UBS/B&B transactions.  The Court examines only Dr. Stiglitz' views on whether there was any economic explanation for the OTC/Long Term/UBS/B&B transactions apart from the tax benefits.

Dr. Stiglitz testified about potential hidden transaction costs in connection with OTC's contributions to LTCP.  He started with the premise that a legitimate tax deduction, for example deductions associated with true leases, have an economic value that is assigned by the market and for which market actors ought to pay.  In attempting therefore to determine why Long Term ostensibly did not have to pay compensation for the tax benefits obtained from OTC, Dr. Stiglitz came up with two theories: either the market considered the tax deduction so likely to be questioned and to invite penalties that it assigned a value of $0 to it or the market considered the tax deduction, although risky,

---

[58] The field of economics of information "deals with the wide variety of situations where individuals ... act with imperfect information and, in particular, in circumstances in which there is what are called asymmetries of information in which one party has more information than the other."  Tr. [Doc. #194] at 2696:18-23.

to have expected value[59] notwithstanding the potential of future
challenge and thus did assign a value to it.  He pointed out
that, to avoid undermining the economics of the OTC transaction,
Long Term might not want to disclose how much it paid for it and
thus would have incentive to seek out forms of hidden
compensation.  Dr. Stiglitz identified a variety of opportunities
for hidden compensation, including Long Term's consulting
arrangement with B&B to the extent the $1.2 million price of that
arrangement to Long Term exceeded the value of consulting
services rendered under it.[60]  However, Dr. Stiglitz also
testified that it is difficult to detect hidden fees, the
existence of those fees requires inquiry into the incentives of
the actors, and ultimately it is difficult to make a definitive
judgment about them.  Ultimately, with respect to Long Term, Dr.
Stiglitz concluded, "...there was obviously the incentive, there
was the opportunity, there were the forms, but ... because it is
so difficult to make a definitive judgment about whether that, in
fact, occurred, I don't want to make a statement on it."  Tr.
[Doc. #194] at 2724:11-16.

Dr. Stiglitz opined that Long Term could not have earned a

---

[59] The expected value, Stiglitz said, would have derived from the
market's expectation that any challenge by the IRS was contingent on the IRS
timely discovering the deduction and further contingent on the IRS succeeding
in a challenge.

[60] Dr. Stiglitz testified that consulting arrangements with fees in
excess of the value of services rendered under them are standard vehicles for
hidden compensation.

profit from the OTC transaction from the fee structure in place
at the time of the contributions.  Assuming reasonable rates of
return, Dr. Stiglitz concluded that the transaction costs
associated with generating fees from the OTC transaction caused a
negative net return.  He included among the transaction costs
legal fees for the opinion letters from Shearman & Sterling and
the bonuses paid to Scholes and Noe.  He further concluded that,
because OTC was permitted to invest in Long Term using Long Term
U.K.'s loan on which Long Term bore all downside risk by virtue
of OTC's downside put option, Long Term was economically worse
off than if Long Term made the identical investment on its own
behalf because, although bearing all downside risk, Long Term was
limited in participating on the upside to its incentive fee of
25% of any profit on OTC's investment.  If Long Term had invested
its own money directly, it would bear all downside risk but would
also have been entitled to all potential upside.  Dr. Stiglitz
concluded that a rational actor would not have selected the route
Long Term selected because such route, absent tax benefits,
forfeited potential profit without any corresponding decrease in
risk.

     In addition, Dr. Stiglitz believed that Long Term itself had
tacitly admitted by closing Portfolio that the OTC transaction
was, from a fee perspective, not a good economic deal because it
meant that Long Term "had decided that the fees they got from

additional contributions were not worth the additional contributions." Tr. [Doc. #194] at 2727:12-14. Because investment opportunities are limited by a fund's investment strategies and management capabilities such that a fund's investments are subject to diminishing returns at the point at which additional contributions dilute the rate of return, Stiglitz explained that closing a fund represents a business judgment that fees derived from additional contributions are not worth the dilution the extra contributions cause to the fund's rate of return. Stiglitz concluded that Long Term had thus already rejected the fee argument it offered at trial - the OTC deal was economically viable because of the fees it would produce for Long Term - "when they were looking at other cases, apart from the tax concerns." Tr. [Doc. #194] at 2728:6-7.

Finally, and similar to the economic problem associated with the Long Term U.K. loan, Dr. Stiglitz concluded the UBS/B&B transaction was a bad economic deal for Long Term because Long Term similarly subjected itself to the downside associated with UBS' investment of approximately $50,000,000 in Portfolio while limiting its participation in the upside of the investment to an incentive fee once B&B exercised its call options rather than seeking all upside potential as commensurate with its risk. He explained the UBS/B&B transaction, including UBS' put options and B&B's call options, was basically equivalent to a loan to Long

85

Term with respect to which all credit risk was borne by Long Term, because, if the investment sours, LTCM must pay UBS the strike price upon UBS' exercise of its put options.  Thus, as a loan, "LTCM could have taken that loan and put it in its portfolio," Tr. [Doc. #194] at 2729:20-21, thereby entitling itself to all upside potential experienced by the investment. Instead, even assuming historical rates of return to Portfolio and not addressing the issue of diminishing returns resulting from limited investment strategies, Long Term gave away by contract seventy-five percent of the upside potential to B&B in a transaction that Dr. Stiglitz summed up as "one of these examples where you, at least as I read it, deliberately try to complicate things so you can obscure what was going on, because there was a UBS investment but also a call and a put.  And when you look at that whole package, that's equivalent to a loan...."  Tr. [Doc. #194] at 2728:16-21.  Thus, in Dr. Stiglitz's view, "the fees did not provide adequate economic explanation [for the UBS/B&B transaction]. ... there was no real economic explanation for this transaction apart from the taxes."  Tr. [Doc. #194] at 2730:9-13.

The Court found the portion of Dr. Stiglitz's opinions summarized above credible and persuasive when viewed in light of the facts of the case.  The Court found petitioners' attempt to discredit him, particularly the emphasis on his alleged personal bias against Long Term, unpersuasive.

## 14.  IRS' Audit and Long Term's Response

The IRS commenced an audit of Long Terms tax returns for the
1996 and 1997 tax years in 1999.  Rosenfeld was in charge of
working with Long Term's lawyers and accountants in responding to
information requests from the IRS during the audit and
examination of Long Term with respect to the OTC transaction.
Rosenfeld testified that, during the audit and examination, Long
Term provided substantiation for the tax basis in the preferred
stock acquired from OTC, including documents and the legal
opinions of Shearman & Sterling and King & Spalding, and Long
Term responded as quickly and accurately as possible to all IRS'
information document requests and summons.  Rosenfeld clarified
that the Shearman & Sterling opinion was provided early on in the
process and the King & Spalding opinion directly to the
Department of Justice later in the process.  Rosenfeld did
testify that he thought the legal opinions were withheld after
IRS requests because they were considered privileged documents,
and that Long Term's lawyers explained the withholding to the
IRS.  He also recalled that the Shearman & Sterling opinion was
disclosed to the IRS after it was determined that it was not a
privileged document.  Rosenfeld also testified that he believed
Long Term maintained all books and records related to items under
audit on its 1996 and 1997 federal income tax returns.

On cross examination, while the Government pressed Rosenfeld

regarding failures to respond to official requests during the IRS audit, including requests for legal opinions and lists of transaction costs associated with the OTC transaction, Rosenfeld almost uniformly answered that he was not aware of any shortcomings and the Government offered no evidence to support the embedded assertions of delinquent responses in its questions to Rosenfeld.  However, Rosenfeld did admit that Scholes' PowerPoint presentation and accompanying written handout were never provided to the IRS because, he testified, Long Term was unable to find them.

Rosenfeld testified that, when Long Term filed its petitions for adjustment on July 9, 2001, it had a negative net worth of approximately $60,000,000.  In rough outline, the claim of negative net worth derived from the following assertions: in September 1998, when a consortium of banks took over Long Term, Long Term held directly or indirectly in Portfolio $100,000,000, owed $200,000,000 in loans (predominantly from banks), and subsequently repaid $40,000,000 earned through fees.  Rosenfeld, however, admitted that, in 1998, Long Term was entitled to $104,000,000 in deferred fees, which were invested in Portfolio, and that the consortium of banks required those fees to be liquidated to pay down Long Term's debts, which, according to Rosenfeld, included some of the $200,000,000 in loans.

88

## II.  Discussion

### A.  Burden of Proof

Taxpayers generally bear the burden of proof when litigating their tax liabilities.  See e.g., United States v. Janus, 428 U.S. 433, 440 (1976); Caplin v. United States, 718 F.2d 544, 549 (2d Cir. 1983)("In a tax refund suit, the burden of proof is on the taxpayer to prove an overpayment of tax.").  Congressional enactment in 1998 of 26 U.S.C. § 7491, however, statutorily altered the traditional analysis, permitting taxpayers to shift the burden of proof to the Government in certain circumstances.  In pertinent part, § 7491(a) provides,

**(a) Burden shifts where taxpayer produces credible evidence.-**

   **(1) General rule.** - If, in any court proceeding, a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer for any tax imposed by subtitle A or B, the Secretary shall have the burden of proof with respect to such issue.

   **(2) Limitations.** - Paragraph (1) shall apply with respect to an issue only if -

   **(A)** the taxpayer has complied with the requirements under this title to substantiate any item;

   **(B)** the taxpayer has maintained all records required under this title and has cooperated with reasonable requests by the Secretary for witnesses, information, documents, meetings, and interviews; and

   **(C)** in the case of a partnership, corporation, or trust, the taxpayer is described in section 7430(c)(4)(A)(ii).

26 U.S.C. 7491(a)(1)-(2).[61]  26 U.S.C. § 7430(c)(4)(A)(ii) in

turn directs the reader to 28 U.S.C. § 2412(d)(2)(B)(as in effect

on October 22, 1986), which reveals that § 7491(a)(2)(C)

precludes the entities listed therein from the benefit of

§ 7491's burden shifting if their net worth exceeded $7 million

at the time the § 7491(a)(1) proceeding was initiated.  Congress

imposed the burden on the taxpayer of establishing that the four

requirements of § 7491(a)(2) have been met.  See S. Rep. No. 105-

174, at 45 (1998)("The taxpayer has the burden of proving that it

meets each of these conditions, because they are necessary

prerequisites to establishing that the burden of proof is on the

Secretary.").[62]  Long Term did not satisfy this burden at trial.

Rosenfeld, who had oversight responsibility for Long Term's

lawyers' and accountants' cooperation with the IRS during the

IRS' audit and examination of Long Term, advanced Long Term's

claim of compliance with the threshold requirements.  Even though

the Government did not offer a revenue agent or attorney in

rebuttal, Rosenfeld's testimony failed to establish

(1) cooperation with the Secretary's reasonable request for the

---

[61] 26 U.S.C. § 7491 applies "to court proceedings arising in connection
with examinations commencing after [July 22, 1998]."  Internal Revenue Service
Restructuring & Reform Act of 1998, Pub.L. 105-206, sec. 3001(a), 112 Stat.
726.  The Government concedes that the examination of petitioners commenced
after that date.  See Govt.'s Opp'n [Doc. #158] at 2 n.2.

[62] "Four conditions apply.  First, the taxpayer must ...
substantiate....  Second, the taxpayer must maintain records....  Third, the
taxpayer must cooperate with reasonable requests....  Fourth, taxpayers other
than individuals must meet the net worth limitations...."  S. Rep. 105-174, at
45 (1998).

PowerPoint presentation and accompanying handout used by Scholes
to detail the OTC transaction to the LTCM principals, and
(2) that on July 9, 2001, the date of filing of the petitions
presently under review, Long Term's net worth was not in excess
of $7 million.

### 1.    Cooperation with Reasonable Requests

The statutory language "reasonable request" is not defined,
and the legislative history sheds no light on its meaning.
Presumably, to be reasonable, a request by the Secretary would
have to be calculated to lead to material relevant to the
determination of the tax liability in dispute, and designed so as
not to impose an undue production burden where evidence of
comparable probative value is available through less burdensome
means.  Thus, the reasonableness determination will be fluid,
requiring an examination of all facts and circumstances in light
of the legal standards implicated in resolving the taxpayer's
liability.  At least one memorandum decision of the Tax Court
appears to have adopted this approach.  See Polone v.
Commissioner, T.C.M. (RIA) 2003-339, No. 12665-00, 2003 WL
22953162 (U.S. Tax Ct. Dec. 16, 2003)(Stating "[w]e consider all
the surrounding facts and circumstances of this case in deciding
whether respondent's request ... is reasonable," and finding
requests for settlement documents and tax returns reasonable

where the requested information was relevant to the determination
of the taxpayer's tax liability).

The reasonableness requirement thus understood, the request
for Scholes' PowerPoint presentation and accompanying handout
clearly satisfies the statutory term "reasonable." Those items
constitute the sole documentary evidence memorializing how
Scholes presented the OTC transaction internally to the other
LTCM principals at the only management committee meeting at which
the transactions were discussed at length and in detail. As this
meeting occurred prior to the LTCM principals' approval of the
transaction at a brief second management committee meeting, those
documents contain significant, direct, and contemporaneous
evidence bearing on Long Term's claim of business purpose for
engaging in transactions with OTC and how Long Term evaluated the
realistic opportunity to derive an actual non-tax based profit
therefrom - - two considerations fundamental to the tax law
analysis of the transaction's economic substance. Similarly,
those documents potentially provide evidence regarding the extent
to which OTC's contributions to LTCP and subsequent sale of its
partnership interest to LTCM by exercise of put options were
prearranged parts of one transaction, a consideration relevant to
application of the step transaction doctrine to the OTC
transaction. These conclusions on probativeness are supported by
Rosenfeld's testimony that Scholes used both documents to walk

92

the principals through the OTC transaction at the management

committee meeting, the meeting included explanation of the

potential for Long Term's principals to obtain tax benefits from

OTC's high basis preferred stock, the written handout contained

an explanation of the tax benefits, the tax benefit explanation

was the only item he recalled being in the handout, and he

believed the handout and PowerPoint presentation were the only

written materials provided to the LTCM principals at the meeting.

The question then turns to whether Rosenfeld's testimony

that he did not know what had happened to the handout[63] and Long

Term's claim that it was unable to find either the handout or the

---

[63]     Q.    Now, you indicated that Professor Scholes had a PowerPoint
               presentation that he used; is that correct?
         A.    Yes.
         Q.    Do you know what happened to that document?
         A.    I can't recall whether it was a document per se in the sense
               that it was paper. We had a projector similar to this where
               you could have used the PowerPoint presentation with the
               computer. I think it's - - I can't recall whether it was in
               - - whether we got a hard copy or not. I know that he did
               pass out some hard-copy materials at the meeting, but I
               don't know if the PowerPoint presentation was in paper form.
               We also - - I'm sorry, we also have the ability to do the
               PowerPoint presentations in all of our offices.
         Q.    The PowerPoint presentation, would that have been saved on a
               computer hard drive?
         A.    It certainly could have been, yes.
         Q.    And you're aware the government requested files that were
               stored in electric form, are you not?
         A.    Yes, yes.
         Q.    And you did testify that there was a handout, some hard-copy
               document, that was provided to the principals during
               Professor Scholes' presentation?
         A.    That is correct.
         Q.    Do you know what happened to that document?
         A.    No.

Tr. [Doc. #188] 2299:16-2300:21.

PowerPoint[64] satisfies Long Term's burden to establish the cooperation prong of § 7491(a)(2)(B). The Court concludes that this testimony was insufficient to do so.

The statute does not define what it means to cooperate. The ordinary meaning of the word is "to act or operate jointly with another or others." Webster's New International Dictionary 585 (2d ed. (Unabridged) 1961). The legislative history uses inclusive terms setting forth various forms of cooperation within the scope of the statutory requirement and, in the context of statute of limitations extensions, language of exclusion identifying what is not necessary for cooperation:

> Third, the taxpayer must cooperate with reasonable requests by the Secretary for meetings, interviews, witnesses, information, and documents (including providing, within a reasonable period of time, access to and inspection of witnesses, information, and documents within the control of the taxpayer, as reasonably requested by the Secretary). Cooperation also includes providing reasonable assistance to the Secretary in obtaining access to and inspection of witnesses, information, or documents not within the control of the taxpayer (including any witnesses, information, or documents located in foreign countries [FN 22]). A necessary element of cooperating with the Secretary is that the taxpayer must exhaust his or her administrative remedies (including any appeal rights provided by the IRS). The taxpayer is not required to agree to extend the statute of limitations to be considered to have cooperated with the

---

[64]
> Q.  Do you recall testifying about that PowerPoint presentation?
> A.  Yes.
> Q.  And you indicated that there was also a handout that was provided by Professor Scholes during that meeting?
> A.  That is correct.
> Q.  Are you aware that neither the PowerPoint presentation nor the handout were provided to the IRS?
> A.  We were not able to find them.

Tr. [Doc. #190] at 2412:3-13.

Secretary.  Cooperating also means that the taxpayer must
establish the applicability of any privilege.

FN 22 Cooperation also includes providing English
translations, as reasonably requested by the Secretary.

S. Rep. 105-174, at 45 (1998).[65]  This structure points to a

facts and circumstances analysis surrounding the determination of

cooperation in any particular case.  See Polone, 2003 WL

22953162.  Thus, the phrases "including providing ... documents

within the control of the taxpayer" and "includ[ing] providing

reasonable assistance [with respect to] documents not within the

control of the taxpayer" should not be read as excusing

cooperation whenever a potentially relevant document reasonably

requested is not produced by the taxpayer because, for example,

the taxpayer states it failed to retain it or claims it cannot be

located, without further context.  Rather, review of the

circumstances surrounding the taxpayer's claimed inability to

produce or locate the information requested by the Secretary is

required to determine whether the taxpayer truly acted jointly

with the Secretary in an effort to get all relevant information

into the hands of the Secretary.  Thus, for example, a taxpayer

would certainly not be considered to have satisfied the

_____

[65] The Senate report is essentially identical to the Senate Amendment to
the House Bill, and, with minor changes not relevant here, was followed by the
Conference Agreement.  See H.R. Conf. Rep. 105-599, at 242.  With respect to
the cooperation requirement, the Senate Amendment changed the House Bill's
"full cooperation" to "cooperation", "fully cooperate" to "cooperate", and
"fully cooperate at all times with the Secretary" to "cooperate with
reasonable requests by the Secretary for meetings, interviews, witnesses,
information, and documents."

95

cooperation prong of § 7491 where the taxpayer knowingly or
negligently allowed the disappearance or destruction of
significant documentation prior to a request of the Secretary,
and, after the request, argued non-existence of or inability to
retrieve the information as excusing cooperation.  By contrast,
demonstrably inadvertent destruction of an otherwise retained
document, or some other circumstance demonstrating no fault or
dereliction on the taxpayer's part would argue in favor of
excusing cooperation.  Cf. S. Rep. 105-174, at 210 n.27 ("If,
however, the taxpayer can demonstrate that he had maintained the
required substantiation but that it was destroyed or lost through
no fault of the taxpayer, such as by fire or flood, existing tax
rules regarding reconstruction of those records would continue to
apply.").  Within such surrounding circumstances, the Court could
balance the significance of the missing material, the likelihood
it would be expected to be called for in an audit, and the
reasonableness of the taxpayer's efforts to preserve or reproduce
the material upon IRS request.

    Here, Scholes' presentation memorializing his analysis and
recommendations played a central role in the LTCM's principals'
decision to enter into the OTC transaction.  Rosenfeld's own
comfort level with going forward with the transaction was based
on Scholes' analysis.  Rosenfeld and Scholes were highly
sophisticated in economics and both well understood that the tax

96

law required this transaction to have demonstrable economic substance, including a reasonable expectation of profits. Rosenfeld, Scholes, and the other principals were well aware that the IRS might well challenge the OTC transaction in the future and even discussed the potential for penalties.  The PowerPoint presentation and written handout constitute the only contemporaneous memorialization of that critical meeting at which these matters would have been addressed.  Under these circumstances, particularly Long Term's understanding of the requirements of economic substance doctrine and knowledge that the IRS might challenge the OTC transaction, satisfaction of § 7491's cooperation prong required Long Term to preserve to the extent within its control a record of Scholes' presentation and written handout, including storing one copy securely from 1996 until after the possibility of a challenge had ceased by operation of the statute of limitations.  Long Term offered no evidence that both were no longer available through no fault of Long Term and in the absence of any explanation why Long Term could not find the requested items or what it did to search for them, its claim of cooperation with the Secretary's reasonable request fails.[66]  This conclusion is in keeping with the

---

[66] The fact that § 7491 was not enacted until 1998 does not alter the analysis.  While, in 1996, Long Term could not have known that Congress would create a burden shifting benefit for taxpayers two years later, compliance with the statutory requirements is not excused.  At the time of Long Term's conduct, the traditional presumption that the Commissioner's determination of tax liability is correct was in full force and therefore Long Term would have

legislative purpose behind the enactment of § 7491, to remove the disadvantage individuals and small business taxpayers face when forced to litigate with the IRS where those taxpayers have kept and provided the Internal Revenue Service with all information relevant to the determination of their tax liabilities.  See S. Rep. 105-174, at 44.

Alternatively, even if § 7491's cooperation requirement did not require Long Term to take reasonable steps to keep Scholes' PowerPoint presentation and written memorandum, Rosenfeld's testimony that Long Term was unable to find them does not carry Long Term's burden to establish cooperation (or being excused therefrom) because conclusory testimony of being unable to find an item does not demonstrate, without more, that such item is not within one's control or reasonable assistance to facilitate access to it.  Without any indication of the nature or scope of Long Term's efforts to locate these items or any testimony that Long Term acted with the Secretary to provide assistance in locating them, Rosenfeld's conclusory remark does not provide a sufficient basis from which to conclude that Long Term met its burden to establish the items were not within its control or that it assisted the Secretary to locate them or obtain access to them.

---

had the same responsibility to preserve and produce if it desired to satisfy its burden to prove the Commissioner wrong.

## 2.   Net Worth

Rosenfeld testified that, when Long Term filed its petitions for adjustment on July 9, 2001, it had a negative net worth of approximately $60,000,000.  In rough outline, he testified that the negative net worth derived from the following facts: in September of 1998, when a consortium of banks took it over, Long Term held assets directly or indirectly in Portfolio of $100,000,000, owed $200,000,000 in loans (predominantly from banks),[67] and, subsequent to take over and prior to July 9, 2001, repaid $40,000,000, which had been earned as fees.  On cross-examination, however, Rosenfeld admitted, that in 1998, Long Term was entitled to $104,000,000 in deferred fees, that those fees were invested in Portfolio, that he considered them an indirect asset of LTCM, and that the consortium of banks required those fees to be liquidated to pay down Long Term's debts, including at least some of the $200,000,000 in loans.  Rosenfeld's testimony is thus unclear regarding how much overlap, if any, existed/s between the $100,000,000 in assets Long Term held in 1998 in Portfolio "directly or indirectly," Tr. [Doc. #190] at 2401:25-2402:1, and the $104,000,000 in deferred fees, the "indirect asset," id. at 2404:18, to which Long Term was entitled during the same time period.  If there were no overlap, Long Term would

---

[67] $50,000,000 of this amount was owed to UBS as a result of the put options purchased from Long Term.

99

have had a positive net worth of $44,000,000 at the time of
filing the petitions now under review.  Thus, Rosenfeld's
ambiguous testimony leaves only speculation as to whether there
was enough overlap to drive Long Term below the statutory
$7 million threshold and therefore Long Term has failed to meet
its burden to establish the technical net worth requirement of
§ 7491.

### 3.   Conclusion on Burden of Proof

Although the Court has concluded that Long Term is not
entitled to shift of the burden of proof to the Government under
§ 7491 on any factual issue relevant to its tax liability with
respect to which it may have introduced credible evidence at
trial, the Court also concludes that the record evidence is not
so evenly weighed such that burden of proof is critical but
instead clearly establishes that OTC's contributions and
subsequent sale of its partnership interest to Long Term lacked
economic substance and therefore should be disregarded for
federal tax purposes, and were prearranged parts of a single
transaction and therefore must be stepped together pursuant to
the step transaction doctrine.

### B.   Lack of Economic Substance

"An activity will not provide the basis for deductions if it

100

lacks economic substance."  Ferguson v. Commissioner, 29 F.3d 98,
101 (2d Cir. 1994)(per curiam); see also Nicole Rose Corp. v.
Commissioner, 320 F.3d 282, 284 (2d Cir. 2003)(per curiam); Lee
v. Commissioner, 155 F.3d 584, 586 (2d Cir. 1998).  The nature of
the economic substance analysis is flexible, see Gilman v.
Commissioner, 933 F.2d 143, 148 (2d Cir. 1991), thereby giving
rise to alternative formulations in the Second Circuit, including
both subjective and objective inquiries, see e.g., Lee, 155 F.3d
at 586 (A transaction lacks economic substance if it "'can not
with reason be said to have purpose, substance, or utility apart
from [its] anticipated tax consequences.'" (quoting Goldstein v.
Commissioner, 364 F.2d 734, 740 (2d Cir. 1966)); Jacobson v.
Commissioner, 915 F.2d 832, 837 (2d Cir. 1990)("A sham
transaction analysis requires a determination 'whether the
transaction has any practicable economic effects other than the
creation of income tax losses.'")(quoting Rose v. Commissioner,
868 F.2d 851, 853 (6th Cir. 1989)); DeMartino v. Commissioner,
862 F.2d 400, 406 (2d Cir. 1988)("A transaction is a sham if it
is fictitious or if it has no business purpose or economic effect
other than the creation of tax deductions.").  The terminology
used, whether sham, profit motivation, or economic substance, is
not critical, rather the analysis evaluates both the subjective
business purpose of the taxpayer for engaging in the transaction
and the transaction's objective economic substance, and a finding

101

of either a lack of a business purpose other than tax avoidance
or an absence of economic substance beyond the creation of tax
benefits can be but is not necessarily sufficient to conclude the
transaction a sham. See Frank Lyon Co. v. United States, 435
U.S. 561, 583-84 (1978); Ferguson, 29 F.3d at 102; Gilman, 933
F.2d at 148 and n.5; Casebeer v. Commissioner, 909 F.2d 1360,
1363 (9th Cir. 1990).[68]

---

[68] Long Term's view of the Second Circuit test, see Trial Brief [Doc.
#133] at 107 ("...if a transaction can be shown either to have a valid
business purpose or economic effect, it is not a sham in substance transaction
under this Second Circuit test."); see also id. at 114 ("It is clear based
upon the [Second Circuit] authorities [cited] above that a transaction lacking
economic effect cannot be disallowed unless the transaction also lacks any
non-tax business purpose. See Gilman...."), appears to misinterpret Gilman,
which, read as a whole and in context, stands for the proposition that the
nature of sham analysis is "flexible" and may but is not required to encompass
both subjective and objective inquiries, see Gilman, 933 F.2d at 145-49.
   Gilman's emphasis on objective factors, see id. at 147-48 and n.5, and
endorsement of the Tax Court's analysis, see id., which was quoted in part as
"[t]he presence of business purpose does not entitle a transaction to be
recognized for Federal tax purposes where objective indicia of economic
substance indicating a realistic potential for economic profit are not
manifest," id. at 146 (quotation omitted), demonstrate that lack of objective
indicia of economic substance alone can support a conclusion that a
transaction is a sham.  This is the interpretation of at least one Second
Circuit case decided subsequent to Gilman, see Ferguson, 29 F.3d at 102
("Having concluded that the partnerships' ... activities lacked economic
substance, those activities must be disregarded for tax purposes and cannot
form the basis of any deductions.  It is unnecessary, therefore, for us to
analyze the tax court's findings with respect to the partnerships' profit
motive.  See Gilman....").
   Admittedly, read in a vacuum, some of the language of Gilman suggests
the opposite conclusion.  See Gilman, 933 F.2d at 148 ("In the present case,
the Tax Court did not demand that the taxpayer demonstrate both business
purpose and economic substance.  Rather, the Court examined each prong
separately and concluded that Gilman lacked a business purpose and that the
transaction lacked economic substance.  The Tax Court applied the sham
analysis consistent with the guidelines of this Circuit and others, indicating
the flexible nature of the analysis.  See ... Casebeer v. Commissioner, 909
F.2d 1360, 1363 (9th Cir. 1990); Sochin v. Commissioner, 843 F.2d 351, 354 (9th
Cir. ... 1988)....").  The focus of the language, which is clarified by
reference to the supporting citations, however, is that it is proper for a
court to "consider[] both the taxpayers' subjective business motivation and
the objective economic substance of the transactions in making its sham
determinations," Casebeer, 909 F.2d at 1363, and that the conclusion that a
transaction is a sham does not require "find[ing] that the taxpayer was
motivated by no business purpose other than obtaining tax benefits *and* that

The utility of the Second Circuit's flexible approach is illustrated in the present case.  Long Term sought to establish at trial that at least part of its subjective motivation for engaging in the OTC and B&B/UBS transactions, namely, the expectation of making a substantial pre-tax profit from the management and incentive fees it could earn from both, also demonstrates the objective economic substance underlying both transactions because such expectation was reasonable.  Long Term also attempted to show additional non-tax subjective business purposes for engaging in the transactions, including establishing and advancing a relationship with B&B as a value-adding strategic investor and increasing the LTCM principals' investments in Portfolio.

The Court concludes, however, that, while Long Term approached the OTC transaction fully conscious of the tax law's requirement of economic substance, including consideration of pre-tax profit potential, Long Term had no business purpose for engaging in the transaction other than tax avoidance and the transaction itself did not have economic substance beyond the creation of tax benefits.

---

the transaction has no economic substance," id. (emphasis in original), which is an "argument [without] merit," id..  In summary, "'consideration of business purpose and economic substance are simply more precise factors to consider in the application of this court's traditional sham analysis; that is, whether the transaction had any practical economic effects other than the creation of income tax losses."  See id. (quoting Sochin v. Commissioner, 843 F.2d at 354).

### 1.    Objective Economic Substance

In Gilman, the Second Circuit affirmed the Tax Court's
economic substance analysis, which was approached from "the
standpoint of a prudent investor," Gilman, 933 F.3d at 147, an
approach that finds "a transaction has economic substance and
will be recognized for tax purposes if the transaction offers a
reasonable opportunity for economic profit, that is, profit
exclusive of tax benefits." Id. (quotations omitted).  The Tax
Court concluded that the sale/leaseback transaction under review
lacked economic substance because, at the time the transaction
was entered into, a prudent investor would have concluded that
there was no chance to earn a non-tax based profit return in
excess of the costs of the transaction.  See id.  The Second
Circuit affirmed the approach, noting that "the most important
element for economic substance" in the sale/leaseback transaction
was the critical objective measurement demonstrating the taxpayer
could not reasonably have expected to recoup his investment.  Id.
at 149.  Importantly, the Second Circuit rejected the taxpayer's
contentions that (1) the relevant standard for determining
economic substance is whether the transaction may cause any
change in the economic positions of the parties (other than tax
savings) and (2) that where a transaction changes the beneficial
and economic rights of the parties it cannot be a sham.  See id.
at 147-48.  Rather, the Second Circuit held that the Commissioner

104

could properly focus on objective economic factors and "concern that [the taxpayer's] entry into the transaction was motivated by tax consequences and not by business or economic concerns," id. at 148, without having to prove or contend that the taxpayer did not become the owner of the computer equipment he purchased and subsequently leased.

The Second Circuit's decision in Goldstein v. Commissioner, 364 F.2d 734 (2d Cir. 1966) also illustrates the role a cost versus reasonable expectation of return comparison can play in analyzing the objective economic substance of a transaction. There the Tax Court found that the taxpayer entered into certain loan transactions solely for the purpose of obtaining tax deductions, see id. at 738, based in part on computations made by the taxpayer's advisor shortly after the transactions had closed that revealed the transactions would produce an economic loss of $18,500. See id. at 739. The computations also showed that the economic loss would be more than offset by the substantial reduction in income tax liability resulting from the deductions generated by the loan transactions. See id. The taxpayer countered with reconstructions of other computations purportedly made by her advisor contemporaneous to the loan transactions that showed expected economic profits of $2,075 and $22,875 and argued that she had entered the transactions with a realistic anticipation of economic gain. See id. In addition to

105

questioning the authenticity of these purported reconstructions, see id. at 740, the Second Circuit concluded that they did not establish that the loan transactions were undertaken with "a realistic expectation of economic profit." Id. Examining the first reconstruction, the Second Circuit concluded that "when the $6,500 fee paid to [the taxpayer's advisor] and tax counsel for their work in planning these transactions ... is included in these computations[,] all economic profit disappears." Id. With respect to the second reconstruction, the purported $22,875 of expected economic profit was concluded to be similarly illusory. No consideration had been given to the $6,500 in planning costs. An embedded presupposition in the computations that the taxpayer might recover some prepaid interest through prepayment of her loans was weak since neither loan agreement contained a provision entitling the taxpayer to reimbursement for unearned prepaid interest and one agreement was unclear with respect to whether petitioner was even permitted to prepay her loan. Finally, the Second Circuit concluded a reduction from the $22,875 figure was necessary to take into account the fact that the computations were predicated on the "remote possibility" that the Treasury obligations (which secured the loans and had largely been purchased with the loan proceeds) "could be sold considerably in excess of par, thereby yielding an effective rate of interest well below 1 ½%, even though it would be unlikely that investors

106

would purchase them for such a small return when they were to
mature at par in the near future." Id.  Significantly, Goldstein
focuses solely on the taxpayer's subjective motivation for
entering the transaction and the transaction's objective economic
substance from the perspective of the taxpayer, and not on the
motivation or perspective of other participating parties.
Indeed, the Second Circuit explicitly rejected an alternative
holding of the Tax Court that the loan transactions were complete
shams as evidenced by the banking participants' failure to carry
out the normal formalities associated with a loan transaction of
the size undertaken by the taxpayer, noting that the banks may
have been induced to forego such formalities because the economic
deal was a virtually guaranteed money maker (taxpayer's loans
bore a higher rate of interest than Treasury notes while
simultaneously being secured by those notes).  See id. at 737.[69]

As the following cost/return analysis demonstrates, like the
taxpayers in Gilman and Goldstein, Long Term could not have had
any realistic or reasonable expectation that it would make a non-
tax based profit from the OTC transaction.

_____

[69] While the opinion in Goldstein expressly limits itself to
"transactions inspired by the lure of [26 U.S.C. § 163(a) (1954)]," Goldstein,
364 F.2d at 740 n.5, subsequent Second Circuit cases have understood its
teachings to apply more broadly to the analysis of economic substance and
business purpose generally.  See DeMartino, 862 F.2d at 406.  Petitioners
recognize this broader applicability.  See Pets.' Trial Memorandum [Doc. #133]
at 107-08.

2.    **The Scope of the Transaction for Purposes of Measuring Costs and Reasonable Expectation of Return**

The facts underlying the relationship between OTC and Long Term demonstrate that an objective analysis of Long Term's costs and reasonable expectation of return should include the loan from Long Term U.K. to OTC, OTC's August 1, 1996 and November 1, 1996 contributions to LTCP, and OTC's sale of its partnership interest on October 31, 1997 by exercise of its liquidity put options on October 28, 1997.  There was no material or economically meaningful difference between the ownership of Long Term and Long Term U.K.  The combined proceeds of Long Term U.K.'s loans to OTC, $9,327,294, derived from liquidating working capital investments Long Term U.K. had in securities, were necessary to facilitate OTC's contributions (as OTC used $3,016,375 to repay existing indebtedness encumbering its contributed preferred stock, $6,189,918 to fund accompanying cash contributions, and $121,000 to purchase put options), and were secured by OTC's partnership interest in LTCP.  The closing documents accompanying the promissory notes for the August 1 and November 1, 1996 loans explicitly provided that OTC was acquiring the partnership interest with the intent to sell it by exercise of one of its two put options.  This formal documentation memorialized OTC's intent as conveyed to Long Term on June 12, 1996 in London (and acknowledged by Scholes in a draft letter written six days later)

108

to liquidate any interest it might acquire in LTCP in the near future. OTC's balance sheet revealed that OTC did not have sufficient funds to repay the loans from Long Term U.K. absent liquidation of its interest in LTCP and the loans matured 21 days subsequent to expiration of OTC's put options.

As set forth in more detail _infra_, from the introduction of the idea of a transaction with high basis stock from Turlington, Long Term itself always anticipated that the investor would subsequently transfer its interest in the partnership to LTCM. Turlington's structure, which Long Term adopted, required sale of the preferred stock by Portfolio before LTCM could obtain the tax benefits because the capital losses purportedly generated by the sale could only be allocated to OTC's partnership interest or the successor thereto. This expectation developed into a specific expectation that OTC would transfer its interest by virtue of the put options it acquired in August and November of 1996. This is demonstrated by the manner in which the transaction was actually structured to permit OTC's exit by means of put options, including Long Term's desire that the put options extend for a term of at least twelve months to provide a veneer of economic substance, Scholes' signature on behalf of Long Term U.K. on closing documents for the loans to OTC (which formalize OTC's intent to exit by put options), and Scholes' memorandum of November 12, 1996 specifically and generally characterizing OTC's

109

sale of its partnership interest to LTCM, which took place approximately one year later, as a foregone conclusion. Under these facts, an objective observer could conclude only that, prior to OTC's contributions, a reasonable expectation of return from the transaction would include interest earned on the loans to OTC, proceeds from the sale of put options to OTC, and fees earned on OTC's contributions beginning on August 1 and November 1, 1996 and ending on October 31, 1997.

### 3.    Reasonably Expected Return

Prior to the OTC transaction, Long Term could at most reasonably expect to earn $787,883 in interest from its loans to OTC, $121,000 in premiums paid for the liquidity and downside puts, and fees approximating 9% of OTC's total investment or $1,050,750, for a total of $1,959,633. The fee figure is calculated by adding 9% of OTC's total investment ($10,340,000) for the year beginning November 1, 1996 and ending October 31, 1997, and 9% of OTC's initial investment ($5,340,000) divided by four for the quarter beginning August 1, 1996 and ending October 31, 1996. The 9% figure is derived from extracting the 2% management fee and the incentive fee from an expected overall return to Portfolio of 30% (the incentive fee is calculated as one quarter of the overall return net of the management fee or

110

28%).[70]  The calculation is based on the Court's conclusion that
it was reasonable to expect at the outset of the OTC transaction
an overall return of 30% but, contrary to petitioners'
contentions, no more than that figure.  Fabozzi emphasized that
he was not opining on the reasonableness of projecting any
particular rate of return or the reasonableness of expecting
historical performance to continue.  Scholes marketed the firm as
providing a 21% net investor return, provided that figure to
Koffey at their first meeting about OTC, and himself expected
Long Term to earn a 21% investor return for OTC.  Kuller claimed
to have used 21% net return in his purported pre-tax profit
analysis.  Rosenfeld admitted that Long Term itself believed its
gross returns in 1996 would be only mid-20s and in 1997 low 20s.
Long Term told investors in the summer of 1997 that investing
opportunities had decreased and thus expected returns for
investors for the year were going to be mid-teens and gross
returns low 20s.  These numbers reflect what was generally
occurring within Portfolio during the 1996/1997 time frame: Long
Term was running out of investment strategies and so closed
Portfolio in late 1995 out of concern that continued expansion of
Portfolio's equity capital base would preclude continued high
returns for investors.  Then, during 1997, Long Term sought to

---

[70] The figure is very slightly low as, similar to the calculation of
petitioners' expert Fabozzi, it does not account for Long Term's actual
practice of calculating fees monthly.  See supra note 54.  Long Term's actual
fees earned from OTC's investment were $1,061,848.

and ultimately did on December 31 (after OTC sold its partnership
interest to LTCM) return capital to investors for the purpose of
increasing investor return relative to risk.

### 4. Costs of the OTC Transaction

Against a reasonably expected return of $1,959,633, Long
Term was willing to expend disproportionate out of pocket costs
of several million dollars (including $513,333.69 for Shearman &
Sterling legal opinions and related costs, $400,000 for the King
& Spalding opinion, a minimum additional $125,650 to King &
Spalding in hourly fees, $1.2 million as a disguised fee to B&B,
up to $1.8 million as a fee to Turlington, several million
dollars to Scholes as a partnership distribution and $50,000-
100,000 to Noe as a bonus for his work on the OTC transaction)
and, given a reasonably expected overall return of 30% for
Portfolio, give away to OTC an additional $1.2 million of
anticipated profit as a result of the economics of the OTC
transaction.

### a. Legal Fees

The invoices for Shearman & Sterling's $513,331.69 bill in
connection with delivering legal opinions for each of OTC's
contributions of preferred stock to LTCP are dated September 26,
1996 and March 31, 1997.  The entirety of these invoices can be

112

charged against Long Term's reasonable expectation of profit.
Long Term was not willing to go forward with the OTC transaction
without "should" level opinions from Shearman & Sterling.  In
fact, Long Term only retained Shearman & Sterling after it
provided assurance that it could render opinions at the "should"
level.  Long Term later had Sykes memorialize the commencement of
Shearman & Sterling's representation of Long Term as of April 11,
1996 by letter dated April 26, 1996.  Long Term paid the bills
for work that was performed prior to OTC's second contribution on
November 1, 1996.  There was no testimony at trial that the
invoice amounts were unexpected or constituted costs that had
spiraled out of control.  To the contrary, Kuller claimed to have
discussed a material pre-tax profit analysis with Noe at the time
of the OTC transaction that assumed $500,000 for the Shearman &
Sterling legal opinions.

The invoice for the $400,000 premium for the King & Spalding
opinion is dated January 28, 1999, and invoices for hourly fees
and costs totaling $125,650 are dated September 13, 1996,
December 6, 1996, April 29, 1997, and June 24, 1997.[71]
Notwithstanding that some of the work represented by the bills
occurred subsequent to OTC's contributions and apparently even
after Portfolio's sale of the contributed stock, their entire sum

---

[71] While the invoices state only that they were "for services rendered
..., consisting of representation with respect to federal income tax matters,"
see Govt.'s Ex. 337, Noe testified that the major component of them related to
the OTC transaction.

properly figures into the reasonable non-tax based profit
analysis under the facts of this case.[72]  Costs occurring
subsequent to the onset of a transaction may be counted against
reasonable expectation of return where such costs are anticipated
at the time of the transaction.  See <u>Gilman</u>, 933 F.2d at 147 and
n.4, 149.  King & Spalding was retained on May 22, 1996, and the
retention letter dated May 29, 1996 and countersigned by Noe for
LTCM stated that the King & Spalding fee for work performed in
connection with the OTC transaction would consist of King &
Spalding's time at hourly rates ranging from $175 per hour for
junior associates to $465 per hour for senior partners,
disbursements, and a premium of $250,000 in the event the OTC
transaction was consummated and King & Spalding rendered a legal
opinion.  Kuller claimed, however, that when he and Noe discussed
a pre-tax profit analysis prior to Long Term entering the OTC
transaction, he and Noe assigned a cost of $500,000 to the King &
Spalding opinion, which included a $400,000 premium.  Thus, while
the Court has not credited the occurrence of Kuller's purported
detailed pre-tax profit discussion with Noe, <u>see</u> <u>supra</u> Part
II.D.8.b., the Court extracts from Kuller's account an
acknowledgment that, prior to the OTC transaction, Long Term
understood the premium for the opinion would be $400,000.  It was

---

[72] It is likely Long Term paid King & Spalding more than $525,650 in connection with the OTC transaction as King & Spalding continued to perform work on the opinion long after May 31, 1997, the last date for which King & Spalding shows charges for legal services in the June 24, 1997 invoice.

114

Long Term's intent to have King & Spalding involved at the very initial stage of what became the OTC transaction, to render advice from that point through OTC's contributions to LTCP and all the way up to LTCM's sale of OTC's contributed stock, and to render a legal opinion after the sale. Long Term would not have permitted OTC's contribution of preferred stock if it did not have assurance from King & Spalding that the firm was willing to issue a "should" opinion in the event OTC exercised one of its put options and LTCM sold OTC's contributed preferred stock. Long Term having anticipated from the outset of the OTC transaction the entirety of the legal fees paid to King & Spalding and in the absence of any evidence of cost escalation, such fees count against any reasonable expectation of profit Long Term might have had in taking OTC's contributions.[73]

###    b.    "Consulting Arrangement" with B&B

The consulting agreement entered into between Long Term and B&B on November 1, 1996, pursuant to which Long Term agreed to

---

[73] Kuller's trial testimony was that he told Noe the costs for the legal opinions should not be included as transaction costs because neither OTC nor B&B required Long Term to obtain such opinions. See supra note 38. This is too rigid a view of transaction cost under the facts of this case and under Second Circuit precedent. First, Noe and Long Term's principals vigorously maintained that they would not have permitted OTC's contributions of preferred stock in the absence of "should" level opinions from Shearman & Sterling and King & Spalding (or, in the case of the latter, the assurance that such opinion would be forthcoming if necessary). Second, the legally material consideration is not the counter party's requirements but the decision to incur costs to plan and accomplish a transaction. See Goldstein, 364 F.2d at 736-37, 740.

pay B&B $100,000 per month for one year, is properly charged to Long Term as a transaction cost for the OTC transaction, that is, a fee cloaked in the form a consulting contract to compensate B&B for bringing the tax benefits of OTC's preferred stock to Long Term.  Scholes', Noe's, and Rosenfeld's testimony demonstrates Long Term's awareness of the requirements of economic substance and business purpose and thus Long Term had ample incentive to avoid the appearance of paying for tax benefits and motive to hide any such payment, particularly one in excess of any reasonable calculation of fees it could obtain from OTC's investment.  Right on cue, the consulting arrangement was entered into on the same day the second of OTC's contribution transactions closed.  Long Term had not before and did not after enter into any comparable consulting arrangement with any other investment banking firm,[74] and did not renew this agreement after expiration.  Koffey proposed the arrangement only after Scholes and Noe told him that no formal fee would be forthcoming for B&B's introduction of OTC to Long Term.  Such proposal must be construed in light of Koffey's and B&B's expectation of earning fees from disposition of OTC's various blocks of CHIPS and TRIPS preferred stock as made explicit in B&B's fee agreements with OTC and calculations and negotiations regarding OTC's CHIPS II

---

[74] Rosenfeld's testimony about a consulting agreement with the firm of Ehrenkrantz & Ehrenkrantz, see Tr. [Doc. 186] at 2220:7-2221:2, is far too vague to compare such agreement with the one made with B&B.

preferred stock.  B&B never expressed an unwillingness to bring
transactions to Long Term in the absence of such an agreement,
there were never any specific discussions between Scholes and B&B
regarding how B&B would earn its $1.2 million "consulting fee,"
and the arrangement itself imposed no performance requirements on
B&B.  Finally, the agreements' written terms explicitly provided
that B&B was entitled to additional fees to be negotiated on a
transaction-specific basis with no deduction for payments made
under the agreement.  The inference which the Court draws from
these facts is that monies paid under the consulting agreement
were paid for the OTC transaction and that Long Term and B&B had
an understanding that any subsequent work undertaken by B&B on
behalf of Long Term would be separately and individually
compensated.  This conclusion is supported by the circumstance
that, while the arrangement was still in place, B&B and Long Term
worked together on a tax oriented transaction termed "LIPS," with
respect to which B&B indicated its fee should not be lower than
7.5% of the "benefit of the deal," meaning at least in part the
tax benefits to Long Term from the transaction.

There are other facts which reveal the true nature of the
$1.2 million payment to B&B.  Paying the additional $1.2 million
to B&B over and above the value to B&B of being permitted an
indirect investment in Portfolio through UBS during the fund's
"closed" period suggests Long Term had in mind something more

117

than simply building and cementing a relationship with B&B.
Rosenfeld claimed that Long Term allowed B&B to invest because it
was a strategic investor.  Having recognized that simply being
permitted to invest in the fund during the "closed" period had
value in and of itself - in fact one occasionally reduced to a
monetary amount, see supra note 9 - Long Term traded that value
in exchange for fees plus the benefits to Long Term accruing from
the relationships thus gained from the strategic investor, in
this case, B&B.[75]  Having already transferred value to B&B in the
same manner as with strategic investors, the supplementation of
such value with an additional $1.2 million constitutes an
extraordinary bonus indicating something greater than just a
desire to strengthen a relationship, particularly where the $1.2
million came without strings attached, that is, requiring no
performance.  Finally, B&B's willingness to pay $550,000 to
Turlington at Long Term's request for the purpose of
strengthening its ongoing relationship with Long Term belies the
notion that a consulting arrangement was necessary to keep B&B

---

[75] In this regard, permitting B&B's investment itself might be
considered a fee to the extent the value of that permission could be appraised
in a secondary trading market, especially in light of Koffey's admission that
Long Term allowed B&B to invest in part because of the tax benefits it
furnished to Long Term through OTC.  Transferring this value constituted a
real cost to Long Term as it could have used the value of an investment
opportunity in Portfolio to entice investment from other strategic investors.
In addition, such value was not limitless during this time period because each
additional investment allowed would have contributed to Long Term's expanding
equity base and correspondingly diminished individual investor return, a
result that emphasizes the scarceness of the resource and the possibility of
its diminishing value if overused.

interested in working on deals for Long Term and supports the
opposite conclusion that it was B&B who desired to go out of its
way to ensure further transactional dealings with Long Term.

### c.    The Turlington Payment

Long Term's share of the $1.8 million dollar fee jointly
paid to Turlington with B&B, $1.25 million, is also properly
charged as a transaction cost for purposes of the material pre-
tax profit analysis.  Turlington made it clear from the outset of
his initial meetings with Noe and Long Term that he expected to
be compensated for his role in bringing B&B to Long Term and for
his partnership tax idea, and that he valued that role at $1.8
million, a figure known by Noe to have been calculated as a
percentage of the tax benefits that would accrue to Long Term
through the ultimate sale of OTC's preferred stock.  In response,
Noe told Turlington that, notwithstanding Turlington's fee
arrangement with B&B, Long Term would compensate Turlington after
completion of the transaction with a fair amount taking into
account the transaction's ultimate value and the amount paid to
Turlington as a fee from B&B.  In making this representation, Noe
explicitly stated that Long Term would consider Turlington's $1.8
million figure in making the fairness assessment because of
Turlington's long standing commitment to Long Term and Long
Term's desire to treat Turlington fairly.  Noe must have had at

119

least apparent if not actual authority to make such
representations or Turlington, who served as regular tax counsel
to Long Term in the mid-1990s, would not have been as satisfied
as he was at the time with Noe's representations.[76]

The fee dispute between Turlington and B&B arose at least by
December 1996, and Long Term was involved soon thereafter and at
least by the time of Long Term's general counsel Jim Rickards'
draft letter to Turlington dated May 9, 1997, shortly after OTC's
contributions and long before the completion of the OTC
transaction.  This timing is demonstrative of Turlington's
expectation of compensation prior to OTC's contributions, which
when not forthcoming promptly gave rise to the post-contribution
dispute.  Moreover, Rickards' draft letter, in summarizing Noe's
conversations, confirms Long Term's pre-OTC contribution
intention of being fully willing and able to compensate
Turlington with a fee for the OTC transaction albeit under the
guise of a "top[ped] up" fee to B&B.  See Govt.'s Ex. 331.[77]  As
the approximate amount of the potential tax deductions was known

---

[76] Documentation contemporaneous with OTC's contributions demonstrates
Noe's actual authority to bind Long Term to at least one significant contract
in the context of the OTC transaction.  Noe signed the King & Spalding
retention letter for Long Term, obligating Long Term to a minimum premium
payment of $250,000 and hourly rates up to $465/hour, and there was no
testimony at trial that such action did not therefore bind Long Term.  See
Govt.'s Ex. 286.

[77] In light of Turlington's testimony about his discussions with Noe and
Noe's acknowledgment of their content, Rickards' reconstructionist letter is
support for Long Term's pre-OTC contribution intent to pay Turlington some
fee.  The use of an agent/medium such as B&B to make a fee payment does not
change the identity of the payor.

to Long Term prior to OTC's contributions and the credible
testimony and contemporaneous evidence on the issue points in
only one direction regarding Long Term's intent, the Court
concludes on these facts that Long Term was prepared, in
accordance with Noe's promises, to pay a substantial fee to
Turlington at the outset of the OTC transaction, and that the
ultimate $1.25 million paid is a reasonable amount to charge
against Long Term as an anticipated cost of the transaction.

Against these facts stands only Kuller's and Noe's self-
serving testimony which is unsupported by any contemporaneous
evidence.  Kuller testified that Long Term entered the OTC
transaction believing it had no financial obligation to pay
Turlington, claiming Noe assured him prior to OTC's contributions
to LTCP that, although initially Long Term suggested it would
compensate Turlington if B&B did not agree, B&B ultimately had
agreed to do so.  For reasons previously set out, see supra Part
II.D.8.b., Kuller's testimony in support of Long Term's position
generally must be so warily scrutinized that, here, without
contemporaneous support, it will be given no weight.  Noe's
testimony that Long Term believed before OTC's contributions that
B&B was going to provide Turlington with fair compensation and
Long Term therefore expected to owe nothing at that point was at
best unfounded optimism, particularly as the fee dispute with
Turlington arose right after OTC's contributions.  As well,

121

Rickards' draft letter of May 9, 1997, which, fairly read, contemplates Long Term's willingness to pay Turlington albeit through the medium of B&B, confirms that Noe conveyed such willingness to Turlington and never indicates that Long Term would have to pay Turlington nothing.  Moreover, Koffey emphatically testified with raised voice that B&B would not have paid Turlington one penny but for Long Term's post-contribution request that B&B do so, which is distinctly inconsistent with the notion that B&B might previously have agreed to fully compensate Turlington.

Finally, this evidence also demonstrates the absence of any factual basis for "statements of fact" and "representations" regarding the $1.8 million payment to Turlington contained in the 1999 King & Spalding opinion:

> Subsequent to the consummation of all transactions addressed herein, Mr. Turlington threatened litigation against B&B and LTCM relating to amounts he believed he was due in connection with such transactions.  On August 3, 1998, in settlement of such claim, LTCM made a cash payment to Mr. Turlington in the amount of $1,250,000.

> It was LTCM's expectation and belief that no fee, commission, or other compensation was due or owing to Mr. Turlington by LTCM, Partners, or Portfolio relating to OTC's investment in Partners or any other transaction addressed herein.  During the period preceding December 31, 1997, there was no expectation on the part of LTCM, Partners, or Portfolio that it would make any payment to Mr. Turlington other than normal hourly fees for legal services.

Pets.' Ex. 357 at 10, 27.  Noe's pre-contribution discussions with Turlington and the fee dispute with Turlington with lawyers

122

negotiating on Turlington's behalf with B&B and Long Term months before Long Term's purchase of OTC's partnership interests contradicts the explicit assertion in the opinion that Long Term had no expectation prior to December 31, 1997 that it would have to make any fee payment to Turlington in exchange for his preferred stock transaction idea and introduction of B&B.

### d. Scholes' Allocation and Noe's Bonus

Scholes' special partnership allocation of several million dollars for his work on the OTC transaction and Noe's bonus of $50,000-$100,000 are also transaction costs that Long Term would have known about when deciding whether to enter into the OTC transaction. Just eleven days after closing OTC's second contribution transaction and approximately one year before OTC's partnership interest was sold to Long Term, the partners met to discuss Scholes' allocation for bringing the tax losses to Long Term, and the ultimate allocation of several million dollars was made pursuant to the standard and normal procedure by which Long Term allocated profits relative to the value principals brought to Long Term. The allocation of a portion of Long Term's profits to Scholes represents a real transaction cost to Long Term as such funds were therefore not available for any other purpose such as compensating other principals for their efforts, reinvestment into Long Term for current or future operating

123

expenses, or investment into expansion of the business. This one cost alone demonstrates the hopeless nature of the OTC transaction as a potentially profitable venture since it alone exceeds the reasonably expected return in fees and interest from OTC's investment, precluding a prudent investor's participation. On the other hand, this allocation amount is small when measured against the income that could be shielded from taxation by the $385 million in capital losses Scholes estimated (on November 12, 1996) would flow from Long Term's subsequent sale of OTC's contributed stock, which perhaps explains why there was no testimony to the effect that the size of Scholes' allocation was unanticipated.

Similarly, Noe's bonus was paid under an arrangement in place before Long Term was introduced to the transaction by Turlington and pursuant to which Long Term knew and understood that it would compensate Noe for such structured transactions.


### e.    Economic Structure of OTC Contributions

While all these specific transaction-related costs would have caused a prudent investor desirous of a pre-tax profit to eschew the OTC transaction, evaluation of the economics of the transaction's structure without regard to transaction costs also reveals deal making by Long Term that is antithetical to rational profit-oriented thinking. To preface, a prudent economic actor

124

in Long Term's shoes[78] would have chosen a direct investment into Portfolio of the $9,327,293 in loans Long Term indirectly invested in Portfolio through OTC because, under the objective economic structure of the OTC transaction, the two courses of action were virtually identical with respect to risk but the direct investment permitted much greater participation in the reasonably expected profit from the investment.

As set forth above, a prudent economic actor would have expected a 30% overall return in Portfolio on OTC's contributions to LTCP of $10,340,000 and not any percentage in excess of that figure such as Long Term suggested at trial, and therefore would have calculated Long Term's reasonably expected return from the transaction as $1,959,633 (total of management and incentive fees, premiums from put options, and interest on loans to OTC). However, Long Term funded the lion's share of OTC's contributions to LTCP ($10,340,000) with loans totaling $9,327,293 and bearing interest at 7% per annum; the loans were secured by OTC's partnership interest; and OTC had a downside put option pursuant to which it could force Long Term to purchase its partnership interest for $10,340,000.  Thus, Long Term's loan capital and expected interest thereon were subject to virtually the identical

---

[78] The Court here switches from use of the term "prudent investor" to "prudent economic actor" or "rational economic actor" to avoid confusion that may result from the fact that Long Term managed OTC's contributions to LTCP in Portfolio.  The change in terminology is not intended to signal a change in the Court's objective economic substance analysis.

risk as any investment in Portfolio, including the LTCM's
principals' direct investments, and Long Term therefore
essentially bore the entire burden of any diminution in value in
OTC's partnership interest just as if it had made its own direct
investment.[79]

By way of illustration, if OTC's partnership interest
diminished in value to $1,000,000, OTC would exercise its
downside put option and force Long Term to pay it $10,340,000.
OTC would then pay off Long Term's $9,327,293 loan plus interest
of $787,883 and depart with the remaining $224,824.  Long Term's
resulting $1,000,000 partnership interest plus the original
$121,000 received in put option premiums would leave Long Term
with a substantial loss of $9,219,000 or almost the entirety of
the original $9,327,293 in loans to OTC.  Given these risk
characteristics connected to the OTC transaction, a reasonably
prudent economic actor in Long Term's position would recognize
that a direct investment of $9,327,293 into Portfolio held
essentially the identical risk as the indirect method selected by
Long Term and was therefore from the downside perspective
essentially the identical investment.  At the reasonably expected
30% rate of overall return for Portfolio, however, the rational
economic actor would further have selected the direct over the

---

[79] Long Term did not bear the absolute entire burden of a Portfolio loss
as its loan capital and expected interest thereon were buffered by the small
amount (approximately $200,000) by which the value of OTC's partnership
interest after contribution exceeded them.

indirect loan investment as it would have been projected to yield $3,173,971.73[80] in contrast to the projection for the indirect investment total of $1,959,633. It thus becomes apparent that Long Term voluntarily structured and entered into a transaction in which it knowingly forfeited substantial and reasonably expected gains from a direct investment notwithstanding that it willingly absorbed downside risk of one. Even accepting Long Term's trial position that a reasonably prudent economic actor would have expected an overall rate of return for Portfolio in excess of 30%, the situation worsens, as the greater the return the greater the gap between a direct investment return and the sum of interest and option premiums received by Long Term.

As Professor Stiglitz concluded, absent tax benefits, a rational economic actor would not forfeit such potential profit to enter the OTC transaction without any corresponding diminution in risk relative to an identical direct investment. Petitioners' expert Fabozzi agreed that, under these facts, Long Term sustained an economic cost. Even Scholes himself, albeit after considerable questioning, admitted that, given that Long Term U.K.'s loan to OTC was secured by OTC's partnership interest and OTC had a right to put its interest to Long Term for an amount

---

[80] 30% of Long Term's total loan of $9,327,293 for the year beginning November 1, 1996 and ending October 31, 1997, and 30% of Long Term's first loan to OTC ($5,010,451) for the quarter beginning August 1, 1996 and ending October 31, 1996. On its own direct investment, Long Term retains the entire overall gain (2% management fee, 7% incentive fee, and 21% investor return) and thus the rational economic actor would have used the 30% figure here.

127

greater than the loan plus interest, the loan to OTC was "indirectly," Tr. [Doc. #184] at 1873:14, the same as if Long Term had invested the money directly in Portfolio. Accordingly, forfeiture of such potential profits is appropriately assessed against Long Term as a cost of the transaction that a prudent economic actor would have taken into account, and, assuming a 30% overall return for Portfolio, can be quantified as $1,214,338.72.

In closing argument, petitioners characterized this line of reasoning as an "opportunity cost red herring," Tr. [Doc. #207] at 3233:19, citing Johnson v. U.S., 11 Ct. Cl. 17 (1986) for the proposition that economic substance analysis does not create transaction costs by second guessing the taxpayer's selection of one investment over another, see Tr. [Doc. #207] at 3234:4-3235:1. Johnson and petitioner's argument are inapplicable to this case; both concern the distinguishable situation in which the taxpayer is taken to task for failing to pursue a different, more lucrative and higher return investment than the one actually selected. See Johnson, 11 Cl. Ct. at 36-37. Under the circumstances here, the loan to OTC and a potential direct investment in Portfolio were from an objective standpoint identical investments, and it is the selection of the manner in which the investment was achieved - through OTC with attendant forfeiture of profit in exchange for no (or minimal) corresponding diminution in risk over a direct investment - that

128

reveals the absence of objective economic substance and strongly
suggests the sole focus as the creation of tax benefits.  See
Boca Investerlings P'ship v. U.S., 314 F.3d 625, 631 (D.C. Cir.
2003)("defies common sense from an economic standpoint" to
execute an investment indirectly through a partnership and not
directly where indirect method diminishes profits by adding
millions in transaction costs).  If Long Term had simply elected
the security of a 7% interest bearing loan over the potentially
more lucrative but riskier 21% return of a direct investment in
Portfolio, under the reasoning of Johnson, it would be
inappropriate for the Court to second guess such a subjective
business determination.  That is not, however, what Long Term
did.

### f.    B&B's Investment Through UBS

Petitioners strenuously maintained and their testifying
principals uniformly testified that any fees derived from B&B's
investment in Long Term through UBS ought to be figured into the
objective economic substance calculation, as petitioners viewed
the B&B/UBS and OTC transactions as inextricably intertwined.
Scholes explained that B&B could only invest if OTC did in light
of Portfolio having been closed and OTC could only invest if B&B
allowed it, which it would not have done without also being
permitted to invest.  The Court disagrees both as a matter of law

129

that fees generated from B&B's investment are relevant to an objective economic substance analysis of the OTC investment, and as a matter of fact that the two transactions are really one or that inclusion of such fees would alter the conclusion that the OTC transaction had no economic substance apart from the creation of tax benefits.

First, the relevant legal inquiry is "whether the transaction that generated the claimed deductions ... had economic substance." Nicole Rose, 320 F.3d at 284. All tax benefits claimed in the present litigation arose from Long Term's transaction with OTC not with UBS/B&B. Long Term cannot avoid the requirements of economic substance simply by coupling a routine economic transaction generating substantial profits and with no inherent tax benefits to a unique transaction that otherwise has no hope of turning a profit.

Second, the trial evidence regarding the UBS/B&B transaction belies petitioners' contention that the OTC and UBS/B&B transactions are unified and indistinct (or that, in the alternative, Long Term contemporaneously believed them to be so). The B&B/UBS transaction was a standard one and as such required minimal transaction costs whereas the OTC transaction was a unique one-time deal for Long Term. At the time, numerous investment banks desired similar investment opportunities in Long Term. It was Long Term that conditioned B&B's investment on

OTC's investment, and even Scholes admitted it was "potentially possible" to have a relationship with B&B independent of a relationship with OTC.  The King & Spalding written opinion draws a distinction between the two transactions, including a separate representation about the material pre-tax profit expectation from OTC's investment in LTCP.  Scholes' memorandum of November 12, 1996 does not mention the B&B/UBS transaction at all but focuses on the tax losses to be derived from the OTC transaction. Scholes' testimony that his query "How Should LTCM pay those who brought the Tax Losses to Fruition...?" incorporated a reference to the B&B/UBS transaction is unsupported and farfetched.  The first most favored nation letters make no mention of the B&B/UBS transaction but solely discuss the OTC transaction.  The Court concludes both that there was nothing inherent in the transactions that required them to be viewed as one and that, with respect to a contemporaneous view of the tax benefits derived from and the objective tax analysis of the OTC transaction, not even Long Term really regarded the two as unitary.

Finally, similar to the economic structure of the OTC transaction, from the standpoint of the rational economic actor, the economic structure of the B&B/UBS transaction put Long Term into an objectively worse economic position than if Long Term had made the identical investment only on its own behalf rather than

B&B's.  At the reasonably expected 30% return rate of Portfolio, a prudent economic actor in Long Term's shoes would have estimated that Long Term stood to earn $5,400,000 in management and incentive fees from the B&B/UBS investment in 1996 and 1997 plus $4,049,000 in premiums for the put options sold to UBS.[81] However, as demonstrated by Stiglitz' and Tannenbaum's testimony, the UBS/B&B transaction was essentially in the form of a loan of $50,000,000 from UBS to Long Term, for which, by the mechanism of the put options sold to UBS, Long Term bore virtually the entire credit risk (buffered in some minimal sense by the put option premiums, see infra note 84): if UBS' capital accounts on August 31, 2001 and December 31, 2001 were less than $44,000,000 and $28,520,000 respectively, Carillon (of which B&B was a partner) would not exercise its call options but UBS would exercise its put options and force Long Term to buy the capital accounts for those sums, thereby guaranteeing UBS a combined rate of return slightly north of the LIBOR rate plus fifty basis points.  As such, the transaction imposed on Long Term virtually the identical risk Long Term would have shouldered had it simply taken the loan from UBS and made the identical investment on its own behalf in Portfolio.  A reasonably expected return from such a direct investment in 1996 and 1997 would have been

---

[81] Long Term actually earned $5,177,891 in management and incentive fees during this time frame from the UBS/B&B investment.

$18,000,000,[82] approximately double the reasonably expected

return from the UBS/B&B transaction during the same time

period.[83]   Thus, Long Term voluntarily did what a rational

economic actor would not: enter a loan transaction for which it

shouldered the credit risk but forfeited to B&B $9,000,000 of

reasonably expected benefit.[84]

---

[82] 30% of 20,000,000 for the year 1997 and 30% of 30,000,000 for the year 1997 and the quarter beginning September 1, 1996 and ending December 31, 1996.

[83] Projecting the numbers forward to the expiration dates of UBS' and B&B's options in 2001 only worsens the results for Long Term, particularly taking into account that Long Term's return of investor capital in late 1997 was undertaken for the purpose of maintaining high rates of return.

[84] The Court is aware that, simplifying the relevant calculations only a little, it is possible to tell an economic story pursuant to which the complex arrangement between Long Term/UBS/B&B reasonably could have been projected at the outset to achieve a higher rate of return than a direct investment by Long Term of a loan from UBS.  For example, if Portfolio's overall yearly rate of return over the five year life of the loan was expected to be approximately 6.5% (equivalent to an investor return of 3.375%), the approximate value of UBS' partnership interests on the expiration date of its put options would have been projected as approximately $59,000,000 and an additional $8.3 million would have been projected as Long Term's earned management and incentive fees.  The $5 million shortfall owed to UBS upon exercise of its put options ($72,520,000-$67,300,000) could reasonably be thought to be hedged by the $4,000,000 in option premiums received by Long Term five years earlier plus a modest rate of return on them.  Under the direct investment scenario, no option premiums would be available for this hedging purpose.
  On the other side of the spectrum, if Portfolio's overall yearly rate of return over the life of the five year loan was expected to be approximately 14% (equivalent to an investor return of 9%), the value of UBS' partnership interests on the expiration date of its put options would have been projected as approximately $77.5 million and an additional $15 million would have been projected as Long Term's earned management and incentive fees.  The $5 million excess captured by B&B upon exercise of its call options ($77.5 million - $72.5 million) could reasonably be thought to be equaled by the $4,000,000 in option premiums received by Long Term five years earlier plus a modest rate of return on them.  Under the direct investment scenario, no option premiums would have been available but Long Term would have captured the excess over the $72.5 million owed to UBS.
  What these two examples illustrate is that, given the virtually identical credit risk characteristics associated with the indirect UBS/B&B loan transaction and a direct investment scenario, the reasonable investor might have selected the UBS/B&B transaction over a straight loan and direct investment if, during the late 1996 time frame, the overall return of Portfolio from 1997 to 2002 was reasonably expected to hit the bull's eye between 6.5% to 14%.  While mathematical manipulations make this a plausible

133

**5.    "Things Economic Happened" - Tr. [Doc. #207] at 3228:25-3229:1**

Counsel for petitioners repeatedly invoked the argument that objective economic substance is present where a transaction causes change in the economic positions/rights of the parties (other than tax savings), such as the exchange of cash or other consideration for a partnership interest or the purchase by one partner of another's partnership interest.[85]  The Second Circuit rejected this argument in Gilman.[86]  Here, even if OTC owned a partnership interest in LTCP or sold such interest to LTCM, such

---

approach, the evidence at trial was to the opposite effect, revealing a reasonably expected return for Portfolio during this time frame to be 30%. Moreover, this story was not Long Term's or its version of the facts offered at trial.  The worst return estimate at trial was Rosenfeld's admission that Long Term expected overall returns in the mid 20s in 1996 and low 20s in 1997. Using such a worst case scenario of 15% investor return, the prudent investor would have expected the value of UBS' capital account to outdistance the option premiums (plus a modest return on them) by approximately $23 million. In addition, Long Term repeatedly attempted the argument that it would have been reasonable to expect historic rates of return, upwards of high 50%s, and no principals testified that the UBS/B&B deal was a good one because Long Term's or a reasonably prudent overall return projection for Portfolio was really between 6.5% to 14%.  Against this factual background, the prudent investor would not have banked on such a narrowly targeted return and correspondingly would not have sacrificed so much upside for the minimal corresponding diminution in risk over a standard loan transaction embodied in the option premiums.

[85] See e.g. Tr. [Doc. #207] at 3230:2-7 ("There is here in the economic substance area, and you can see from those cases going back to 1934 and moving forward, the real focus, and sometimes there are areas of emphasis on these decisions, but the real focus is did things economic happen, did things move."); id. at 3233:2-5 ("... LTCM ... ended up purchasing the $10 million interest of the investor, OTC.  That was a real transaction.  It occurred.").

[86] See Gilman, 933 F.2d at 148 ("The taxpayer relies on Rosenfeld v. Commissioner, 706 F.2d 1277 (2d Cir. 1983) ..., to argue that where a transaction changes the beneficial and economic rights of the parties it cannot be a sham.  But the Commissioner does not contend that Gilman does not own the computer equipment.  Instead, the concern is that his entry into the transaction was motivated by tax consequences and not by business or economic concerns."); see also id. at 147-48.

134

"movement" does not shield the transaction from scrutiny for economic substance and the Government may mount a challenge thereto from the perspective of a prudent economic actor.

Frank Lyon Co v. U.S., 435 U.S. 561 and Newman v. Commissioner, 902 F.2d 159, 163 (2d Cir. 1990), on which petitioners heavily rely, are not to the contrary. Because of the flexible nature of economic substance analysis, both cases necessarily focus on objective economic realities in deciding whether or not to disregard contracts made in the context of leasing arrangements. The contexts differ from the partnership investor/hedge fund at issue in this case. While one of the facts considered was whether the taxpayers faced economic risk as a result of having entered into the arrangement, see Lyon, 435 U.S. at 576-77; Newman, 902 F.2d at 163, the cases leave no doubt that economic substance analysis, particularly in factually complex cases like Lyon and this one, requires consideration of much more. See e.g. Lyon, 435 U.S. at 582-83. Critically, facts central to the outcomes of those cases are absent here: in Lyon, the form of the transaction was compelled by state and federal regulatory agency requirements, see e.g. id. at 582-83; and in Newman, one of the contracting parties was entitled to the tax credit at issue, precluding the possibility of tax collusion, see Newman, 902 F.2d at 163. The absence of such facts does not, of course, compel the conclusion that economic substance is absent

135

any more than the existence of taxpayer risk somewhere in a
transaction requires the conclusion that economic substance
exists; it only reinforces that determination of economic
substance is a case by case, fact-based inquiry.  See Lyon, 435
U.S. at 584.  In sum, neither case speaks against the prudent
investor analysis of Gilman and Goldstein, which seeks to
determine whether the taxpayer entered into a transaction with a
reasonable expectation of profit or purposefully incurred expense
in excess of any reasonably expected gain.


### 6.    Subjective Business Purpose

Long Term argued that it was primarily motivated to enter
the OTC transaction because of the management and incentive fees
it could earn from OTC's and B&B's investment.  Long Term
stressed that accepting investments was its core business.  It
pointed to other claimed non-tax subjective motivations, namely,
establishing a relationship with B&B as a value-adding strategic
investor and increasing the LTCM principals' investments in
Portfolio.  As analyzed above, the evidence of claimed
reasonableness of the purported primary motivation, fees, is
unpersuasive - - a prudent investor would not have made the deal.
The absence of reasonableness sheds light on Long Term's
subjective motivation, particularly given the high level of
sophistication possessed by Long Term's principals in matters

136

economic.  This is demonstrated, for example, by Scholes'
concession that some of Long Term's principals viewed the added
value of OTC and B&B solely to be anticipated tax benefits.
Moreover, the construction of an elaborate, time consuming,
inefficient and expensive transaction with OTC for the purported
purpose of generating fees itself points to Long Term's true
motivation, tax avoidance.  Taking fee-generating investments was
Long Term's core business and was regularly executed without
either the complex machinations related to OTC's contributions or
the attendant millions in transaction costs.  See Boca
Investerlings P'ship, 314 F.3d at 631-32.  For these and the
following reasons, the Court finds that fees, strategic value
added by B&B, and increasing Long Term's principals' Portfolio
investments did not motivate the OTC transaction; rather Long
Term possessed no business purpose other than tax avoidance.

     While what transpired between B&B, OTC, and others after the
close of the CHIPS and TRIPS transactions but before contact with
Long Term does not speak directly to Long Term's motivation, this
background reveals the context from which Long Term's transaction
with OTC arose: a highly sophisticated marketplace in which B&B,
a firm which marketed the ingenuity of its principals like
Koffey, assiduously developed a scheme for selling tax deductions
through the vehicle of preferred stock to any entity or
individual materializing as a suitable buyer.  B&B expected to

market the resulting preferred stock for fees justified by and
calculated on the transferee's ability to utilize the stock's
inflated basis.  B&B ensured its fee for delivering the tax
deductions to a buyer by entering into an exclusive agency
agreement with OTC pursuant to which B&B alone could sell the
stock, and concurrently by retaining rights (in the event the
exclusive agency terminated) to buy the stock and thereby prevent
OTC (or some other tax product promoter on OTC's behalf) from
selling the stock with its built-in tax deduction potential.
Koffey and Shearman & Sterling worked jointly to create a product
for transferring OTC's preferred stock to a purchaser without
disturbing its inflated basis.  Shearman & Sterling failed to
devise an appropriate transactional vehicle, and Koffey settled
for Shearman & Sterling's assurance that it could render an
opinion that OTC's basis in the stock was in fact in excess of
$90 million following the CHIPS and TRIPS transactions.  While
all this expenditure of effort occurred prior to Long Term's
involvement, Shearman & Sterling's billing records show that at
least some of its work was subsequently charged to Long Term's
account.

The OTC transaction was brought to Long Term not as an
investment but as a tax product, and Long Term pursued the
preferred stock as such with little real attention to the makeup
of the entity OTC.  James Babcock himself approached Donald

138

Turlington, Long Term's regular outside tax counsel, about the placement of preferred stock with high basis, assuring Turlington of compensation based on a percentage of profits flowing to B&B through successful placement.  Turlington in turn approached Noe, Long Term's Director of Taxes, not anyone else in Long Term. Without any knowledge of OTC, the entire scheme was hatched: an investor's contribution of high basis stock for a partnership interest and subsequent sale of that interest to LTCM with the result that LTCM, by operation of the federal partnership tax laws, would succeed to the built-in loss of the investor's partnership interest and accordingly pass through to its principals loss deductions obtained from the subsequent sale of the stock.  Scholes' initial instruction to Noe was to find out about the high basis stock and why it had high basis. Turlington's recommendations of law firms was in the context of executing the entire transaction, both contributions of the preferred stock and their subsequent sale.  Long before Scholes and Noe had any contact with OTC and its principals, Shearman & Sterling had already performed substantial work for and with Long Term on the legal opinion regarding OTC's basis in the preferred stock.  In fact, Long Term's insistence on having their retention of Shearman & Sterling made effective as of April 11, 1996 for purposes of establishing a date on which Shearman & Sterling represented Long Term exclusively implies Long Term's knowledge

139

that Shearman & Sterling had been working on the legal opinion at
the behest of B&B prior to the commencement of the representation
and thus Long Term's recognition that it was purchasing a ready
made tax product.  Scholes' and Noe's initial meetings with
Koffey were fixated on the potential tax deductions available to
Long Term from ultimately acquiring and selling OTC's preferred
stock, and with constructing a transaction to try to pass muster
under federal tax laws.

The majority of Long Term's four testifying principals
recalled little more about OTC other than that it represented a
tax transaction.  Merton was not even aware that OTC represented
an entity, believing it instead to be an acronym for exchanging
high basis preferred stock for a partnership interest, but did
recall discussion among the principals prior to approving the OTC
transaction about obtaining the tax benefits inherent in the high
basis stock for LTCM.  Rosenfeld, in recalling the critical
management meeting at which Scholes detailed the OTC transaction,
had no recollection that "OTC" was identified beyond being a UK
investor or client of B&B but did recall discussion focused on
the potential for Long Term's principals to obtain tax benefits
from the loss built into the contributed preferred stock, and his
deposition testimony (admissible as substantive evidence under
Fed. R. Evid. 801(d)(2)(A) or 801(d)(1)(A)) was that he did not
recall Scholes' presentation as having covered anything other

140

than the tax benefits from OTC's stock, including having no recollection of any discussion about a B&B/UBS investment.

Long Term made extraordinary efforts not offered to other investors to facilitate OTC's contributions, notwithstanding that they were in contravention of a number of Long Term's general and specific investing requirements.  The put option effectively permitted OTC to remove its entire investment within twelve to fifteen months of obtaining its partnership interest whereas other investors were limited to removing only a third of their invested capital annually.  OTC was permitted to invest in Portfolio when it was "closed" to all but strategic investors, and yet OTC was not a strategic investor with any value to Long Term as an investor compared to Disney's Ovitz, foreign banks, the Tang family foundation, and senior partners from Bear Stearns.  Long Term had never sold downside protection puts to any investor before OTC, and, afterwards, only to B&B/UBS.  To Meriwether's recollection, Long Term had never before loaned money to an investor to facilitate its purchase of a partnership interest in Long Term.  OTC was the sole investor (other than the founding principals in the first month of Long Term's operation) ever allowed to contribute assets other than cash in exchange for a partnership interest, to wit, the very asset critical to transfer of the tax benefits to Long Term's principals.  Long Term itself admitted the novelty of the OTC transaction when, as

141

required by contract, it described the transaction in its most favored nation letters as "unique."  Moreover, contrary to general practice, OTC, although a foreign entity, was not required to invest in Portfolio through an overseas investment vehicle but was permitted to invest through LTCP, a U.S. domestic limited partnership.  This is significant because Long Term purportedly obtained OTC's Rorer and Quest stock without disturbing the claimed tax basis thereof by means of federal partnership tax laws and LTCP was the only investment vehicle that was treated as a partnership for federal income tax purposes.  Such repeated exceptions to operating principles and rationale are more persuasively explained by a tax avoidance motive.

Long Term knew OTC would not remain an investor and knew it would exercise one of its put options.  OTC told Scholes and Noe in their one pre-contribution meeting (and the only meeting of which there is evidence) that it desired to liquidate the partnership interest it would obtain in the near future, and there was discussion about the possibility of extending the exercise date of the put options into 1998 in the event Long Term did not need tax losses for the 1997 tax year.  This desire was memorialized in Scholes' draft letter of June 18, 1996 in which he stated that Long Term intended to accommodate OTC's quick exit wishes by granting of the put options.  Long Term was aware

142

through Noe's review of OTC's balance sheet that OTC did not have sufficient funds to repay the loan from LTCM U.K. (which matured approximately 21 days after the exercise date of OTC's put options) without liquidating its interest in LTCP through the put options, and Long Term had the legal right to prohibit OTC from pledging its partnership interest to any lender.  Any notion that OTC's principals would have personally borrowed money to pay off OTC's $10.1 million loan plus interest (or paid it off from their own funds) and opted to continue with their investment in Partners is contradicted by the evidence of OTC's intent to exercise its put option and the principals' individual rights to invest in Partners: (1) OTC always intended to dispose of the preferred stock received in the CHIPS and TRIPS transactions for cash as early as possible as memorialized in its business plan; (2) the OTC principals intended to liquidate their partnership interest not hold onto it; (3) the closing documents accompanying the promissory notes for Long Term's loans to OTC included the OTC board meeting minutes approving its contributions to LTCP which explicitly state that OTC intended to sell its interests pursuant to one of its two put options; and (4) OTC's principals held a contractual right to make their own individual investments of $2,000,000 into LTCP, up to a combined total of $10,000,000, albeit on a date two months subsequent to the exercise date of OTC's put options, so that OTC could exit Long Term and its

143

attendant $10 million loan obligation and its principals could still, if an investment in Long Term at that point continued to appear profitable, obtain the benefits of such an investment without risk of loan obligations in the event of a downturn in the marketplace after expiration of OTC's put options.

Scholes' internal memorandum of November 12, 1996 to Long Term's management committee confirms the tax avoidance purpose underlying the OTC transaction. Not twelve days after the ink had dried on the transaction documents for OTC's second contribution and over 345 days prior to the exercise date of OTC's options, Scholes was speaking of OTC's subsequent sale of its interest to LTCM and Long Term's attendant reaping of tax benefits through sale of the contributed preferred stock as a foregone conclusion.[87] His focus was on how Long Term could best utilize the losses to be obtained from Portfolio's sale of OTC's preferred stock through allocation and avoid paying any corresponding taxes: "**If we are careful, most likely we will never have to pay long-term capital gains on the 'loan' from the Government**." Gov.'s Ex. 320B (emphasis in original). The memorandum's closing question asks the committee to consider how the principals instrumental in having "**brought the Tax Losses to**

---

[87] See e.g., Gov.'s Ex. 320B ("After OTC transfers its investment in LTCP partnership to LTCM entities..., LTCP's sale of the preferred stock that it holds ... will generate $245 million of short-term capital losses and $140 million of long-term capital losses.").

**Fruition**," id. (emphasis in original), should be compensated for their work.

B&B itself was a strategic investor only with regard to adding the "unique" value of OTC's contributions -- Scholes admitted Long Term would not have permitted B&B to invest through UBS without an investment from OTC. Because OTC was not a strategic investor and its contributions were almost entirely funded by Long Term on terms which imposed on Long Term sacrifice of upside potential without corresponding diminution in risk relative to an identical direct investment, it is not difficult to deduce that B&B's strategic value manifested itself in the form of tax benefits. Scholes even admitted that some principals at Long Term took this view. In addition, although there were multiple investment banks that desired to invest in Long Term during the relevant time frame, Long Term selected B&B, with its expertise in the financing of illiquid assets other than securities, an enterprise area in which Long Term never developed business.[88]

---

[88] Long Term's principals' claimed desire to increase their investment in Portfolio could not have played a role in the OTC transaction because, if this had truly been a motivation, they would have foregone the expenditure of money and resources and simply invested the $9.3 million into Portfolio on their own behalf instead of indirectly through OTC. The chosen course realized an increased investment only by reinvestment of the relatively modest fees generated by a $10 million investment in a fund with $5-7 billion in capital. The evidence leads to a strong inference that expenditure of all that money and energy was motivated by Scholes' projected $385 million in tax deductions, not the potential increase of LTCM's partnership interest in Long Term by acquisition of a partnership interest the vast percentage of which was already effectively comprised of Long Term's money.

In sum, for the foregoing reasons, the Court concludes Long Term entered into the OTC transaction without any business purpose other than tax avoidance.[89]

_____

[89] Petitioners appear to suggest that, if one party to a transaction (here OTC) had a non-U.S. tax motivation, then, under Lyon, 435 U.S. 561 and Newman, 902 F.2d 159, there can be no conclusion of lack of business purpose even if the other party's sole motivation for the transaction (here Long Term) was tax avoidance. See Pets.' Trial Brief [Doc. #133] at 114; Tr. [Doc. #207] at 3212:16-3213:7. As discussed above, however, Lyon and Newman were engaged in a fact sensitive multi-factor analysis in which no one particular fact was determinative of the outcome. While both considered the non-tax motivations of parties other than the taxpayer, sensitivity to context is especially important here where adoption of petitioners' position would require a finding of business purpose whenever a transaction involving one entity solely motivated by tax avoidance included a foreign entity lacking motivation to avoid U.S. taxes for which it is not liable. Thus, for example, it is important to note that the Lyon court considered important the following "economic realities of the transaction," Lyon, 435 U.S. at 582: that taxes were only part of Lyon's motivation and that "diversification was Lyon's principal motivation," id. at 583, and, of particular interest to the foreign entity context, "the absence of any differential in tax rates and of special tax circumstances for one of the parties....," id. The transaction in Goldstein was found to be devoid of economic substance notwithstanding that the banks participating in the loan transactions with the taxpayer were motivated by the economics of the deal which guaranteed profit for them. See Goldstein, 364 F.2d at 737.
    Similarly, even the expansive view of business purpose annunciated by the Eleventh Circuit in United Parcel Serv. of Am. v. Commissioner, 254 F.3d 1014, 1018-1020 (11th Cir. 2001) heavily relied upon by petitioners, see Tr. [Doc. #207] at 3213:8-3215:20, 3219:5-12, 3242:16-3243:8, 3288:19-24, would not aid Long Term. United Parcel concluded that a going concern's restructuring of its internal administration of the provision of loss coverage to its customers and corresponding limitation of its own loss exposure had business purpose because it "figure[d] in" a profit-seeking program of the going concern, namely, UPS's excess value charge program. See United Parcel, 254 F.3d at 1016, 1019-20. The excess value program earned UPS "large profit[s]" and the restructuring served through sophisticated machinations to reduce the corresponding tax burden on "the lucrative excess-value business." Id. at 1016. The present case is readily distinguishable: the OTC "investment" was a one-time purchase of a tax product by Long Term and different in almost every way from Long Term's core investment business. The OTC transaction was not a mere change in the manner in which a profit making business is administered but, in Scholes' words, a "unique" transaction, different in kind not just degree from the usual transaction cost investments of which Long Term's core business was comprised. In sum, the present case is akin to the ones United Parcel took pains to distinguish, "tax-shelter transactions ... by a business ... that would not have occurred, *in any form*, but for tax-avoidance reasons." United Parcel, 254 F.3d at 1020.

146

C.    **Step Transaction Doctrine**

"The step-transaction doctrine developed as part of the
broader tax concept that substance should prevail over form."
Associated Wholesale Grocers, Inc. v. U.S., 927 F.2d 1517, 1521
(10th Cir. 1991)(quotation omitted).  "The doctrine treats the
steps in a series of formally separate but related transactions
involving the transfer of property as a single transaction, if
all the steps are substantially linked.  Rather than viewing each
step as an isolated incident, the steps are viewed together as
components of an overall plan."  Greene v. U.S., 13 F.3d 577, 583
(2d Cir. 1994).  Courts have identified three tests for
determining whether to apply the doctrine, the "end result," the
"interdependence," and the "binding commitment" tests.  See
Associated, 927 F.2d at 1522.  The doctrine will operate where
the circumstances satisfy only one of the tests.  See True v.
U.S., 190 F.3d 1165, 1175 (10th Cir. 1999); see also Greene, 13
F.3d at 583-85; Associated, 927 F.2d at 1527-28.  The Government
contends that, under either the end result test or the
interdependence test, OTC's contributions of preferred stock to
LTCP on August 1, 1996 and November 1, 1996 in exchange for a
partnership interest and OTC's subsequent sale of that
partnership interest to LTCM on October 31, 1997 must be stepped
together into a single sale transaction with the result that LTCM
acquired the preferred stock for a cost basis pursuant to 26

147

U.S.C. § 1012, which, for the combined Quest and Rorer stock, was approximately $1.1 million.  The Court agrees that this result follows from application of the end result test and therefore does not undertake an application of the interdependence test.

"Under the end result test, the step transaction doctrine will be invoked if it appears that a series of separate transactions were prearranged parts of what was a single transaction, cast from the outset to achieve the ultimate result." Greene, 13 F.3d at 583.  A prerequisite to application of the end result test is proof of an agreement or understanding between the transacting parties to bring about the ultimate result, here, the transference of OTC's preferred stock into the control of Long Term.  See id.; see also Blake v. Commissioner, 697 F.2d 473, 478-79 (2d Cir. 1982).  Relevant to this inquiry is the taxpayer's subjective intent to reach a particular result by directing a series of transactions to an intended purpose or structuring them in a certain way.  See True, 190 F.3d at 1175.

OTC's contributions of preferred stock to LTCP followed by the sale of the received partnership interest to LTCM was in substance a sale of the preferred stock for a purchase price determined as the greater of $103,824 ($10,340,000 minus $121,000 option premiums, $787,883 interest on loan from LTCM (U.K.), $9,327,293 loan principal from LTCM (U.K.)) or that amount plus the excess of the value of the partnership interest over

148

$10,340,000 between October 27-31, 1997.  As discussed above,
Long Term had no business purpose for the OTC transaction other
than tax avoidance.  The same evidence supporting that conclusion
also demonstrates that Long Term had no interest in OTC as an
investor and was only interested in obtaining OTC's preferred
stock, that OTC had no interest in investing specifically in LTCP
and was only interested in obtaining cash for its preferred
stock, that OTC from the time of its contributions intended to
exercise its put options and Long Term understood and agreed to
accommodate such intent, that the various steps of the OTC
transaction were prearranged to ensure that OTC would sell its
partnership interests to LTCM by exercise of its put options, and
that B&B was not interested in an investment vehicle for OTC but
looked to earn fees (however disguised) from the sale of tax
benefits.  See supra Part III.B.6.[90]  In sum, there was at a
minimum a clear understanding between Long Term and OTC prior to

---

[90] While two OTC principals, Sir Geoffrey Leigh and Nicolas Wills,
suggested that OTC had no agreement with Long Term to exercise its put options
but did so after review of the market on their own initiative, see e.g. Pet.'s
Ex. 437 at 90:8-91:11; Pet.'s Ex. 438 at 78:17-23, OTC principal Dominique
Lubar could not even remember the OTC/Long Term transaction.  See Govt. Ex.
434 at 51:4-24.  It is difficult to credit Leigh's and Wills' recollection on
this point, given that their testimony is replete with failure of memory and
recollection regarding CHIPS, TRIPS, and the OTC/Long Term deals.  They
repeatedly deferred to the contents of OTC's minutes for an accurate
historical account.  The contradictory evidence contemporaneous to OTC's
contributions and subsequent sale of its partnership interests to LTCP, see
supra Part III.B.6., is far more persuasive: (1) pre-contribution written
memorialization of OTC's intent to exercise its put option (board minutes
included in closing documents for LTCM U.K's loan to OTC); (2) the fact that
OTC lacked sufficient funds to repay LTCM U.K.'s $9.3 million loan due 21 days
subsequent to the exercise date of OTC's put options and the other structural
elements of the transaction; (3) OTC's statements to Scholes and Noe; and (4)
Long Term's understanding of its agreement with OTC memorialized in Scholes'
internal memorandum of November 12, 1996.

OTC's contributions to LTCP that OTC was selling its preferred stock to LTCM through the transactional vehicle of an "investment" in LTCP and subsequent sale of that "investment" by exercise of put option with the purchase price determined by a formula that guaranteed $103,824 to OTC with the chance to earn substantially more.  Since it is evident that what actually occurred was a sale by OTC of its preferred stock to Long Term followed by Long Term's sale of the stock (through Portfolio), the losses claimed by Long Term cannot be sustained.  Long Term's basis in the Quest and Rorer stock was Long Term's cost for it, approximately $1 million not one hundred times that amount.

Long Term makes several arguments against the applicability of the end result test, the strongest of which are addressed here.  First and principally, it maintains that there was no informal agreement or understanding that OTC would sell LTCM its partnership interest.  As set forth in the preceding paragraph, the Court has made a contrary fact finding, concluding such agreement or understanding did exist.

Second, Long Term asserts that, because from August 1, 1996 (date of OTC first contribution) to October 31, 1997 (date of OTC's sale of partnership interest to LTCM) LTCP and Portfolio had economic substance independent from the OTC transaction, operated for valid and substantial business purposes to make a material pre-tax profit, and expected to continue in the same

150

manner for the foreseeable future, therefore application of the step transaction doctrine is precluded.  Long Term cites for support <u>Vest v. Commissioner</u>, 57 T.C. 128 (1971), <u>aff'd in part and rev'd in part on other grounds</u>, 481 F.2d 238 (5th Cir. 1973), <u>Dewitt v. Commissioner</u>, 30 T.C. 1 (1958), and <u>Weikel v. Commissioner</u>, 51 T.C.M. (CCH) 432 (1986).  <u>See</u> Pets.' Trial Brief [Doc. #133] at 130-31.  The same argument is contained in the King & Spalding written opinion.  <u>See</u> Pets.' Ex. [Doc. #357] at 35-36.  The Tenth Circuit has rejected this argument, <u>see Associated</u>, 927 F.2d at 1526-27, holding that the presence of a valid business purpose and independent economic substance in the entity used as a transactional vehicle or some valid business purpose for the transaction itself does not bar application of the step transaction doctrine, rather both are circumstances to be considered in a multi-factor analysis.  In doing so, the Tenth Circuit characterized <u>Vest</u> and <u>Weikel</u>, a characterization with which this Court agrees:

> <u>Vest</u> ... considers business purpose as one factor among many in declining to apply the step transaction doctrine.  After identifying a business purpose, the court undertakes a thorough discussion of whether to treat a stock exchange as a step transaction.  <u>57 T.C. at 145</u>.  The court remarked "[t]he fact that there were business purposes for the incorporation of V Bar is *an indication* that its formation was not a step mutually interdependent with the subsequent stock exchange" and continued to consider other factors, including the existence of a binding commitment, the timing of the steps, and the actual intent of the parties.  <u>Id. at 145-46</u> (emphasis added).  Far from precluding step transaction analysis, the business purpose was not even considered the most significant factor in <u>Vest</u>.

151

> <u>Weikel</u> ... appears to support the proposition [that the existence of a business purpose precludes the application of the step transaction doctrine]. <u>Weikel</u>, however, erroneously states that <u>Vest</u> declined to apply step transaction analysis *because* a business purpose was found. <u>Id. at 440</u>. Because <u>Vest</u> said no such thing, <u>Weikel</u> must be discounted.

<u>Associated</u>, 927 F.2d at 1527 n.15.[91]

Here, in contrast to the situation in <u>Dewitt</u>, <u>see</u> <u>supra</u> note 91, all parties were on the same page from the outset: B&B cashed in with its "consulting arrangement," Long Term timed its tax benefits (and began planning how to utilize them at least immediately after the close of OTC's second contribution), and OTC waited to find out exactly what the purchase price of its preferred stock would turn out to be. The Court sees no reason why using an ongoing business entity (here, LTCP and/or Portfolio), which otherwise engaged in independent profit making activities, as the vehicle to accomplish the parties' ultimate objective should shield a transaction from step transaction analysis, particularly where the purpose of the transaction was to buy tax losses, a purpose distinct from Portfolio's core investments, <u>see</u> <u>supra</u> note 89.

Relatedly, Long Term appears to object to application of the step transaction doctrine based on disruption to certain economic

---

[91] <u>Dewitt</u> is to the same effect as <u>Vest</u>, noting the independent economic substance and business purpose of the corporation used to effect a transfer of property through the sale of its stock as one factor in deciding whether or not to apply the step transaction doctrine but stressing that the intent to sell the stock and therewith the property did not arise until <u>after</u> the property was transferred to the corporation. <u>See</u> <u>Dewitt</u>, 30 T.C. at 8-10.

152

consequences of the OTC transaction, such as OTC's sharing in

partnership profits.  See Pets.' Trial Brief [Doc. #133] at 125-

28.  However, application of the step transaction doctrine by its

nature may ignore economic relations created by the parties,

notwithstanding impact on bona fide economic effects:

> To ratify a step transaction that exalts form over substance
> merely because the taxpayer can either (1) articulate some
> business purpose allegedly motivating the indirect nature of
> the transaction or (2) point to an economic effect resulting
> from the series of steps, would frequently defeat the
> purpose of the substance over form principle.  Events such
> as the actual payment of money, legal transfer of property,
> adjustment of company books, and execution of a contract all
> produce economic effects and accompany almost all business
> dealing.  Thus, we do not rely on the occurrence of these
> events alone to determine whether the step transaction
> doctrine applies.

True, 190 F.3d at 1177.

Third, Long Term argues that because the Court may not

invent new steps or create fictional events under step

transaction doctrine in the Second Circuit, any attempts to re-

characterize the form of the OTC transaction are improper.

Petitioners' argument is that:

> The government's attempt to recast OTC's investment in
> the Fund is directly at odds with the Second Circuit's
> holding in Greene.  OTC made two investments in the Fund in
> 1996.  More than a year later, OTC sold its investment to
> another investor in the Fund, LTCM.  The government's
> fiction is that (1) OTC made sales of stock to LTCM in 1996
> and (2) LTCM then made an investment in the LTCP.  This re-
> characterization does not constitute a collapsing of two
> steps or the ignoring of a conduit entity.  Rather, the
> reordering of actual steps required by the government's
> fiction is not permitted.  The government's argument that
> LTCM should be treated as acquiring preferred stock in 1996

153

even though it never held title to it exceeds in audacity
even its rejected litigating position in the <u>Greene</u> case.

Pets.' Trial Brief [Doc. #133] at 129-30.  Long Term places heavy

emphasis on language in <u>Grove v. Commissioner</u>, 490 F.2d 241, 247

(2d Cir. 1973)("[u]seful as the step transaction doctrine may be

... it cannot generate events which never took place just so an

additional tax liability might be asserted.")(quotation omitted)

and <u>Greene</u>, 13 F.3d at 583.[92]  <u>See</u> Pets.' Trial Brief [Doc. #133]

at 128-129.  Long Term misapplies Second Circuit doctrine,

plucking supporting quotations from the context that frames them.

   <u>Grove</u> and <u>Greene</u> stand for the unstartling proposition that,

absent clear error in a trial court's finding that the

transacting parties did not informally agree to or prearrange

various steps of an overall plan, or where it determines on

summary judgment that there is no evidence that the transacting

parties did so, an appellate court will not overturn that

finding/determination in favor of rejected findings of fact or a

position for which there is no evidence.  In such cases, the

Government's re-characterization is unsubstantiated fiction and

does not reflect the substance of what the evidence fairly shows

occurred.  Thus, the Second Circuit has commented on <u>Grove</u>,

---

   [92] "In effect, the government's argument boils down to an attempt not to
recharacterize several separate transactions as a whole one, but to describe
two actual transactions as two hypothetical ones.  Specifically, appellant
urges that a donation followed by a sale by the donee is really a sale by the
donor followed by a donation.  In this fashion, the government turns fact into
fiction." <u>Greene</u>, 13 F.3d at 583.

stating "[i]n <u>Grove</u>, this court relied on the Tax Court's finding
there was not even an informal agreement that the charity would
deal with the contributed asset in a manner providing a tax
benefit to the taxpayer," <u>Blake</u>, 697 F.2d at 479,[93] and, after

---

[93]    "The Commissioner would have us infer from the systematic nature
of the gift-redemption cycle that Grove and RPI reached a mutually
beneficial understanding: RPI would permit Grove to use its tax-exempt
status to drain funds from the Corporation in return for a donation of a
future interest in such funds.

    We are not persuaded by this argument and the
totality of the facts and circumstances lead us to a contrary
conclusion.  Grove testified before the Tax Court concerning the
circumstances of these gifts.  The court, based on the evidence and the
witnesses' credibility, <u>specifically found that 'there was no informal
agreement between (Grove) and RPI that RPI would offer the stock in
question to the corporation for redemption or that, if offered, the
corporation would redeem it.'</u>  Findings of fact by the Tax Court ... are
binding upon us unless they are clearly erroneous ...; ... and 'the rule
. . . applies also to factual inferences (drawn) from undisputed basic
facts.'  It cannot seriously be contended that the Tax Court's findings
here are 'clearly erroneous' and no tax liability can be predicated upon
a <u>nonexistent agreement</u> between Grove and RPI or by a fictional one
created by the Commissioner.

    Grove, of course, owned a substantial majority of the
Corporation's shares.  His vote alone was sufficient to insure
redemption of any shares offered by RPI.  But such considerations,
without more, are insufficient to permit the Commissioner to ride
roughshod over <u>the actual understanding found by the Tax Court</u> to exist
between the donor and the donee. ...

    Nothing in the December, 1954, minority shareholder agreement
between the Corporation and RPI serves as a basis for disturbing the
conclusion of the Tax Court. Although the Corporation desired a right of
first refusal on minority shares-- understandably so, in order to reduce
the possibility of unrelated, outside ownership interests-- it assumed
no obligation to redeem any shares so offered. In the absence of such an
obligation, the Commissioner's contention that Grove's initial donation
was only the first step in a prearranged series of transactions is
little more than wishful thinking grounded in a shaky foundation. ...

    Were we to adopt the Commissioner's view, we would be required to
recast two actual transactions-- a gift by Grove to RPI and a redemption
from RPI by the Corporation-- into two completely fictional
transactions-- a redemption from Grove by the Corporation and a gift by
Grove to RPI.  <u>Based upon the facts as found by the Tax Court</u>, we can
discover no basis for elevating the Commissioner's 'form' over that
employed by the taxpayer in good faith.  Useful as the step transaction
doctrine may be in the interpretation of equivocal contracts and
ambiguous events, it cannot generate events which never took place just
so an additional tax liability might be asserted.  In the absence of any

discussion of <u>Grove</u>, <u>Greene</u> similarly summarized its conclusion:

> In the case at hand, as already stated, there was no
> evidence of a prearranged plan that the Institute would sell
> the futures contracts and taxpayers had no control over
> whether or not the Institute did so.  Thus, the charitable
> plan at issue here was not a prearranged scheme of
> purportedly separate steps, or in actuality a single
> transaction so as to trigger the end result test of the step
> transaction doctrine.

<u>Greene</u>, 13 F.3d at 584.  The clear import of <u>Grove</u> and <u>Greene</u> is

that the result would have been different and the re-

characterizations acceptable had the trial court found or had

there been evidence of an informal agreement between the

transacting parties to achieve the ultimate result.  Thus, in

<u>Blake</u>, the Second Circuit affirmed re-characterization of what in

form was a charitable contribution of stock followed by sale of

the stock by the charity and use of the proceeds to purchase the

contributor's yacht as a sale of stock by the contributor

followed by a contribution of the yacht to the charity where the

tax court found that the transactions were undertaken pursuant to

an advance understanding.  <u>See</u> <u>Blake</u>, 697 F.2d at 474-76, 478-81.

<u>Grove</u>, <u>Blake</u>, and <u>Greene</u> support the Court's application of the

step transaction doctrine here where, at a minimum, a clear

understanding and prearrangement had been arrived at prior to

---

> supporting facts in the record we are unable to adopt the Commissioner's
> view; to do so would be to engage in a process of decision that is
> arbitrary, capricious and ultimately destructive of traditional notions
> of judicial review.  We decline to embark on such a course.

<u>Grove</u>, 490 F.2d at 247-48 (citations and quotations omitted)(emphasis added).

OTC's contributions that OTC would exercise its put options and force LTCM to purchase OTC's partnership interest.  There are no fictitious events created here only realities recognized.[94]


### D.  Penalties

The Government maintains that any underpayment of tax resulting from adjusting Long Term's inflated basis in the stock contributed by OTC is subject to a 40% penalty for gross valuation misstatement, see 26 U.S.C. § 6662(a), (b)(3) and (h),

---

[94] Long Term also places heavy reliance on Esmark, Inc. v. Commissioner, 90 T.C. 171 (1988), see Pets.' Trial Brief [Doc. #133] at 124, 129, as does the King & Spalding written opinion, see Pets.' Ex. 357 at 31-32 (opining that Esmark strongly supports respecting form of OTC contribution and subsequent sale of partnership interest because step transaction doctrine does not support creation of new transactions, reordering of them in a manner most favorable to government, or a re-characterization that is no more direct than the route chosen by the taxpayer but requires the same number of steps).  Even if Esmark has any applicability to the instant context, which appears doubtful, Greene, Blake, and Grove are binding over anything contrary in Esmark.
    In Esmark, pursuant to a binding contract with the taxpayer, Mobil purchased 54.1% of the shares of taxpayer in a public tender and then exchanged that stock for almost all the stock of one of taxpayer's subsidiary corporations.  The tax court upheld the form of the transaction against the government's proposed recast as a sale of the subsidiary to Mobil followed by distribution of the proceeds to shareholders. To be successful, the Esmark transaction required the participation of three parties, only two of which (Mobil and taxpayer) had any agreement and the third of which comprised multiple individuals (shareholders).  In distinguishing the case from Blake, the tax court emphasized its fact findings that the two transacting parties lacked control over the individual shareholders and that each shareholder made an independent and individual decision to accept Mobil's tender.  See Esmark, 90 T.C. at 194-95.  Here, the OTC transaction utilized two parties and they had absolute control over the ultimate result.  Moreover, the tax court's refusal to apply the step transaction doctrine does not appreciate that the Grove prohibition against invention of new (or fictional) steps was dependent on the conclusion that the tax court had not clearly erred in finding no informal agreement among the transacting parties.  See id. at 196-97.  At least one factor therefore that appears to distinguish Grove from Esmark is the tax court's finding that the binding agreement between taxpayer and Mobil was insufficient to bring about the ultimate result but that potential success rose and fell on the individual whim of the shareholders, a fact the tax court repeatedly invoked in rejecting substance over form arguments.  See id. at 179, 188, 194-95.

and, in the alternative, a 20% penalty for substantial valuation
misstatement, see id. § 6662(a) and (b)(3), a 20% penalty for
negligence or disregard of rules or regulations, see id.
§ 6662(a) and (b)(1), or a 20% penalty for substantial
understatement of income tax, see id. § 6662(a) and (b)(2).  Long
Term contests the applicability of these accuracy-related
penalties principally on the grounds that obtaining the Shearman
& Sterling and King & Spalding opinions satisfies the reasonable
cause exception of 26 U.S.C. § 6664(c)(1).  It also maintains
that it satisfies the statutory limitations on the scope of each
penalty, namely, that there is no valuation misstatement on its
tax return, it did not act negligently but acted as a reasonable
and prudent person, and it had substantial authority for its tax
return position.  For the reasons that follow, the Court
concludes that the IRS determination with respect to the 40%
penalty for gross valuation misstatement should be sustained and,
in the alternative, the 20% penalty for substantial
understatement should be sustained.  There is no need to reach
the negligence penalty issue.

### 1.    Burden of Proof

26 U.S.C. § 7491(c) provides,

**(c) Penalties.**– Notwithstanding any other provision of this
title, the Secretary shall have the burden of production in
any court proceeding with respect to the liability of any
individual for any penalty, addition to tax, or additional

158

amount imposed by this title."
Petitioners argue that this provision places the burden of
production on the Government regarding their liability for
accuracy-related penalties. See Pets.' Mem. [Doc. #145] at 6-7.
If applicable, such burden would require the Government
"initially [to] come forward with evidence that it is appropriate
to apply a particular penalty to the taxpayer ... [but not] to
introduce evidence of elements such as reasonable cause or
substantial authority." H.R. Conf. Rep. 105-599, at 241; see
generally e.g., Higbee v. Commissioner, 116 T.C. 438, 446 (2001).
The Government, however, points to the contrast in terminology
between § 7491(c) - "with respect to the liability of any
individual for any penalty ... imposed by this title" (emphasis
added) - and § 7491(a)(1) - "with respect to any factual issue
relevant to ascertaining the liability of the taxpayer for any
tax imposed by subtitle A or B" (emphasis added), arguing that
Congressional selection of two different terms in the same
statutory enactment must be presumed to have been deliberate.
See Opp'n [Doc. #158] at 7-8.  The Government urges that since
"[i]n a TEFRA action, the partnership, and not the individual
partners, is the taxpayer, ... § 7491[(c)] is inapplicable to
this case because Petitioners are not individuals." See id. at
8.

    The Government's interpretation has substantial appeal.

There is undeniably a difference between § 7491(a)(1) and
§ 7491(c) as originally enacted in 1998, and such contrast
appears to rise to the level of substantive terminological
difference in light of Congress' demonstrated ability to
distinguish elsewhere in the same enactment between 'taxpayers'
as an all encompassing category and subsets of that category,
including partnerships, corporations, trusts, and individuals,
compare e.g., 26 U.S.C. § 7491(a)(2)(C)("in the case of a
partnership, corporation, or trust, the taxpayer ...") with §
7491(b)("In the case of an individual taxpayer ....").[95]  See
e.g., United States v. Gayle, 342 F.3d 89, 92-93 (2d Cir.
2003)(quoting Saks v. Franklin Covey Co., 316 F.3d 337, 345 (2d
Cir. 2003))(statute's "plain meaning can best be understood by
looking to the statutory scheme as a whole and placing the
particular provision within the context of that statute.").

On the other hand, at least two arguments support
petitioners' view.  First, the Government's interpretation is at
odds with the legislative history of § 7491(c):

> "... in any court proceeding, the Secretary must initially
> come forward with evidence that it is appropriate to apply a
> particular penalty to the taxpayer before the court can
> impose the penalty.  ... Rather, the Secretary must come
> forward initially with evidence regarding the
> appropriateness of applying a particular penalty to the
> taxpayer; if the taxpayer believes that, because of

---

[95] See 26 U.S.C. § 7701(a)(14)("The term 'taxpayer' means any person
subject to any internal revenue tax.") and § 7701(a)(1)("The term 'person'
shall be construed to mean and include an individual, a trust, estate,
partnership, association, company or corporation").

> reasonable cause, substantial authority, or a similar
> provision, it is inappropriate to impose the penalty, it is
> the <u>taxpayer's</u> responsibility (and not the Secretary's
> obligation) to raise those issues."

H.R. Conf. Rep. 105-599 at 241 (emphasis added).  The Court has
not located and the parties have not cited any explanation of why
this language of the conference agreement was not replicated in
the statutory language.

    Second, although weaker, § 7491(c)'s "<u>with respect to</u> the
liability of any individual" (emphasis added)[96] could arguably be
viewed as applying to petitions filed pursuant to 26 U.S.C. §
6226(a) where denial will indirectly result in penalty liability
for one or more partners who are also individuals.  Recognizing
that such petitions seek "readjustment of ... partnership items,"
26 U.S.C. § 6662(a), if the partnership is considered the
taxpayer, this argument points to statutory provisions
illustrating the close relationship between the readjustment
action and the partners of the partnership, in which each partner
of the partnership, with certain exceptions, is treated as a
party to the readjustment action, <u>see</u> 26 U.S.C. § 6226(c), (d),
the tax treatment of such partnership items and the applicability
of any penalty is determined in the readjustment action, <u>see</u> 26
U.S.C. § 6221, and assessments are made against partners after
the readjustment action becomes final, <u>see</u> 26 U.S.C. § 6225.

---

    [96] "With respect to" is defined as "with reference to" or "as regards,"
Webster's New International Dictionary 2128 (2d unabridged ed. 1959).

However, this argument is weakened by explicit statutory and regulatory provisions that preserve partner level defenses for proceedings subsequent to disposition of a readjustment petition, see e.g. 26 U.S.C. § 6230(c)(1)(c), (4); Treas. Reg. § 1.6662-5(h)(1), and the fact that a partnership may be comprised completely or in part of partners who are not individuals.[97]

In addition, focus on the legislative purpose for the enactment of § 7491 yields ambiguous results. The Senate Report states that the reason for the enactment was to correct the "disadvantage" faced by individuals and small business taxpayers "when forced to litigate with the Internal Revenue Service." S. Rep. 105-174 at 44. To that end, § 7491(a) was supported by the "belie[f]" that, if the statutory conditions are met, "facts asserted by individual and small business taxpayers ... should be accepted," and § 7491(c) because "[t]he Committee also believes that, in a court proceeding, the IRS should not be able to rest on its presumption of correctness if it does not provide any evidence whatsoever relating to penalties." See id. Given these premises, it would be arguably inconsistent to conclude that, just like individuals, small business taxpayers organized under

---

[97] In one tax controversy involving a corporate taxpayer, the Tax Court appears to have assumed that § 7491(c) places the burden of production with respect to penalties or additions to tax on the Government, see Maintenance, Painting & Construction, Inc. v. Commissioner, 2003 WL 22137927, 86 T.C.M. (CCH) (Sept. 17, 2003), and, in another, the Government conceded as much, see Charlotte's Office Boutique, Inc. v. Commissioner, 121 T.C. 89, 109-110 and n.11 (2003). In neither case is there discussion of the differences between § 7491(a) and § 7491(c).

various structures qualifying, for example, as partnerships or S Corporations for federal tax purposes, were to be afforded the benefit of the burden shifting provision of § 7491(a) but, unlike individuals, not afforded the benefit of § 7491(c) imposing the burden of production in the penalty context on the Secretary.  On the other hand, interpreting "individual" in § 7491(c) as encompassing taxpayers such as partnerships and corporations would give the subsection far broader scope than the plain meaning of the statutory language used.  Members of those classifications which are not "small," and which are explicitly excluded from the benefit of burden shifting when litigating the merits of their tax liabilities, see § 7491(a)(2)(C)(excluding from burden shifting benefit of § 7491(a)(1) partnerships, corporations, or trusts with net worth in excess of $7,000,000 at the time an action is filed), would receive the advantage of the burden imposing benefit in the penalty context.

If it were necessary to decide the applicability of § 7491(c) in this case, the Court would conclude that the Government has the stronger position.  The language of § 7491(c) is unambiguous, particularly within the context of § 7491 as a whole, even though it is in contrast with the language of its legislative history.  See e.g. Russello v. U.S., 464 U.S. 16, 20 (1983)("If the statutory language is unambiguous, in the absence of a clearly expressed legislative intent to the contrary, that

163

language must ordinarily be regarded as conclusive.")(quotations omitted).  However, because the Government has met any burden of production it may have in this case, even under petitioners' view of § 7491(c), by coming forward with evidence demonstrating the appropriateness of penalties, resolution of whether such burden is appropriately imposed is unnecessary.

## 2.  Gross Valuation Misstatement

A 40% penalty is imposed on any underpayment of tax exceeding $5,000 that is attributable to a "gross valuation misstatement."  26 U.S.C. § 6662(a), (b)(3), (e)(2), (h)(1).[98] As relevant here, a gross valuation misstatement exists if "the value of any property (or the adjusted basis of property) claimed on any return of tax imposed by chapter 1 is 400 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be)...."  26 U.S.C. § 6662(e)(1)(A), (h)(2)(A)(i).

Long Term reported on its 1997 return losses of $106,058,228 resulting from the sale of a portion of the preferred stock contributed by OTC.  Embedded in that number are claims that the stock sold for fair market value of $1,078,400 and had an adjusted basis of $107,136,628.  The Court's application of the

_____

[98] The dollar limitation element is not applicable to a petition for readjustment under 26 U.S.C. § 6226(a) but applies at the taxpayer level.  See Treas. Reg. § 1.6662-5(h)(1).

step transaction doctrine to the OTC transaction has the effect
of imputing to Long Term a cost basis in the Rorer and Quest
stock of approximately $1 million and thereby making Long Term's
claimed adjusted basis well in excess of 400 percent of the
amount determined to be the correct adjusted basis.[99]

### 3.    Substantial Understatement of Income Tax

A 20% penalty is imposed on any underpayment of tax

---

[99] The Court's economic substance ruling, which has the effect of
disregarding for tax purposes the contributions of stock to LTCP by OTC and
the subsequent sale of OTC's partnership interest to Long Term, thereby
producing a basis of zero for the contributed stock in the hands of Long Term
and a claimed adjusted basis in the preferred stock of not just 400 percent
but infinitely more than the amount determined to be the correct basis, see
Treas. Reg. § 1.6662-5(g), may also provide grounds for sustaining the gross
valuation misstatement penalty.  What is difficult is the issue of whether any
tax deficiency resulting from the basis claimed by Long Term is "attributable"
to the misstatement of basis, as required by 26 U.S.C. § 6662(b)(3), (h)(1),
or, as argued by Long Term, to the disallowance of the partnership
transactions.  The Second Circuit in Gilman, 933 F.2d at 151-52, considered
and approved application of a valuation misstatement penalty in the context of
an inflated purchase price from which claimed depreciation and interest
deductions are derived at least in part.  The assumption appears to be that,
had the purchase price been lower, the chance at a pre-tax profit would have
been correspondingly increased.  "In that way, the overvaluation of the
computer equipment contributed to the Court's conclusion that the transaction
lacked economic substance."  Id. at 151.  Where, as here, the taxpayer seeks
to obtain capital losses by acquisition of property with a basis purported to
be in excess of the property's fair market value, the taxpayer will have no
incentive to inflate the property's fair market which would thereby reduce the
sought after tax benefit; in fact, understatement would be the more likely
motivation to increase the claimed tax loss.  To the extent some nexus is
required under the reasoning of Gilman to this different context to
demonstrate how Long Term's claimed basis contributed to the absence of
economic substance, such a nexus is possibly satisfied here because the
differential between the stock's value and its claimed basis drove the entire
OTC/Long Term transaction, including Long Term's outlay of expense in order to
obtain the perceived built-in tax losses.  In that way, the high basis
motivated Long Term's expenditures, which in turn provide the cornerstone
evidence supporting a conclusion of lack of economic substance, and thus may
be said to have contributed to the Court's holding.  The Court does not reach
whether its economic substance holding would sustain the gross valuation
misstatement penalty because the penalty is appropriately sustained on the
application of the step transaction doctrine.

attributable to "any substantial understatement of income tax."
26 U.S.C. § 6662(b)(2).  The term "understatement" generally
means the excess of the amount of tax required to be shown on the
return over the amount of tax shown on the return.  See 26 U.S.C.
§ 6662(d)(2)(A).  An understatement is substantial if the amount
of the understatement exceeds the greater of 10 percent of the
tax required to be shown on the return or $5,000.  See 26 U.S.C.
§ 6662(d)(1)(A).

In calculating the understatement, the taxpayer is permitted
a reduction for that portion attributable to "the tax treatment
of any item by the taxpayer if there is or was substantial
authority for such treatment," 26 U.S.C. § 6662(d)(2)(B)(i), or
"any item if the relevant facts affecting the item's tax
treatment are adequately disclosed in the return or in a
statement attached to the return and there is a reasonable basis
for the tax treatment of such item by the taxpayer."  26 U.S.C. §
6662(d)(2)(B)(ii)(I & II).  However, the reduction rules are
modified "in the case of any item of a taxpayer other than a
corporation which is attributable to a tax shelter," 26 U.S.C.
§ 6662(d)(2)(C)(i): no reduction is available for adequate
disclosure and, to be entitled to a reduction on grounds of
substantial authority for any item, the taxpayer must also have
"reasonably believed that the tax treatment of such item by the
taxpayer was more likely than not the proper treatment."  26

166

U.S.C. § 6662(d)(2)(C)(i)(I & II).  The term "tax shelter" for these purposes includes "any ... plan or arrangement if a significant purpose of such ... plan[] or arrangement is the avoidance or evasion of Federal income tax."  26 U.S.C. § 6662(d)(C)(iii)(III).  Treasury regulations define "tax shelter" as "any ... plan or arrangement, if the principal purposes of the ... plan or arrangement, based on objective evidence, is to avoid or evade Federal income tax," Treas. Reg. § 1.6662-4(g)(2)(i), and set out that a principal purpose is tax avoidance if it exceeds any other purpose and that tax shelters are "transactions structured with little or no motive for the realization of economic gain."  Id.  It is the taxpayer's burden to prove substantial authority or reasonable belief; the Government has no burden in this regard.  See H.R. Conf. Rep. 105-599 at 241.

Long Term argues that it had substantial authority for claiming a basis of $107,136,628 on its tax return for the Rorer and Quest stock, but does not address whether it had a reasonable belief that its treatment of the basis on its return was more likely than not the proper treatment, apparently assuming that the OTC transaction was not a "tax shelter."[100]

---

[100] As appears to have been assumed by both parties, the calculation of the understatement and whether it is substantial are not issues for determination at the entity level in a petition filed pursuant to 26 U.S.C. § 6226.  See Govt.'s Trial Brief [Doc. #132] at 164-65 ¶ 203; Pets.' Trial Brief [Doc. #133] at 137-40.  Rather, as both require reference to each partner's tax return, such calculations are partner level determinations and

As an initial matter, the Court's determination that Long Term entered the OTC transaction without any business purpose other than tax avoidance and that the transaction itself did not have economic substance beyond the creation of tax benefits makes the transaction a "tax shelter" for purposes of the understatement penalty.  Acquisition of the claimed basis in the Rorer and Quest stock was the purpose for the transaction and thus is attributable to it.  <u>See</u> Treas. Reg. § 1.6662-4(g)(3).[101] Accordingly, the partners of Long Term are not entitled to a reduction of any understatement attributable to the claimed basis and corresponding losses unless Long Term both had substantial authority for the claimed basis when it filed its return and a reasonable belief that more likely than not the basis was as claimed.  Long Term had neither.

### a.    Substantial Authority

"The substantial authority standard is an objective standard involving an analysis of the law and application of the law to relevant facts."  Treas. Reg. § 1.6662-4(d)(2).  It exists where "the weight of the authorities supporting the treatment is

---

thus, to the extent attributable to a partnership item, subject to contest in a subsequent refund action.  <u>See</u> 26 U.S.C. § 6230(c)(1)(C), (4); Treas. Reg. §§ 301.6221-1(d), 301.6231(a)(5)-1(e), 301.6231(a)(6)-1(a)(3).

[101] In addition, Long Term did not disclose on its return the relevant facts affecting the basis of the Rorer and Quest stock or the corresponding claimed losses.

substantial in relation to the weight of authorities supporting contrary treatment." Treas. Reg. § 1.6662-4(d)(3)(i). Weight is determined in light of the particular facts and circumstances of the case at hand and the weight accorded any particular authority depends on its relevance and persuasiveness. See Treas. Reg. § 1.6662-4(d)(3)(i & ii). The definition of what constitutes "authority" is explicitly limited to written determinations provided to the taxpayer and legal sources (including statutes, regulations, case law, legislative history, etc.). See Treas. Reg. § 1.6662-4(d)(3)(iii & iv).

Notwithstanding the regulations' explicit cabining of "authority" to legal sources, disagreement has arisen both within and among the federal courts of appeal regarding whether evidence offered by the taxpayer unsuccessfully on the merits nevertheless may qualify in certain circumstances as authority for purposes of the substantial understatement penalty analysis, and, if so, when such evidence can be considered substantial. See Kluener v. Commissioner, 154 F.3d 630, 637-41 (6th Cir. 1998)(2-1 decision); Streber v. Commissioner, 138 F.3d 216, 222-23, 227-29 (5th Cir. 1998)(2-1 decision); Osteen v. Commissioner, 62 F.3d 356, 358-60 (11th Cir. 1995).[102]  The majority opinions in those cases agree that evidence may constitute authority (only Kluener analyzes the

---

[102] Both Osteen and Streber deal with 26 U.S.C. § 6661 and its implementing regulations. Those provisions do not appear materially different from those under consideration in the present case.

relevant regulatory provisions) but disagree on the meaning of "substantial" in this context.

Osteen concluded that evidence can be authority based on its view that "application of a substantial authority test [was] confusing in a case of this kind" where once the taxpayer loses on the factual finding - - finding a profit motive would permit deductions and finding no profit motive would deny deductions - - the taxpayer must then lose on "what would seem to be a legal issue [the threshold penalty determination]." Osteen, 62 F.3d at 359. Thus, Osteen concluded that "the regulations ... are unsatisfactory in application to an all or nothing case of this kind." Id.[103]

Kluener concluded that evidence may constitute authority based on Osteen, interpretation of applicable regulations, and policy considerations. It interpreted the regulations directing application of the law to relevant facts, see Treas. Reg. § 1.6662-4(d)(2), and weighing authorities "in light of the pertinent facts and circumstances," Treas. Reg. § 1.6662-4(d)(3)(i), as "command[ing] ... examin[ation of] relevant facts...." Kluener, 154 F.3d at 638, reasoning that the regulations (see Treas. Reg. § 1.6662-4(d)(3)(iii & iv)) only

---

[103] In Osteen the Commissioner did not argue to the contrary and the opinion notes that there was no case law to provide guidance. See Osteen, 62 F.3d at 359. Streber simply adopted Osteen, explicitly noting that the Government did not make a legal challenge to Osteen's holding but rather attempted to distinguish the case on its facts. See Streber, 138 F.3d at 223 and n.14.

distinguish between the types of legal sources that constitute legal authority and the types that do not and therefore do not comment on factual evidence.  <u>Kluener</u> was motivated by "policy concerns" where, as in <u>Osteen</u>, discrediting the taxpayer's evidence was tantamount to assessing a substantial understatement penalty.  <u>See</u> <u>id.</u> at 638-39.[104]

These decisions do not distinguish between the terms "relevant facts" and "facts and circumstances" in the regulatory language and the "evidence" offered by the taxpayer.  The former exist only as found by the trial court, not a taxpayer, who can only present evidence from which "facts" are found.  The regulation at issue, Treas. Reg. § 1.6662-4(d) defines "authority" only as legal sources.  <u>See</u> Treas. Reg. § 1.6662-4(d)(3)(iii).  As emphasized by the dissent in <u>Streber</u>, "Noticeably absent from this list of potential sources of authority is any mention of factual evidence favorable to the taxpayer's position."  <u>See</u> <u>Streber</u>, 138 F.3d at 228 (King, J., dissenting).  <u>Kluener</u>'s gloss on the regulation's otherwise unambiguous language is unconvincing.  The regulatory language is clear and thus the presumption should be in favor of the

_____

[104] The <u>Osteen</u>/<u>Streber</u> and <u>Kluener</u> majorities disagreed, however, on the meaning of "substantial."  <u>Osteen</u>/<u>Streber</u> adopted a standard under which substantial authority from a factual standpoint is lacking only if a merits decision for the taxpayer would have to be reversed at the appellate level as clearly erroneous.  <u>See</u> <u>Streber</u>, 138 F.3d at 223; <u>Osteen</u>, 62 F.3d at 359. <u>Kluener</u> disagreed, holding that "'substantial authority' requires a taxpayer to present considerable or ample authority, whereas <u>Osteen</u> requires him to present only some evidence."  <u>Kluener</u>, 154 F.3d at 639.

unambiguous meaning unless other parts of the regulatory scheme
direct review of the taxpayer's evidence.  None do.

In fact, the section of the regulation relied on in <u>Kluener</u>
as support for its interpretation includes the following
statement: "Conclusions reached in ... opinions rendered by tax
professionals are not authority.  The authorities underlying such
expressions of opinion <u>where</u> <u>applicable</u> to the facts of a
particular case, however, may give rise to substantial authority
for the tax treatment of an item."  Treas. Reg. § 1.6662-
4(d)(3)(iii)(emphasis added).  Similarly, written determinations
from the IRS provided to a taxpayer are authority unless "[t]here
was a misstatement or omission of a material fact or the facts
that subsequently develop are materially different from the facts
on which the written determination was based."  Treas. Reg. §
1.6662-4(d)(3)(iv)(A)(1).  Opinions rendered by tax professionals
and private letter rulings from the IRS are based on the
taxpayer's representations and submitted evidence.  Yet the
regulations explicitly take into account that the "facts of a
particular case" or the "facts that subsequently develop" may
require a result different than the submissions relied upon by
the taxpayer (e.g. personal expressions of intent such as
"Kluener's personal notes indicat[ing] that he decided to
withdraw the proceeds only after meeting with bank officials,"
<u>Kluener</u>, 154 F.3d at 636; <u>see</u> <u>also</u> <u>id.</u> at 639.).  In such cases,

172

the regulations direct disregard of such opinion sources as authority.

The regulations also state that "the taxpayer's belief that there is substantial authority for the tax treatment of an item is not relevant in determining whether there is substantial authority for that treatment." Treas. Reg. § 1.6662-4(d)(3)(I). This provision which would be rendered a nullity if a taxpayer's testimony of his or her profit motive can be considered as authority in a case where, if credited, a decision on the merits would be rendered in favor of the taxpayer since "substantial authority" in such context would necessarily merge with belief in the existence of a profit motive. Finally, the regulations direct that little weight be given to an authority if it "is materially distinguishable on its facts." Treas. Reg. § 1.6662-4(d)(3)(ii). Such provision would have little force if it means authority is given only little weight when materially distinguishable from the evidence offered by the taxpayer since the taxpayer could simply manufacture weight by, for example, testifying as to his or her profit motive and citing the authorities holding the existence of a profit motive sufficient in a particular context.

In sum, the regulation permits a taxpayer to escape penalties where the taxpayer can cite legal sources that would hold for the taxpayer on the merits of identical or closely

173

analogous facts if the same were found by the court, even if such legal authority was rejected during determination of the taxpayer's liability.[105]  It does not permit consideration as authority rejected evidence offered by the taxpayer, even in cases in which the merits of the taxpayer's tax liability and the threshold application of a substantial understatement penalty are decided jointly merely by making fact findings.[106]

The mischief resulting from use of evidence as authority is shown when analyzed under the summary judgment standard propounded by Osteen and Streber, as persuasively set forth in the Streber dissent:

> [T]he majority's construction of the substantial authority standard implies that, in many circumstances, if a taxpayer is able to survive summary judgment, he is shielded from

---

[105] A textbook example would be the taxpayer's reliance in a refund suit filed in one circuit on application of precedent from another to undisputed facts where the Government urges application of conflicting precedent from yet a third circuit and all agree that no precedent controls.

[106] In similar vein, Judge Wellford wrote in dissent in Kluener:

I would affirm the Tax Court's assessment of the penalty in this case under the standard endorsed by the majority.  The appellants argue that "substantial authority" existed to support their tax treatment of the horse sales.  The legal authority upon which the appellants rely is the same as that relied upon to challenge the deficiency itself.  The appellants cite cases which hold "that funding of corporate operations [is] a valid business purpose."  I do not disagree with this legal premise.  The appellants' argument, however, presupposes that Kluener in fact transferred the proceeds of the horses to APECO to fund corporate operations.  We have unanimously found that Kluener had no valid business purpose in the transfer of the horses.  In essence, the appellants' entire argument regarding the penalty is a factual one, and it must rise or fall depending on the disposition of the deficiency issue.  Because the absence of a valid business purpose undermines the appellants' legal arguments, the argument that "substantial authority" existed for their tax treatment of the horses must fail.

Kluener, 154 F.3d at 640-41 (Wellford, J., dissenting).

liability for substantial understatement penalties because substantial authority--in the form of some evidence--supports his tax position.  Moreover, when a taxpayer's entitlement to a particular tax benefit hinges upon facts that will be elucidated by witness testimony, the taxpayer need only lie about the facts that would entitle him to the benefit in order to shield himself from liability for a substantial understatement penalty resulting from his improperly claiming the benefit.  In such a circumstance, the taxpayer's testimony would constitute some evidence indicating his entitlement to the benefit, and, the majority opinion in this case notwithstanding, it is doubtful that we would be in a position on appeal to conclude that the trial court would have clearly erred had it credited the taxpayer's testimony.  Surely Congress did not intend to impose such a toothless penalty for substantial understatement of tax liability. FN3

     FN3. It is worth noting that the majority's construction of the substantial authority standard also provides a disincentive for taxpayers to settle with the IRS in situations in which they are potentially liable for substantial understatement penalties. If the taxpayer is able to create a fact issue about which reasonable minds could differ regarding his entitlement to a particular tax benefit, he can avoid liability for substantial understatement penalties. In some circumstances, this heightened incentive may be sufficiently strong that it convinces the taxpayer to proceed to trial rather than settle the dispute.

Streber, 138 F.3d at 228 and n.3.  Moreover, the Court notes that

the concerns in Osteen, Streber, and Kluener about the potential

for mechanical application of the substantial understatement

penalty based on the underlying merits determination are

misplaced.  Other penalties, such as valuation misstatement, are

intended to apply in mechanical fashion, inquiring only as to the

magnitude of error in the taxpayer's claimed value or adjusted

basis, and the taxpayer may defend against a substantial

understatement penalty by assertion of the reasonable cause and

175

good faith defense of 26 U.S.C. § 6664(c), which provides for consideration of a taxpayer's motives and reliance on facts that ultimately turn out to be incorrect, see infra Part III.D.4.

Since the Court has found that the OTC transaction is devoid of objective economic substance and subjective business purpose, Long Term has not and cannot cite authority, much less substantial authority, for the proposition that a taxpayer may claim losses from a transaction in which the taxpayer intentionally expends far more than could reasonably be expected to be recouped through non-tax economic returns in a transaction the sole motivation for which is tax avoidance. The cases relied on by Long Term, principally Frank Lyon, Newman, and UPS are not authority supporting the OTC transaction as having genuine economic substance but are "materially distinguishable," Treas. Reg. § 1.6662-4(d)(3)(ii), from it. By contrast, the clear and pre-existing on-point authority of Goldstein and Gilman[107] preclude Long Term's tax treatment of the sale of the Rorer and Quest stock. Similarly, with respect to the Court's application of the step transaction doctrine, there is no authority for claiming losses on the sale of the Rorer and Quest stock approximately 100 times in excess of the cost basis to Long Term. The "authority" offered on this point by Long Term was based on

---

[107] The Court recognizes that the fact that Goldstein and Gilman are Second Circuit decisions does not count against Long Term in the substantial authority calculus. See Treas. Reg. § 1.6662-4(d)(3)(iv)(B).

the rejected factual claim that no agreement or understanding existed between OTC and Long Term prior to OTC's contributions that OTC would sell its partnership interest to LTCM, the rejected legal contentions that the independent economic substance of LTCP and Portfolio and their valid and substantial business purposes precluded operation of the step transaction doctrine under <u>Vest</u>, <u>Weikel</u>, and <u>Dewitt</u>, and that <u>Grove</u> and <u>Greene</u> precluded the Court's recast of the OTC transaction.[108]

### b.    Reasonable Belief

In addition, the partners of Long Term are not entitled to a reduction of any understatement attributable to the claimed basis and corresponding losses because Long Term lacked a reasonable belief that more likely than not the basis was as claimed.  There was no evidence or argument at trial that Long Term itself "analyze[d] the pertinent facts and [legal] authorities ... and in reliance upon that analysis, reasonably conclude[d] in good faith that there [was] a greater than 50-percent likelihood that the tax treatment of the item [would] be upheld if challenged by the [IRS]."  Treas. Reg. § 1.6662-4(g)(4)(i)(A).  To the

---

[108] While not pressed at trial, Long Term in its trial brief cites several informal memoranda and electronic mail purported to be advice provided to the IRS exam team from the IRS National Office during the course of the examination of Long Term to show that the National Office believed that Long Term had substantial authority for its return position.  <u>See</u> Pets.' Trial Brief [Doc. #133] at 138-40.  However, Long Term does not claim that the cited documents may be considered as "authority" for purposes of the substantial authority analysis, and indeed they may not.  <u>See</u> Treas. Reg. § 1.6662-4(d)(3)(iii).

contrary, Long Term repeatedly urged that it relied just upon the analysis of the "should" level opinions issued by Shearman & Sterling and King & Spalding, and thus, to establish reasonable belief, Long Term must demonstrate its reasonable good faith reliance on those opinions.  See Treas. Reg. § 1.6662-4(g)(4)(i)(B).  Such showing is impossible in light of the Court's conclusion infra that Long Term failed to satisfy its burden of proof to satisfy the requirements of Treas. Reg. § 1.6664-4(c)(1).  See Treas. Reg. § 1.6662-4(g)(4)(ii)("... in no event will a taxpayer be considered to have reasonably relied in good faith on the opinion of a professional tax advisor for purposes of paragraph (g)(4)(i)(B) of this section unless the requirements of § 1.6664-4(c)(1) are met.").

### 4.    Reasonable Cause Exception

Long Term principally seeks to avoid imposition of accuracy related penalties by reliance on 26 U.S.C. § 6664(c)(1), which provides, "No penalty shall be imposed under this part with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion."  The entity level inquiry relevant to this TEFRA proceeding is whether Long Term had reasonable cause for and acted in good faith with respect to claiming approximately $100 million in losses from the

178

sale of the Quest and Rorer stock.  See Treas. Reg. § 1.6664-
4(d); supra note 100.  Long Term bears the burden of production
and proof on its reasonable cause defense.  See H.R. Conf. Rep.
105-599 at 241.

"The determination of whether a taxpayer acted with
reasonable cause and in good faith is made on a case-by-case
basis, taking into account all pertinent facts and circumstances.
Generally, the most important factor is the extent of the
taxpayer's effort to assess the taxpayer's proper tax liability."
Treas. Reg. § 1.6664-4(b)(1).  Neither reliance on the advice of
a professional tax advisor nor on facts that, unknown to the
taxpayer, are incorrect necessarily demonstrates or indicates
reasonable cause and good faith.  See id.

However, "[r]eliance on professional advice[] or other facts
... constitutes reasonable cause and good faith if, under all the
circumstances, such reliance was reasonable and the taxpayer
acted in good faith."  Id.

> Advice is any communication, including the opinion of a
> professional tax advisor, setting forth the analysis or
> conclusion of a person, other than the taxpayer, provided to
> (or for the benefit of) the taxpayer and on which the
> taxpayer relies, directly or indirectly, with respect to the
> imposition of the section 6662 accuracy-related penalty.
> Advice does not have to be in any particular form.

Treas. Reg. § 1.6664-4(c)(2).  Before a taxpayer may be
considered to have reasonably relied in good faith on advice, two
threshold requirements must be satisfied: (1) the advice must be

179

based upon all pertinent facts and circumstances and the law as
it relates to those facts and circumstances, including taking
into account the taxpayer's purpose for entering into a
transaction and for structuring a transaction in a particular
manner, and is not adequate if the taxpayer fails to disclose a
fact that it knows, or should know, to be relevant to the proper
tax treatment of an item; and (2) the advice must not be based on
unreasonable factual and legal assumptions (including assumptions
as to future events) and must not unreasonably rely on the
representations, statements, findings, or agreements of the
taxpayer or any other person, including a representation or
assumption the taxpayer knows, or has reason to know, is unlikely
to be true, such as, an inaccurate representation or assumption
as to the taxpayer's purposes for entering into a transaction or
for structuring a transaction in a particular manner.  See Treas.
Reg. § 1.6664-4(c)(1).

Long Term claims it reasonably relied in good faith on the
advice of Shearman & Sterling and King & Spalding in claiming
losses from Portfolio's sale of the Quest and Rorer stock.  There
are at least four separate grounds for concluding that Long Term
has failed to carry its burden to show that all pertinent facts
and circumstances demonstrate reasonable and good faith reliance
on the advice of King & Spalding and therefore Long Term may not

180

avoid penalties by taking refuge in 26 U.S.C. § 6664(c).[109]

### a.    Receipt and Content of King & Spalding Advice

Long Term cannot satisfy its burden to establish
applicability of the reasonable cause defense if it cannot prove
it received the King & Spalding' opinions prior to April 15,
1998.  Similarly, proof of the content of those opinions and
corresponding analysis is necessary to an evaluation of threshold
requirements for reasonable good faith reliance on advice,
whether the advice was based on all pertinent facts and
circumstances and the law related to them and was not based on
unreasonable factual or legal assumptions.  There is no reliable
basis in the record from which to conclude that, prior to
claiming losses from the sale of the Rorer and Quest stock on its
1997 tax return, Long Term actually received the opinions from
King & Spalding on which it claims to have relied and, even
assuming it timely received some form of "opinion," there is
inadequate evidentiary basis for accurately determining what it
consisted of and what substantive analysis undergirded it.

Long Term's proof problems stem from the fact that, prior to
April 15, 1998, King & Spalding's advice was apparently conveyed

---

[109] Because the claimed basis in the Rorer and Quest stock purportedly
derived from the CHIPS and TRIPS transactions, reasonable good faith reliance
on advice from both Shearman & Sterling and King & Spalding would be required
for Long Term to establish its reasonable cause defense.  The Court does not
reach whether Long Term reasonably relied in good faith on advice from
Shearman & Sterling.

to Noe and Long Term exclusively by oral communication from
Kuller and is purportedly memorialized in writing prior to that
date only by an electronic mail Noe wrote to his own file the day
before Long Term's 1997 tax return was due, April 14, 1998.  See
Pets.' Ex. 346.  The e-mail, reprinted in full supra at Part
II.D.8., is essentially comprised of conclusory statements that
the losses generated from the sale of the Rorer and Quest stock
should be allocated to LTCM and mere parroting of the language of
Treas. Reg. § 1.6664-4(c)(such as, King & Spalding "considered
all pertinent facts and circumstances and the current U.S.
Federal Income tax law and administrative practice as it relates
to such facts and circumstances." See id.).  The King & Spalding
written opinion was not issued until January 27, 1999, over nine
months after Long Term claimed the losses, and, while Noe
testified he received drafts of it prior to its issuance, he did
not testify he ever received any drafts before Long Term's tax
return was filed.  There was no corroborative evidence offered
regarding the existence or timing of his receipt of such drafts.

The King & Spalding written opinion provided three opinions
to Long Term, see Pets.' Ex. 357 at 28-29, and followed up each
opinion with a corresponding "discussion and analysis" section:
the first opinion related to Portfolio's tax basis in OTC's
preferred stock (see Pets.' Ex. 357 at 29-42); the second opinion
related to Portfolio's recognition of loss upon sale of the Rorer

182

and Quest stock (see id. at 42-49); and the third opinion related
to allocation to LTCM of the built-in loss recognized upon
Portfolio's sale of the Rorer and Quest stock (see id. at 50-79).
The written opinion states, "[t]he opinions set forth herein
confirm oral opinions provided to you prior to March 15, 1998."
Id. at 79.  Noe testified that all three opinions had been given
to him orally before he wrote his April 14, 1998 e-mail.  At
trial, however, Kuller admitted that the oral opinion he rendered
to Long Term in March 1998 was essentially the third of the three
opinions set forth in the King & Spalding opinion, see Tr. [Doc.
#186] at 2151:16-17, which is corroborated by Noe's e-mail,
stating in pertinent part,

> In deciding how to properly allocate the loss, I had
> discussions with Mark Kuller of King & Spalding.  Mark, on
> this date, has orally confirmed that King & Spalding will
> issue an opinion that the allocation of such Loss, as
> described above, should be sustained; that is, it is
> properly allocable to LTCM.

Pets.' Ex. 346.  This language tracks the third of the opinions
set forth in the King & Spalding written opinion.  Notably absent
from the e-mail is any mention of the purported
26 U.S.C. § 721(a) non-recognition contribution transactions of
OTC to LTCP and LTCP to Portfolio, the subject of the first
opinion, or recognition of loss by Portfolio upon sale of the
Rorer and Quest stock, the subject of the second opinion.  This
is significant because the Court's holdings on liability,
applying the step transaction doctrine and finding lack of

183

economic substance in the OTC Transaction, are the subject of the King & Spalding first and second opinions, and Long Term makes no showing it ever saw these analyses before filing its tax return. See Pets.' Ex. 357 at 30-37, 44-49.

In addition, Noe's testimony about advice received from Kuller prior to Long Term's filing was either too vague or inconsistent to provide a basis for evaluating whether and what advice was actually received, much less whether it was based on unreasonable legal or factual assumptions or covered the law applicable to the OTC transaction.  For example, Noe repeatedly emphasized that, prior to the tax return deadline, Kuller was intimately involved with every aspect of the OTC transaction, had all documents related to it, and discussed all aspects of the transaction with Noe, including the topics of substantive law covered by the final written King & Spalding' opinion.  Noe at times even appeared to suggest that the exact substance of what was set forth in the final written opinion was provided to Long Term before it claimed the losses.  However, on cross examination, a fuller picture emerged and Noe admitted that he could not remember discussing with Kuller the specific representations and assumptions set forth in the final written opinion and on which its conclusions depend, see Pet.'s Ex. 357 at 16-27 (for example that LTCM expected to derive a material pre-tax profit from OTC's investment in LTCP, see id. at 20),

184

suggested that he could not recall whether such assumptions were in drafts he reviewed, see Tr. [Doc. #171] at 799:3-6, conceded that he had not read all authorities cited in the final written opinion, and acknowledged that he could not recall whether he was concerned about the absence of Second Circuit authority in the opinion or whether he had even discussed with Kuller whether Second Circuit authority should be relied upon.  Thus, the record does not permit using the content of the King & Spalding written opinion as a proxy for the analysis underlying any advice King & Spalding rendered to Long Term prior April 15, 1998.

With one notable exception, Kuller's and Scholes' testimony are both too vague to provide sufficient content for evaluating the basis of advice received before claiming losses.  The one exception was Kuller's exhaustive and detailed testimony of his purported discussions with Noe regarding a material pre-tax profit analysis of the OTC transaction.  If such conversations actually took place, they would constitute concrete analysis from which the Court could assess whether the advice provided prior to claiming losses, at least with respect to the Court's economic substance holding, was based on unreasonable legal assumptions or otherwise failed to take into account pertinent facts and circumstances and the law relevant thereto.  However, as already discussed, the Court has concluded that such conversations either never took place in the time period claimed or were so

185

embellished at trial by Kuller's testimony that it is impossible
to ferret out reality.  See supra Part II.D.8.b.

Accordingly, the Court holds that Long Term has failed to
prove that the King & Spalding' advice on which it claims to have
relied when it claimed losses on its 1997 tax return, at least as
related to the Court's holdings on economic substance and the
step transaction doctrine, had been rendered to it prior to the
claiming of those losses such that it could have in fact relied
upon such advice.  The King & Spalding' advice thus cannot form
the basis of a reasonable cause defense.  In the alternative, the
Court holds that Long Term has not satisfied its burden to prove
entitlement to the reasonable cause defense as it is unable to
prove the content of any advice actually received from King &
Spalding before claiming losses from the sale of the Rorer and
Quest stock for the purpose of showing it was based on all
pertinent facts and circumstances and not on unreasonable
assumptions.

### b.    King & Spalding's Written Opinion

Assuming, arguendo, that the King & Spalding' written
opinion dated January 27, 1999, had been provided to Long Term
prior to April 15, 1998, Long Term cannot prove that such advice
meets the threshold requirements for reasonable good faith
reliance, and the preponderance of evidence otherwise does not

demonstrate that Long Term reasonably relied in good faith on King & Spalding' advice.

The first page of the King & Spalding opinion states that it was prepared as part of Long Term's litigation strategy in anticipation of possible future litigation over the claimed losses, language sounding like a predicate for assertion of an attorney work product privilege against disclosure, which Kuller testified was its purpose.  The opinion's timing and stated purpose casts doubt on its contents as serving the purpose of providing a reasoned opinion on the application of tax law to the facts of the OTC transaction for client guidance in future actions.

The substance of the King & Spalding opinion does not provide a basis for concluding that the advice rendered to Long Term was based on all pertinent facts and circumstances or does not unreasonably rely on unreasonable factual assumptions.  While the opinion states that it relies on assumptions and representations expressly made by Long Term, including that Long Term entered the OTC transaction for business purposes other than tax avoidance and reasonably expected to derive a material pre-tax profit from it and that there was no preexisting agreement on the part of OTC to sell its partnership interest to LTCM, it makes no effort to demonstrate, factually or analytically, why it was reasonable to rely on those assumptions and representations.

187

Moreover, there is no evidence, such as internal King & Spalding memoranda, revealing King & Spalding' analysis of the claimed non-existence of an agreement on the part of OTC to exercise its put option or any breakout of Long Term's claimed expectation of profit or business purpose.  As seen in the Court's discussion above, particularly the existence of evidence clearly contrary to certain representations regarding the settlement payment to Turlington, see supra Part III.B.4.c., a reasonably diligent analysis of all facts and circumstances would have revealed at least some of those assumptions to be unreasonable and unsupportable.

The King & Spalding written opinion also fails to demonstrate that its advice was based on the law related to the OTC transaction and not based on unreasonable legal assumptions. There is no citation to Second Circuit authority in the opinion, notwithstanding Long Term's continual residence in the Second Circuit and the obvious, central applicability of Goldstein, Gilman, Grove, Blake, and Greene.  Furthermore, there is little, if any, of what could be characterized as legal analysis of the economic substance of the OTC transaction.  What little there is essentially quotes a sentence from Frank Lyon, observes that the subjective business purpose/objective economic substance test emerged from that decision, and concludes that the OTC transaction passes muster because Long Term "instructed [King &

188

Spalding] to assume" that both OTC and Long Term had business purpose for and a reasonable expectation of material pre-tax profit from the transaction.  See Pet.'s Ex. 357 at 45-46.  As set forth above, however, the Supreme Court's decision in Frank Lyon is highly fact sensitive and cannot simply be applied to just any set of facts.  For example, before Frank Lyon could be relied on as support for the OTC transaction, in which the star attraction was a foreign entity not subject to U.S. taxes and thus one that could not use the $170 million in U.S. tax savings it was carrying, some explanation would have to be devoted to the Supreme Court's explicit consideration that the parties to the Lyon transaction had no differential in their respective tax rates or other special tax circumstances.  See supra note 89.

The King & Spalding written opinion further contains minimal legal analysis of the application of the end result test for purposes of step transaction analysis.  The opinion's treatment of Esmark is shallow; after brief discussion of the basic facts and step transaction holding of the tax court, King & Spalding opines:

> Esmark strongly supports respecting the form of the transactions described herein as a contribution of Preferred Shares followed by the sale of the Partners' Interest to LTCM.  As in Esmark, the Service's potential re-characterization (a sale of the Preferred Shares to LTCM followed by a contribution of the Preferred Shares by LTCM to Partners) involves the same number of steps as the route chosen by LTCM, Partners, and OTC.  In both cases, the route chosen by the taxpayers produces a more tax beneficial result than the one potentially suggested by the Service.

189

Pets.' Ex. 357 at 32.  It contains no comparison of the facts in
Esmark to those of the OTC transaction, merely an extraction of a
talismanic test that compares the numerosity of the steps of what
was purportedly done versus the steps proposed in a re-
characterization.  As discussed above, Esmark's derivation of
such mechanical step transaction analysis from Grove is
questionable, see supra note 94, but more importantly Esmark's
reliance on Grove as the basis for its holding, see Esmark, 90
T.C. at 196-97, makes it all the more surprising that the King &
Spalding opinion omits any discussion of that Second Circuit
decision.

    After some discussion of authorities, the opinion concludes
that "where the new corporation was found to have independent
economic significance or a valid business purpose, the form of
the transactions has been respected," Pets.' Ex. 357 at 36, with
supporting citation to Vest, Dewitt, and Weikel:

> You have instructed us to assume that at all times from
> August 1, 1996 through the date hereof, each of Partners and
> Portfolio operated for valid and substantial business
> purposes with the objective of realizing a material pre-tax
> profit and possessed independent economic substance, and
> that each is expected to do so for the foreseeable future.
> The end result test therefore should not apply to the
> present case.

As discussed above, even if this assumption were factually
correct, application of the end result test would not be legally
precluded, as is apparent from Vest and Dewitt and exhaustively

analyzed in <u>Associated</u>.[110]  This assumption that the end result test would not be properly applied is a paradigmatic example of an unreasonable legal assumption within the meaning of Treas. Reg. § 1.6664-4(c)(1)(ii).

Finally, no other evidence such as companion memoranda discussing the application of the Second Circuit's decisions in <u>Goldstein</u>, <u>Gilman</u>, <u>Grove</u>, <u>Blake</u>, and <u>Grove</u>, or the Tenth Circuit's decision in <u>Associated</u> to the actual facts of the OTC transaction was offered to show research for King & Spalding's legal analysis and opinions.  Such background research does not involve obscure or inaccessible caselaw references, is basic to a sound legal product, especially for "should" level opinion and a premium of $400,000.  With hourly billing totals exceeding $100,000 there could not have been research time constraints.

In essence, the testimony and evidence offered by Long Term regarding the advice received from King & Spalding amounted to general superficial pronouncements asking the Court to "trust us; we looked into all pertinent facts; we were involved; we

---

[110] This is an example of the selective discussion of authority that appears in the King & Spalding' written opinion, which bolsters its appearance as an advocacy piece not a balanced reasoned opinion with the objective of guiding a client's decisions.  One would expect that this comprehensive Tenth Circuit opinion from 1991 critiquing <u>Weikel</u> and accurately describing <u>Vest</u> should be considered before citation to the latter authorities as supporting the inapplicability of the step transaction doctrine.  In this regard, the Court notes that <u>Associated</u> is the first case listed in the citing references of <u>Vest</u> in Westlaw and there it is labeled with three stars to demonstrate discussion as opposed to mere citation or mention; similarly, <u>Associated</u> is the sole case listed in the negative indirect history of <u>Weikel</u> in Westlaw where it is also marked with three stars.

researched all applicable authorities; we made no unreasonable
assumptions; Long Term gave us all information."  The Court's
role as factfinder is more searching and with specifics,
analysis, and explanations in such short supply, the King &
Spalding effort is insufficient to carry Long Term's burden to
demonstrate that the legal advice satisfies the threshold
requirements of reasonable good faith reliance on advice of
counsel.

There was other evidence in the record suggesting the
absence of reasonable good faith reliance on legal advice.  Noe
discussed the King & Spalding advice with other partners only to
the extent of informing them that King & Spalding would render a
"should" level opinion.  There was no evidence that any partners
other than Scholes has ever read the King & Spalding opinion,
only that the principals specifically discussed that "should"
level opinions would provide penalty protection.  Merton was
unaware of what assumptions, if any, were made by King &
Spalding.  Rosenfeld erroneously believed Long Term had a written
opinion from King & Spalding at the time of the OTC transaction,
apparently based on Scholes informing him that King & Spalding
had issued a "should" level opinion.

### c.  Long Term's Lack of Good Faith

There is a fourth reason Long Term has not qualified itself

192

for the reasonable cause defense, namely, its apparent steps to conceal the tax losses from the sale of the Rorer and Quest stock on the tax returns to thereby potentially win the audit lottery and evade IRS detection. Long Term reported the losses as "Net Unrealized Gains" on line 6 of Schedule M-1 of its 1997 tax return. <u>See</u> <u>e.g.</u>, Pets.' Ex. 319; 332. As Noe conceded, the M-1 schedule is designed to notify the IRS of differences in book income/loss and tax income/loss. Line 6, on which Long Term reported the losses, calls for income recorded on the books not included in tax income. Line 7, by contrast, calls for deductions not charged against book income. On its return, Long Term combined Line 6 and Line 7 to produce one number, netting out the losses against other capital gains, and put the composite number on Line 6.

In an internally prepared draft copy of Portfolio's return, Long Term initially described the composite as "Net Capital Gains/Losses," <u>see</u> Govt.'s Ex. 321, which at least truthfully reveals that the composite number included capital losses. Long Term then sent the draft to Price Waterhouse. While the draft was at Price Waterhouse, Will Taggart of Coopers & Lybrand, who had worked under Noe's supervision when Noe was with that firm, advised Long Term to re-characterize the composite number as "Net Unrealized Gains." Price Waterhouse concurred. Noe provided no testimony regarding the reasoning of Price Waterhouse or Coopers

193

& Lybrand but explained that he believed line 7 of the M-1 was not applicable because the tax losses were not "deductions" as called for by that line but were losses used to offset capital gains and thereby reduce the partners' taxes.

Noe's explanation of Long Term's use of the term "Net Unrealized Gains" on line 6 is a transparent attempt to conceal Long Term's efforts to keep the huge tax losses claimed from raising a red audit flag.  Long Term sold the Quest and Rorer stock and claimed losses from the sale so there was nothing "unrealized" about them.  Furthermore, Long Term certainly did not pass the losses through to partners as "gain", rather it used them to reduce the partners' tax liability.  The sale of the Rorer and Quest stock resulted in virtually no action on Long Term's books, and, the little activity there constituted a <u>loss</u>, not, as reported by Long Term, "<u>book income</u> not included [in taxable income]."  If Noe and the collaborating consultants were properly concerned about accurately reporting the technical difference between a loss that offsets gain and thereby reduces taxes and a deduction that reduces taxes, Long Term should have put the amount in line 7 and labeled it to that effect, e.g., "tax losses offsetting gains."  There is no justification for reporting approximately $106,000,000 in tax losses under the misleading titles and labels used.  Given that Long Term's characterization contravenes a central purpose for the M-1

194

schedule - - to notify the IRS of tax losses not charged to book income, it is of little moment that its disingenuous choices were counseled or encouraged by consultants.

**IV.  Conclusion**

For the reasons set forth above, the petitions are DENIED in all respects.  The clerk is directed to enter judgment in favor of respondent and close this case.

IT IS SO ORDERED.

/s/

_____
Janet Bond Arterton, U.S.D.J.

**Dated at New Haven, CT, this 27<u>th</u> day of August, 2004.**

195

**APPENDIX – TIMELINE of OTC TRANSACTIONAL EVENTS**

| | |
|---|---|
| June 29, 1994: | Onslow Trading and Commercial ("OTC") is incorporated under the laws of the Turks and Caicos Islands. |
| June/August 1995: | OTC engages in CHIPS IVA, CHIPS IVB, and TRIPS I. |
| August 1, 1996: | OTC contributes cash and preferred stock, including the Rorer preferred stock acquired in CHIPS IVB and TRIPS I, to LTCP in exchange for a partnership interest.  LTCM (UK) loans OTC approximately $5 million to facilitate contribution; loan bears interest at a rate of 7% per annum and matures on November 21, 1997.  OTC acquires puts from LTCM entitling OTC to sell its partnership interest to LTCM during the period of October 27 to October 31, 1997. |
| November 1, 1996: | OTC contributes cash and preferred stock, including the Quest preferred stock acquired in CHIPS IVA, to LTCP in exchange for an additional partnership interest.  LTCM (UK) loans OTC approximately $4.3 million to facilitate contribution; loan bears interest at a rate of 7% per annum and matures on November 21, 1997.  OTC acquires puts from LTCM entitling OTC to sell its partnership interest to LTCM during the period of October 27 to October 31, 1997. |
| October 28, 1997: | OTC exercises its August 1, 1996 and November 1, 1996 liquidity put options and sells its limited partnership interests in LTCP to LTCM as of October 31, 1997. |
| October 30, 1997: | Portfolio sells Rorer and Quest preferred stock. |
| April 15, 1998: | Long Term files U.S. Return of Partnership Income (Form 1065) claiming losses from sale of Rorer and Quest preferred stock and passing them through to LTCM's partners. |

196